**2013-1458**

# United States Court of Appeals
# for the Federal Circuit

SITE UPDATE SOLUTIONS, LLC,

*Plaintiff-Appellee*,

*v.*

ACCOR NORTH AMERICA, INC., CBS CORP.,
TICKETMASTER ENTERTAINMENT, INC., JASON'S DELI CORP.,
THE WALT DISNEY COMPANY, and TIME WARNER, INC.,

*Defendants*,

*and*

NEWEGG, INC.,

*Defendant-Appellant*.

*Appeal from the United States District Court for the Northern District of
California in case no. 11-CV-3306, Magistrate Judge Paul S. Grewal.*

## BRIEF OF APPELLANT

YAR R. CHAIKOVSKY
PHILIP OU
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
Telephone: (650) 815-7400
Facsimile: (650) 815-7401

*Counsel for Defendant-Appellant*

SEPTEMBER 5, 2013

# CERTIFICATE OF INTEREST

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Federal Circuit Rules 47.4, Defendant/Appellant makes the following disclosures:

1.    The full name of every party or amicus represented by me is:

Newegg Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

3.    All parent corporations and any publicly held companies that own 10 percent of more of the stock of the party or amicus curiae represented by me are:

None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

McDermott Will & Emery LLP – Yar R. Chaikovsky, Philip Ou, David M. Stein (no longer with McDermott, Will & Emery LLP), David Beckwith; The Heartfield Law Firm – J. Thad Heartfield; Young, Picket & Lee – Lance Lee; Yarbrough Wilcox, PLLC – Trey Yarbrough, Debby E. Gunter

Dated: September 5, 2013        */s/ Yar R. Chaikovsky*

Yar R. Chaikovsky
Counsel for Defendant-Appellant

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ....................................................................v

I.      STATEMENT OF RELATED CASES.......................................1

II.     JURISDICTIONAL STATEMENT .........................................1

III.    INTRODUCTION ...................................................................2

IV.     STATEMENT OF THE ISSUES ............................................13

V.      STATEMENT OF THE CASE ................................................15

VI.     STATEMENT OF THE FACTS ..............................................17

        A.      Background of the Parties ..........................................17
        B.      The '683 Patent .........................................................18
        C.      Accused Instrumentalities .........................................22
        D.      Ruling of the District Court on Appeal ......................24

VII.    SUMMARY OF THE ARGUMENT .......................................24

VIII.   ARGUMENT - LEGAL STANDARDS ...................................27

        A.      Standard of Review ....................................................27
        B.      35 U.S.C. § 285 Exceptional Case ..............................28
        C.      35 U.S.C. § 112(6) – Means-Plus-Function Law.............30

IX.     THE DISTRICT COURT ERRED IN DENYING NEWEGG'S
        REQUEST UNDER 35 U.S.C. § 285.........................................32

        A.      Site Update's Conscious and Continued Disregard for Well-
                Settled MPF Law was Objectively Baseless.......................32
                1.      Site Update Knew the Law, Recognized the Law, but
                        Failed for Two Years in Two Briefs in Two Venues to
                        Follow or Address the Law......................................33
                2.      Site Update's Purported "Misunderstanding" of the Law
                        in its Reply Brief Does Not Excuse Its Objectively
                        Baseless Positions ...................................................38

# TABLE OF CONTENTS

**Page(s)**

3.    Site Update's Conscious Disregard of MPF Law for Almost 26 Months of Litigation was Objectively Baseless ...................................................................40

B.    Site Update's Failure to Include the Tables for "Creating and Modifying the [Website] Database" as Necessary Linked Structure was Objectively Baseless ................................42

1.    The Markman Transcript Clearly Evidences that Site Update Disregarded the Law and Contradicted the Intrinsic Record While Urging the Court to Adopt a Position that the Court Believed Would "Get [the Court] in Trouble" ..................................................42

2.    Site Update's Disregard of the Table of Files within the Table of Search Engines Cannot Be Excused by a its Purported "Misunderstanding" of MPF Law...........................46

C.    Site Update's Insistence that the Website Database Need Not Be Separate and Distinct from the Website or Resources of the Website Themselves was Objectively Baseless................................48

1.    The Court Recognized that Site Update's Infringement Position, vis-à-vis its Proposed Claim Construction of "Website Database", was Unsupportable ................................48

2.    The District Court Clearly Erred in Finding that Site Update Finally Agreed that its Position was Untenable Because Site Update Reneged on Any Alleged Agreement ................................................................50

D.    Site Update's Conduct Rises to Subjective Bad Faith Under Federal Circuit Precedent ...................................................54

1.    Frivolous Claim Construction Positions Support a Finding of Subjective Bad Faith ..............................55

2.    Site Update's Shakedown Approach to Litigation Further Evidences Subjective Bad Faith................................55

X.    RECENT POLICY CONSIDERATIONS SUPPORT FINDING OF AN EXCEPTIONAL CASE........................................................59

XI.    FEES REQUESTED................................................................63

XII.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT...................63

# TABLE OF CONTENTS

**Page(s)**

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbs v. Principi*,
237 F.3d 1342 (Fed. Cir. 2001) ..........................................................36

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) .....................................................passim

*Biomedino, LLC v. Waters Techs. Corp.*,
490 F.3d 946 (Fed. Cir. 2007) ..............................................................6

*Borowski v. DePuy, Inc.*,
850 F.2d 297 (7th Cir. 1988) ..............................................................36

*Brown v. Baylor Healthcare Sys.*,
381 F. App'x 981 (Fed. Cir. 2010) ........................................................6

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*,
711 F.3d 1341 (Fed. Cir. 2013) ..........................................................27

*Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*,
524 F.3d 1254 (Fed. Cir. 2008) ..........................................................29

*Eltech Sys. Corp. v. PPG Indus., Inc.*,
903 F.2d 805 (Fed. Cir. 1990) ............................................................29

*Eon-Net LP v. Flagstar Bancorp.*,
653 F.3d 1314 (Fed. Cir. 2011) ....................................................passim

*Ergo Licensing v. Carefusion 303, Inc.*,
673 F.3d 1361 (Fed. Cir. 2012) ....................................................32, 38

*Finisar Corp. v. DirecTV Group, Inc.*
523 F.3d 1323 (Fed. Cir. 2008) ....................................................passim

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
687 F.3d 1300 (Fed. Cir. 2012) ..........................................................28

# TABLE OF AUTHORITIES

**Page(s)**

*HTC Corp. v. IPCom GmbH & Co., KG,*
667 F.3d 1270 (Fed. Cir. 2012) ........................................................31

*iLor, LLC v. Google, Inc.,*
631 F.3d 1372 (Fed. Cir. 2011) .................................................6, 9, 28

*In re Katz Interactive Call Processing Patent Litig.,*
639 F.3d 1303 (Fed. Cir. 2011) ...................................................32, 38

*Kelora Systems, LLC v. Target Corp.,*
No. C 11-1548 CW (LB) (N.D. Cal. Apr. 5, 2013)............................61

*Klein v. Dep't of Transp.,*
768 F.2d 336 (Fed. Cir. 1985) .........................................................36

*Laitram Corp. v. Cambridge Wire Cloth Co.,*
919 F.2d 1579 (Fed. Cir. 1990) .......................................................36

*MarcTec LLC v. Johnson & Johnson,*
664 F.3d 907 (Fed. Cir. 2012) ...................................................passim

*Markman v. Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996)................30

*McEnery v. Merit Sys. Prot. Bd.,*
963 F.2d 1512 (Fed. Cir. 1992) .......................................................36

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB,*
344 F.3d 1205 (Fed. Cir. 2003) .......................................................30

*O.I. Corp. v. Tekmar Co.,*
115 F.3d 1576 (Fed. Cir. 1997) .......................................................30

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.,*
No. 12-1184, 2013 WL 1309080 (Mar. 27, 2013) ...........................28

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .......................................30

# TABLE OF AUTHORITIES

**Page(s)**

*Raylon, LLC v. Complus Data Innovations, Inc.*,
    700 F.3d 1361 (Fed. Cir. 2012) ...................................................passim

*Refac Int'l, Ltd. v. IBM*,
    790 F.2d 79 (Fed. Cir. 1986) .............................................................36

*Robb v. Elec. Data Sys. Corp.*,
    No. 92-1875, 1993 WL 129777 (5th Cir. Apr. 16, 1993)....................36

*WMS Gaming Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999) ....................................................6, 31

**STATUTES**

28 U.S.C. § 1295(a) ................................................................................1

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1338(a) .............................................................................1, 2

35 U.S.C. § 112, ¶ 6 .......................................................................passim

35 U.S.C. § 285 ............................................................................passim

**RULES**

Fed. R. App. P. 4(a) ...............................................................................1

**OTHER AUTHORITIES**

Barack Obama, United States President, Fireside Hangout on Google+ (Feb.
    14, 2013) ..........................................................................................59

Chief Judge Randall R. Rader, Colleen Chien & David Hricik, *Make Patent
    Trolls Pay in Court*, NYtimes.com (June 4, 2013),
    http://www.nytimes.com/2013/06/05/opinion/make-patent-trolls-pay-in-
    court.html?_r=0...................................................................2, 3, 5, 61

*Fact Sheet: White House Task Force on High-Tech Patent Issues* (June 4,
    2013), http://www.whitehouse.gov/the-press-office/2013/06/04/factsheet- ......59

# TABLE OF AUTHORITIES

**Page(s)**

Patent Abuse & Reduction Act of 2013, S. 1013, 113th Cong. (2013)...................60

Patent Litigation & Innovation Act of 2013, H.R. 2639, 113th Cong. (2013)........60

Saving High-Tech Innovators from Egregious Legal Disputes Act of 2013,
    H.R. 845 113th Cong. (2013) ..........................................................................60

## I.    STATEMENT OF RELATED CASES

Counsel knows of no other case pending in this Court or in any other court that may directly affect, or be directly affected by, the Court's decision in this appeal.

## II.    JURISDICTIONAL STATEMENT

This appeal arises out of a suit for patent infringement, filed on May 11, 2010 in the Eastern District of Texas ("EDTX").  A161-98.  On June 8, 2011, the litigation was transferred to the Northern District of California ("NDCA").  A1190-91.  The NDCA district court had jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  On November 9, 2012, pursuant to stipulation, the district court issued an order dismissing all claims between Site Update Solutions, LLC ("Site Update" or "Appellee") and Newegg Inc. ("Newegg" or "Appellant"), specifically dismissing Site Update's infringement claims with prejudice and making Newegg the prevailing party.  A1901-07.  Thereafter, Newegg filed a Motion for Attorneys' Fees Pursuant to 35 U.S.C. § 285 ("Fee Motion").  On May 21, 2013, the district court denied Newegg's Fee Motion.  A1-33.  On June 18, 2013, Newegg timely filed a notice of appeal.  *See* Fed. R. App. P. 4(a); A3323-24.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a) because the

appeal is from a final judgment of a district court in an action where jurisdiction

was based on 28 U.S.C. § 1338(a).

## III.    INTRODUCTION

Patent troll Site Update launched an "abusive litigation" against Newegg and

thirty-six other companies, leveraging defense costs to extort nuisance-settlements.

This case exemplifies the meritless suits our nation's leaders have recently sought

to reform.   Chief Judge Rader explained in a NY Times article:

> The onslaught of litigation brought by 'patent trolls'—
> who typically buy up a slew of patents, then sue anyone
> and everyone who might be using or selling the claimed
> inventions—has slowed the development of new
> products, increased costs for businesses and consumers,
> and clogged our judicial system.
>
> Their business plan is simple:  trolls (intellectual property
> lawyers use less evocative terms like 'non-practicing
> entities' and 'patent-assertion entities') make money by
> threatening companies with expensive lawsuits and then
> using that cudgel, rather than the merits of the case, to
> extract a financial settlement.

Chief Judge Randall R. Rader, Colleen Chien & David Hricik, *Make Patent
Trolls Pay in Court*, NYtimes.com, (June 4, 2013), available at
http://www.nytimes.com/2013/06/05/opinion/make-patent-trolls-pay-in-
court.html?_r=0 ("Rader Article").

This Court is familiar with this troll tactic from its *Eon-Net* decision, affirming a

finding of exceptional case.  There, this Court explained:

> Meritless cases like this one unnecessarily require the
> district court to engage in excessive claim construction
> analysis before it is able to see the lack of merit of the
> patentee's infringement allegations.  In this case, Flagstar
> expended over $600,000 in attorney fees and costs to
> litigate this case through claim construction.   Viewed
> against Eon-Net's $25,000 to $75,000 settlement offer
> range, it becomes apparent why the vast majority of those
> that Eon-Net accused of infringement chose to settle
> early in the litigation rather than expend the resources
> required to demonstrate to a court that the asserted
> patents are limited to processing information that
> originates from a hard copy document. Thus, those low
> settlement offers—less than ten percent of the cost that
> Flagstar expended to defend suit—effectively ensured
> that   Eon-Net's   baseless   infringement   allegations
> remained unexposed, allowing Eon-Net to continue to
> collect additional nuisance value settlements.

> *Eon-Net LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1327
> (Fed. Cir. 2011) (citations omitted).

Judges can make trolls pay for abusive litigation, as this Court confirmed in

in *Eon-Net*, and more recently in *MarcTec*, and *Raylon*.  But as Judge Rader points

out—"judges don't so very often:  by our count, fees were shifted under Section

285 in only 20 out of nearly 3,000 patent cases filed in 2011."  Rader Article.  The

high costs of defense, coupled with the reluctance by courts to fee shift has created

a complacent disposition among Defendants in frivolous suits—disposing the case

for a nuisance value settlement (or better, no settlement) while spending minimal

defense costs is considered a victory.  Defendants are happy walking away, and

despite being warranted, are discouraged from seeking attorneys' fees.

This case on appeal sums it all up.  Site Update targeted anyone with a website that uses a search engine promulgated technology—XML Sitemaps—to provide search engines with information about URLs (or pages) on the website, lumping thirty-seven unique companies into one single lawsuit.  Familiar with the disturbing patent troll trends, Defendants realized they were in for a shake-down and banded together to level-off the high costs of defense.  In a unique joint-defense arrangement, two firms, McDermott Will & Emery LLP ("McDermott") and Weil, Gotshal & Manges LLP ("Weil") represented over two-thirds of the defense group, balancing the disproportionate costs of continued defense in a normal patent case versus the nuisance-value settlement demands of Site Update.  By jointly sharing in defense fees, the McDermott and Weil Defendant groups were well-positioned to cost-effectively expose Site Update's baseless positions at Markman and did so.  Indeed, twenty-three Defendants (eighteen represented by McDermott or Weil) refused Site Update's nuisance value demands, waiting over two years for their day in court.

As this brief will explain in detail, the district court confirmed the frivolity of Site Update's case, vis-à-vis its claim construction positions at Markman.  Shortly after, but now exposed, Site Update agreed to dismiss its claims with prejudice, though conditioned on a stipulation for each party to bear their own fees

and costs.  Defendants' decision to band together paid off, but it was only a measured victory.  As Judge Rader explained:

> With huge advantages in cost and risk, trolls can afford to file patent-infringement lawsuits that have just a slim chance of success.  When they lose a case, after all, they are typically out little more than their own court-filing fees.  Defendants, on the other hand, have much more to lose from a protracted legal fight and so they often end up settling.
>
> Lost in the debate, however, is that judges already have the authority to curtail these practices: they can make trolls pay for abusive litigation.
>
> Rader Article.

In total, Site Update still extorted over a million dollars from certain Defendants despite bringing a frivolous claim.  And for those Defendants who refused to be bullied, like Newegg, each still bore its own defense costs absent a willingness by the district court to follow Judge Rader's suggestion to "curtail these practices" and "make trolls pay for abusive litigation."  The district court erred by refusing to do so, leading to this appeal.

Newegg recognizes that not every case brought by a non-practicing entity is a frivolous one and that a losing argument is not necessarily an objectively baseless one.  But the record here proves that this patent troll's case was exceptional under 35 U.S.C. § 285.

Despite deciding to assert a single means-plus-function ("MPF") claim, even though other claims existed (*e.g.*, method claim 1), Site Update consciously disregarded well-established Federal Circuit law governing MPF claims. Site Update knew the law, recognized the law, yet chose to ignore the law. A claim construction, predicated on this conscious disregard, crosses the threshold below which this Court in *Raylon* referred to as "so unreasonable that no reasonable litigant could believe it would succeed." *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1368 (Fed. Cir. 2012) (quoting *iLor, LLC v. Google, Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011)).

Site Update knew the law. It hired experienced patent litigation counsel who has dealt with MPF law in district courts and before the Federal Circuit. *See, e.g.*, *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007) (appealing a finding of indefiniteness because the claim limitation had no corresponding structure described in the specification as required by 35 U.S.C. § 112, ¶ 6) (E. Goldstein, A. Lipski); *Brown v. Baylor Healthcare Sys.*, 381 F. App'x 981, 984 (Fed. Cir. 2010) (non-precedential decision) (discussing algorithm requirement in computer-implemented MPF law in view of Federal Circuit opinions in *WMS Gaming, Aristocrat* and *Finisar Corp.*) (E. Goldstein).

Not only did Site Update, through at least its counsel, know and have experience with the Federal Circuit's governing decisions in MPF law, it recognized and cited to this law in its opening claim construction brief filed in the EDTX ("EDTX Brief").  Site Update cited to the algorithm requirement for computer-implemented MPF claims.

> For computer-implemented inventions with terms in means-plus-function format, the particular structure disclosed must be more than just a general purpose computer or microprocessor.  *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  The patent must disclose, to the satisfaction of one of ordinary skill in the art, **enough of an algorithm to provide the necessary structure under § 112, ¶ 6**.  *Finisar Corp. v. DirecTV Group, Inc.* 523 F.3d 1323, 1340 (Fed. Cir. 2008).
>
> A649-50 (emphasis added).

Nevertheless, despite the asserted claim having eight MPF elements, Site Update failed to propose any algorithm for any of these eight elements, let alone discuss the algorithm requirement (or any basis it had for ignoring it).  Defendants' EDTX Responsive Brief pointed out these defects, yet Site Update continued to disregard the law more than one year after reading this brief.  A978-1017.

The case transferred to NDCA, and Site Update was afforded a claim construction redo—now more than two years into the case.  Nevertheless, Site

Update continued its conscious disregard for the law. In its NDCA Brief, Site

Update admitted that "Plaintiff has carefully considered Defendants' positions"

and purports to correct its EDTX deficiencies by "including additional structure."

A1331-32. But Site Update's modifications only disguise its continued disregard

for this Court's MPF law. None of the "additional structures" included an

algorithm, and again, Site Update's brief was devoid of any discussion (beyond

properly reciting the law) of why Site Update's proposed structures failed to

include an algorithm.

Only after Defendants called out Site Update's disregard for well-settled

MPF law for the **second** time in its NDCA Brief did Site Update attempt to

reconcile its frivolous position—contending (for the first time, despite two prior

opening briefs) that its proposed structures did not require algorithms. A1568-69.

But Site Update's position finds no support in any controlling Federal Circuit

authority whatsoever, and again, Site Update failed to follow MPF law for now the

**third** time.

No surprise, the district court rejected Site Update's frivolous claim

construction positions, forcing Site Update to abandon its case and dismiss all of

the Defendants with prejudice. Site Update ultimately framed its position as losing

"complicated issues involving M-P-Fs claims". A2374. And here is where the

district court erred by excusing Site Update's conscious disregard for the law by characterizing it as a "misunderst[anding of] the Federal Circuit's guidance". A22. Rather, Site Update's positions were and continue to be objectively baseless. "Reasonable minds can differ as to claim construction positions and losing construction can nevertheless be nonfrivolous. But there is a threshold below which a claim construction is 'so unreasonable that no reasonable litigant could believe it would succeed.'" *Raylon,* 700 F.3d at 1368 (quoting *iLor*, 631 F.3d at 1378).

First, the district court rejected Site Update's unsupportable position that no algorithm was required for the computer-implemented MPFs—requiring an algorithm where one was disclosed and inviting summary judgment of indefiniteness where one could not be found. Site Update knew the law, recognized the law, but consciously disregarded it. The court erred by not finding this objectively baseless.

Next, the district court rejected Site Update's argument that a clearly linked structure (the Table of Files within the Table of Search Engines) was not corresponding structure, a position contrary to the intrinsic record and MPF law. When the district court raised concerns that it would "get in trouble" if it did not include this structure, Site Update urged the court to ignore the clearly linked

structure, reasoning that it was simply a "specific preferred embodiment" and thus unnecessary.  The court quickly rejected this argument, reminding counsel that this was a 112 ¶ 6 claim.  Here again, for over two years Site Update consciously disregarded MPF law and even encouraged the court to do so as well.  The court erred by not finding this objectively baseless.

Finally, the district court rejected Site Update's attempt to construe the term "website database" in a way that would leave the door open for an interpretation both unsupported and contradicted by the intrinsic record.  During the Markman hearing, the district court mistakenly believed that Site Update's counsel agreed with the court's (and Defendants') concerns about Site Update's defective claim construction.   When the court offered a construction that would address these concerns, counsel for Site Update backed out of its prior agreement with the court, contending that the court's proposed construction would introduce error.  In short, Site Update continued to urge a position the court already had stated was unsupported and contradicted by the intrinsic record.  The court erred again by not finding this objectively baseless.

The district court's order confirms that Site Update failed to follow controlling MPF law, but excused Site Update by characterizing its disregard for the law as a 'misunderstanding' and reasoning that the "Federal Circuit and district

courts have created a complicated framework from which to determine whether a particular computer-related structure does or does not satisfy Section 112(6)." A23. Newegg respectfully submits that the MPF law set forth by the Federal Circuit as applied to this case is clear. Site Update knew it, cited to it, but failed to adhere to it in EDTX, and then again over a year later in NDCA. Site Update then either blindly or tactically misunderstood the law to manufacture a justification for its failures, failing to follow the law for the **third** time. Then at Markman, Site Update continued its conscious disregard for controlling authority and the intrinsic record, while urging the court to do the same. And after the district court rejected Site Update's positions, Site Update's final excuse was simply that the claim construction disputes and MPF law were complicated.

Turning to the subjective bad faith prong of the exceptional case analysis, Site Update's frivolous claim constructions already demonstrate bad faith under the Federal Circuit's opinion in *MarcTec LLC v. Johnson & Johnson*, 664 F.3d 907 (Fed. Cir. 2012). In addition, the case's record further evidences the type of indicia of extortion this Court found as subjective bad faith in *Eon-Net. Eon-Net* had (1) a plethora of nearly identical complaints against diverse defendants, (2) followed by quick settlement demands (3) for a price far lower than patent litigation defense costs. *Eon-Net*, 653 F.3d at 1327. Here, Site Update (1)

concurrently sued thirty-seven unique defendants at once under an identical

barebones infringement theory, (2) executed several nuisance value settlements in

the *Eon-Net* range of $25,000 - $75,000, and (3) always negotiated for settlements

that fell well below the defense costs for patent litigation.  Combined with the

frivolity of its claim construction positions discussed above, Site Update's *Eon-Net*

like approach clearly evidences subjective bad faith—the district court clearly

erred in not finding so.

In addition to the overwhelming evidence from the case history supporting

an exceptional case, Newegg finds additional government-driven support in

fighting the meritless patent troll litigations that this lawsuit exemplifies.  As

discussed above, Chief Judge Rader recently chastised the impact of frivolous

litigations by patent trolls—such as this one—on this country's economy.

President Obama has done the same.  Congress has also recently sought to remedy

the problems caused by meritless troll suits.  Our nation's leaders recognize the

need to discourage frivolous suits and demands by holding the perpetuators

accountable with appropriate fee shifting.  This Court should hold Site Update

accountable by finding this case exceptional.

## IV.    STATEMENT OF THE ISSUES

A district court may award reasonable attorney fees in "exceptional cases" under 35 U.S.C. § 285.  Under prevailing authority, the district court could award such fees only if it found that the litigation was both (1) objectively baseless and (2) brought in subjective bad faith.  The district court denied Newegg's request to find this case exceptional despite overwhelming evidence demonstrating both the objectively baseless and subjectively bad faith positions of Site Update.  This appeal seeks reversal of the order from the United States District Court for the Northern District of California denying attorneys' fees and costs under 35 U.S.C. § 285 and presents the following issues:

1.  Did the district court err in not finding the objectively baseless prong met, where Site Update consciously disregarded well-settled Federal Circuit MPF law when it failed to include an algorithm for any of the eight computer-implemented MPF terms, despite (1) Site Update's undisputed knowledge of the law, (2) Site Update's own recognition of the law in its briefs, (3) detailed explanation of the law in Defendants' briefs and (4) multiple failed opportunities over the course of two years in two venues to correct its positions?

2.  Did the district court err in not finding the objectively baseless prong met, where Site Update refused to include the tables of the website database as

necessary linked structure for the "means for creating and modifying the website database" MPF term despite (1) Site Update's continuous and conscious disregard of this Court's MPF law as described in issue 1, (2) its lack of linkage argument finding zero support in, and contradicted by, the intrinsic record, (3) its counsel erroneously representing that the structure was not necessary because it was simply a "specific preferred embodiment", (4) and Site Update's continued pursuit of this position when the court expressed concerns that it would "get in trouble" if it did not link this structure?

3.   Did the district court err in not finding the objectively baseless prong met, where Site Update insisted that a claim construction for "website database", which distinguished the "website database" from the website or the resources of the website themselves, would introduce error, despite (1) the court's recognition that the distinction was necessary for "website database" to fit within the claim and (2) any other position failing to recognize the distinction was unsupported and contradicted by the intrinsic record (*i.e.*, Site Update's construction would eviscerate the word "database" from the claim)?

4.   Did the district court clearly err in not finding the subjective bad faith prong to be met, despite (1) Site Update's continued assertion of frivolous claim

construction positions as described in issues 1-3, and (2) Site Update's *Eon-Net*
like indicia of extortion behavior?

## V.    STATEMENT OF THE CASE

On May 11, 2010, Site Update filed a complaint in the Eastern District of
Texas against Newegg and thirty-four other companies, later amending to sue a
total of thirty-seven.  Site Update alleged patent infringement of claim 8 of U.S.
Patent No. RE40,683 ("'683 Patent") based on the use of XML Sitemaps by each
companies' website.  A235-56.

Shortly after answering, Site Update extracted its first wave of nuisance-
value five-figure settlements.  A2226-27.  On November 3, 2010, the majority of
Defendants moved to transfer the case to the Northern District of California.  Site
Update did not meaningfully oppose, conceding in a two-page, five sentence
argument response that "Plaintiff is agreeable to the transfer if the Court deems
that such transfer is in the interests of justice of all the parties."  A510-11.  In view
of Plaintiff's effective acquiescence to transfer, Defendants requested Plaintiff to
agree to transfer.  Plaintiff refused.

Several months passed without transfer, and Defendants requested Site
Update to jointly move the court to vacate the claim construction dates pending

disposition of the six-month old motion, but Plaintiff refused.  A2221-2.
Defendants' subsequent motion for this relief was denied.  *Id.*

The court granted Defendants' motion to transfer on June 8, 2011 (A1190-91), but by then, Site Update already filed an Opening Claim Construction Brief and Defendants filed their Responsive Brief and a Motion for Summary Judgment on Indefiniteness.  Nevertheless, over a year passed and the parties re-briefed their claim construction positions in NDCA in the summer of 2012.  With Markman underway, and the McDermott and Weil groups leading a cost-effective defense, Site Update's ability to convince Defendants to take nuisance-value settlements halted.

Twenty-three Defendants participated in the July 20, 2012 Markman where the court orally issued constructions rejecting Site Update's frivolous positions.  The court declined to construe four terms based on concerns of indefiniteness and invited Defendants to file summary judgment motions on that issue.   A1854:5-22.

Shortly after, Site Update dismissed its claims with prejudice against all Defendants except Newegg, which was unwilling to accept Site Update's terms for dismissal.  On November 9, 2012, the parties eventually entered into a stipulated dismissal, and on November 26, 2012, Newegg filed its Fee Motion under 35

-16-

U.S.C. § 285 seeking $144,129.09 in attorneys' fees and costs.  A1901-05; A3244.

The district court heard oral argument on January 15, 2013 and issued an Order

denying Newegg's Fee Motion on May 21, 2013.  A1-33.  The Order included

confirmation of the oral claim constructions from the July Markman.  A7-12.

On June 18, 2013, Newegg timely filed a notice of this appeal.  A3323-24.

## VI.    STATEMENT OF THE FACTS

### A.    Background of the Parties

Plaintiff Site Update is a patent troll formed by its parent company, Acacia

Research Corporation, shortly before filing the complaint.  Despite having no

employees, Site Update's "place of business" is in East Texas.  Nor does Site

Update innovate or make any products.  In fact, Acacia Research Corporation's

sole business model is to form litigation entities to file lawsuits asserting patents it

neither invented nor practices.

Defendant Newegg is an online retailer of computer hardware and software,

based in City of Industry, California.  Newegg respects other companies'

intellectual property and pays for technology when necessary.  But Newegg will

not pay off a troll simply to avoid costs of defense.  And when the suits are

frivolous, Newegg will seek the appropriate relief.

**B.    The '683 Patent**

The application leading to U.S. Patent No. RE40,683, titled "Process For Maintaining Ongoing Registration For Pages On a Given Search Engine" was filed on May 11, 1999 by Alan Perkins.  A143.  The patent issued on June 26, 2001 as U.S. Patent No. 6,253,198, and a reissue application was filed on June 20, 2003. *Id*.  The reissued patent issued on March 24, 2009.  A143-60.

When the patentee filed its patent application in 1999, the internet consisted of thousands of websites and millions of pages of information.  A151 at 2:14-15. Search engines were created to assist users in navigating this universe of content by searching a search engine's database to find the most relevant content.  *Id.* at 1:57-59.  Internet search engines created their databases by visiting (or "crawling") websites, indexing the individual website's content, and storing the indexed content on a database on the search engine.  *Id.* at 1:41-46.  After indexing, a user running a search would find the appropriate content from the various websites that had been crawled.  This process is still performed by search engines today.

In 1999 though, search engines lacked the processing power to crawl websites quickly enough to keep their databases current—they visited only periodically—creating lags in updating databases.  *Id.* at 2:13-24.  Further, each search engine used agent programs to discover and download a website's pages,

potentially requiring a single website to be repeatedly crawled by different search engines. The patent criticized this "cyclical and repetitive" inquiry. A143, Abstract.

Instead of requiring agents to repetitively crawl websites, the '683 Patent suggests a process where the websites, as opposed to the search engines, generate *their own indices* of new or modified content and actively send them to the search engines. A143; A152 at 4:1-20; A153 at 5:30-40. In short, "[i]nstead of making the search engine do all the work necessary to index a site, the web site owner is now responsible for that operation." A152 at 4:5-8.

The '683 Patent builds a website database identifying changes, additions, or deletions to the website's content—the database is organized by search engine and the website manager decides which search engines to update with which content. A143; A153 at 5:30-35; 6:34-43. This website database is a Table of Search Engines, where each Search Engine Table has its own Table of Files. This "Table of Files within the Table of Search Engines" is illustrated below:

process and is outlined below. Initially, there is a database Table of Search Engines, containing an entry for each Internet search engine. The table below illustrates the format of a typical search engine record.

| Field | Type | Default | Description |
|---|---|---|---|
| Name | String | None | The name of the search engine |
| Enabled | Boolean | True | Whether the search engine is to be informed of changes to content |
| Table of Files | Table | None | Database table of files indexed on this site and for which changes must be tracked |
| Register by default | Boolean | True | Whether to register a resource on this search engine in the absence of explicit information provided by the site manager |
| Max registrations | Integer | None | The maximum number of registrations allowed per day by this search engine |
| Limit to site | Boolean | None | Whether the search engine allows searches to be restricted to one web site only |
| Lists index date | Boolean | None | Whether the search engine will report the date a resource was last indexed |
| Lists index time | Boolean | None | Whether the search engine will report the time a resource was last indexed |
| Index time | Integer | None | Typical delay between registration and indexing of a site by the search engine |
| Supports file lookup | Boolean | None | Whether the search engine will allow a particular file to be searched for |

The Table of Files is a field in the Table of Search Engines database. It is initially configured by the user through a CGI program (FIG. **1**, Box **200**) to list the files the user wishes to be registered with this search engine. This table contains a record for each resource. Each record contains the following fields:

| Field | Type | Default | Description |
|---|---|---|---|
| Name | String | None | The URL of the resource |
| To Be Registered | Boolean | False | Whether the resource needs to be registered with this search engine |
| To Be Un-registered | Boolean | False | Whether the resource needs to be unregistered (removed) from this search engine |
| Date and time last registered | Date and Time | None | Date and time the file was last registered with the search engine |
| Register | Enum (True, False, By default) | By default | Whether the site manager wants the file to be registered on this search engine. The 'By default' value indicates to follow the value of the 'Register by default' field of the search engine record of the database |

A153 at 6:55-7:18; A154 at 7:29-50 (annotated).

The patent explains that a user uses an HTML form to select or deselect particular search engines to update. *Id.* at 7:19-28. Tools automatically compare the current website to historical versions of the website (stored as records in the website database) and develop indices of the differences to transmit to the selected search engines, which in turn, update their databases. A152 at 4:51-67; A155 at 9:31-10:24.

Claim 8 of the '683 Patent, the only asserted claim, is directed to an apparatus implementing the process described above, which is the only example

disclosed in the specification of building the Table of Files within the Table of Search Engines and providing selected internet search engines with selected changes.  The claim has eight means-plus-function elements and is reproduced below:

An apparatus for updating an internet search engine database with current content from a web site, comprising:

a means for creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine;

a means for identifying, using said web site database, new deleted, [unmodified] or modified content;

a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted, unmodified or modified database content;

a means for opening, by a user, a form on a computer to enable or disable internet search engines to be updated with information;

a means for enabling or disabling, by said user, the appropriate internet search engines on said form;

a means for submitting, by said user, said information to a script;

a means for parsing, through the user of said script, said information from said form; and

a means for updating, through the use of said script, said database of search engine.

A158 at 15:26-16:4.

### C.    Accused Instrumentalities

Site Update accused Newegg of infringement based on its use of the XML

Sitemaps and admitted prior art robots.txt protocols to update search engines.

Robots.txt is a de-facto standard from the mid-1990s, generally adopted by

websites to control search engines crawling their website.  In the background of the

'683 Patent, the patentee explains that a website's robots.txt file will instruct

search engines of files or directories not to index.  A151 at 2:29-58.  These

instructions can be search engine specific or for all search engines.  For example,

the U.S. Courts' website's robots.txt file can be found at

www.uscourts.gov/robots.txt , shown below:

```
User-agent: *
Crawl-delay: 10

Disallow: /Court_Locator/courtLocatorByCircuit.aspx
Disallow: /court_locator/CourtLocatorSearch.aspx
Disallow: /court_locator/CourtMapDetails.aspx
Disallow: /News/NewsSearchResults.aspx
Disallow: /News/TheThirdBranch/SearchResults.aspx
Disallow: /SearchResults.aspx
Disallow: /Multimedia/mediaTest_Mar2012.aspx
Disallow: /Multimedia/mediaTest_Mar2012_Tenn.aspx

Sitemap: http://www.uscourts.gov/sitemap.xml
Sitemap: http://news.uscourts.gov/sitemap.xml
```

www.uscourts.gov/robots.txt (annotated).

Newegg's robots.txt file, based on the same admitted prior art robots.txt

protocol, is similar:

```
User-agent: *

Disallow: /App/
Disallow: /Application/
Disallow: /Common/
Disallow: /Configuration/
Disallow: /Scripts/
Disallow: /Test.aspx
Disallow: /GiftCertificate/GiftCartPlus.aspx
Disallow: /GiftCertificate/GiftOrderCompleteHandle.aspx
Disallow: /GiftCertificate/GiftResponseFromBank.aspx
Disallow: /MyAccount/AudioCAPTCHA/
Disallow: /MyAccount/ImageValidator.aspx
Disallow: /RMA/LabelSOResponseFromBank.aspx
Disallow: /RMA/RMALabelTest.aspx
Disallow: /Shopping/AddtoCart.aspx
Disallow: /Shopping/ResponseOrderFromBank.aspx
Disallow: /WishList/WishCartPlus.aspx
Disallow: /WishList/WishCartPlus.aspx
Disallow: /NewMyAccount/
Disallow: /MyNewegg/

User-agent: 008

Disallow: /


# Sitemap files
Sitemap: http://www.newegg.com/Siteindex_USA.xml
```

www.newegg.com/robots.txt (annotated).

As annotated, both robots.txt files contain the web location of a XML
Sitemaps.  Sitemaps is an XML file that lists URLS for a site along with additional
metadata about each URL (when it was last updated, how often it usually changes,
and how important it is relative to other URLS in the site) so that search engines
can more intelligently crawl the site.  *See* www.sitemaps.org.

### D.    Ruling of the District Court on Appeal

The parties proposed twelve terms for construction—the eight MPF terms and four others.  The court's constructions, provided orally at the conclusion of Markman, are confirmed in its Order denying Newegg's Fee Motion.  A7-12.

In its Fee Motion, Newegg highlighted the most egregious positions—ones so contrary to controlling law and the intrinsic record that no reasonable litigant could believe successful—to prove the objectively baseless prong for an exceptional case.  While the Order confirms that Site Update's positions were incorrect, the threshold issue on appeal is whether those positions were so unreasonable to meet the objectively baseless standard.  As this appeal will explain in detail, the district court erred in concluding that those positions did not.

Finally, the district court noted that Site Update's settlement patterns, in view of *Eon-Net*, "raises some eyebrows", but ultimately did not find subjective bad faith because it already concluded that Site Update's positions were not entirely frivolous or objectively baseless.   A28.  This was clear error.

## VII.  SUMMARY OF THE ARGUMENT

This Court should reverse the district court's order denying Newegg's motion for an exceptional case under 35 U.S.C. § 285.  Site Update's claim construction positions—both contrary to controlling law and refuted by the

intrinsic record—fell below the threshold level of reasonableness, making them objectively baseless. Site Update's assertion of these frivolous claims combined with its *Eon-Net* like indicia of extortion behavior evidence subjective bad faith.

First, Site Update's continued and conscious disregard for controlling MPF law was objectively baseless. The Federal Circuit and other appellate courts have confirmed that such disregard for law is sanctionable. Site Update cannot just bury its head in the sand. But it did so, and continued to do so, through over two years of litigation, briefing and argument in two venues. The district court agreed that Site Update's EDTX positions were frivolous—positions Site Update maintained and litigated under for over two years. Defendants' EDTX Brief put Site Update on notice of those frivolous positions, but after a year of consideration, Site Update continued to disregard MPF law in its NDCA Brief. And when Site Update **finally** attempted to explain its disregard for the law—**26 months into the case**—that purported "justification" again found no support in controlling MPF law. Site Update's failures were not based on a misunderstanding; they were the result of a knowingly or willfully blind disregard for the law. The court erred in not finding this objectively baseless.

Second, Site Update's insistence that the specific tables of the website database for the "creating and modifying the database" were not necessary linked

structure was objectively baseless.  The court expressed concern that it would **"<u>get</u> <u>into trouble</u>"** by excluding this linked structure.  Nevertheless, Site Update urged the court that the structure was not necessary because it was simply a "specific preferred embodiment."  In doing so, Site Update misrepresented the law and encouraged the court not to follow it.  Though the district court's Order rejected Site Update's baseless positions for the "creating and modifying" term, the district court erred by only analyzing those positions in the context of Site Update's "misunderstanding" that an algorithm was not required (a separate basis that Site Update's positions are objectively baseless as described above).  The court failed to consider Site Update's disregard for the specific tables—a separate basis for finding its claim construction positions objectively baseless.  Here, the district court erred again.

Third, Site Update's infringement position that relied on its unsupportable claim construction of "website database" was objectively baseless.  The district court recognized that the "website database" needed to be distinct from the website or its resources.  The court reasoned that any other position not recognizing this distinction was unsupported and contradicted by the intrinsic record.  Although counsel **<u>first agreed</u>** with the court's concern, Site Update **<u>ultimately reneged</u>** from any agreement, and insisted that the court's proposed construction would

-26-

introduce error by recognizing the distinction. But the district court's Order erred by (1) **mistakenly believing** that Site Update kept its agreement when it did not, and then (2) relying on this mistake in analyzing Site Update's position. Site Update's unsupportable infringement position was objectively baseless.

Fourth, Site Update's positions and actions throughout this litigation demonstrate subjective bad faith. Site Update asserted and maintained frivolous positions, as described above. Combined with Site Update's *Eon-Net* like indicia of extortion behavior— concurrently suing thirty-seven companies to leverage defense costs (as opposed to any merits in the case) and extorting nuisance-settlements—meets the subjective bad faith prong under Federal Circuit precedent.

## VIII.  ARGUMENT - LEGAL STANDARDS

### A.  Standard of Review

On appellate review of an attorney fee ruling, the Federal Circuit determines *de novo* whether the litigation was objectively baseless, and the district court's finding regarding subjective bad faith is reviewed for clear error. Thus this Court may conduct "a retrospective assessment of the merits of the entire litigation" to determine "whether the record established in the proceeding supports a reasonable argument as to the facts and the law." *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.,*

711 F.3d 1341, 1346 (Fed. Cir. 2013) (citing *Highmark, Inc. v. Allcare Health*

*Mgmt. Sys., Inc.,* 687 F.3d 1300, 1309-10 & n.1 (Fed. Cir. 2012)).[1]

## B.     35 U.S.C. § 285 Exceptional Case

35 U.S.C. § 285 of the Patent Statutes authorizes courts to award

"reasonable attorney[s'] fees to the prevailing party" in "exceptional cases" to

rectify the injustice from bad faith litigation. *iLor*, 631 F.3d at 1376.   A decision

to award attorney fees under § 285 requires a two-step inquiry:  First, "the court

must determine whether the prevailing party has proved by clear and convincing

evidence that the case is exceptional"; and second, if exceptional, the court "must

then determine whether an award of attorney fees is justified." *MarcTec*, 664 F.3d

at 915-16.  Absent litigation misconduct or misconduct in securing the patent, a

district court can award attorney fees under § 285 only if the litigation is both (1)

"brought in subjective bad faith"; and (2) "objectively baseless". *iLor*, 631 F.3d at

1377.

---

[1] Newegg recognizes that the standard of review for the objectively baseless prong is in dispute at the Supreme Court. *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, No. 12-1184, Petition for Writ of Certiorari, 2013 WL 1309080, at *1 (Mar. 27, 2013).  Newegg respectfully submits that even under the old standard of review, the district court abused its discretion in not finding Site Update's claims objectively baseless under the guidance and analysis from this Court's opinion in *Raylon.*

To be objectively baseless, "the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits." *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (internal quotation omitted).  The subjective bad faith prong of this test can be "grounded in or denominated wrongful intent, recklessness, or gross negligence", and subjective bad faith can be inferred where "the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court." *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990).

This Court recently upheld an award of attorney fees under § 285 where the plaintiff's proposed claim construction "was so lacking in any evidentiary support that assertion of this construction was unreasonable and reflect[ed] a lack of good faith." *MarcTec*, 664 F.3d at 919.  And in this Court's recent Opinion in *Raylon*, the Court explained that "[r]easonable minds can differ as to claim construction positions and losing constructions can nevertheless be nonfrivolous.  But, there is a threshold below which a claim construction is 'so unreasonable that no reasonable litigant could believe it would succeed.'"  *Raylon*, 700 F.3d at 1368 (internal quotations omitted).

### C.     35 U.S.C. § 112(6) – Means-Plus-Function Law

Claim construction is a matter of law for the court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996).  When determining the meaning of a claim term, the primary focus is on the intrinsic record, which consists of the claims themselves, the patent specification, and the prosecution history.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*).

A means-plus-function term is a tradeoff between a patentee and the Patent Office. The patentee is permitted to draft a claim "without recitation of all the possible means that might be used in a claimed apparatus." *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997).  However, "[i]f the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid that price [for use of the convenience of broad claiming afforded by § 112 ¶ 6], but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification. Such [claiming] is impermissible under the statute." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003); *see generally Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

For computer-implemented means-plus-function claim limitations, the Federal Circuit has made clear that a general purpose computer is not a sufficient structure; rather, the patent must disclose specific algorithms for performing the claimed function.  *See Aristocrat Techs.*, 521 F.3d at 1333-34, 1338 (Section 112 requires that the patent "at least disclose the algorithm" linked to the claimed function); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999) ("the court erred by failing to limit the claim to the algorithm disclosed in the specification"); *HTC Corp. v. IPCom GmbH & Co., KG,* 667 F.3d 1270, 1282 (Fed. Cir. 2012) ("The necessity of an algorithm has been well established at least since *WMS Gaming*, a 1999 case.").  "[T]he disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *Finisar Corp. v. DirecTV Grp., Inc.,* 523 F.3d 1323, 1340 (Fed. Cir. 2008) (quoting *WMS Gaming*, 184 F.3d at 1349).  A sufficient algorithm may be disclosed as a mathematical formula, prose text, a flow chart or any other similar manner, satisfactory to one of ordinary skill in the art to perceive the bounds of the invention.  *Finisar* at 1340.  In contrast, simply reciting a general purpose computer or general computer function, such as "software," without providing some detail about the means to accomplish the function is not enough. *Id*. at 1340-41.

The Federal Circuit identified a narrow exception to the requirement that an algorithm must be disclosed to satisfy the disclosure requirement:  when the function "can be achieved by any general purpose computer without special programming."  *Ergo Licensing v. Carefusion 303, Inc.*, 673 F.3d 1361, 1364-65 (Fed. Cir. 2012) (citing *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011)).  In *Ergo*, the Federal Circuit explained that "[i]f special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure of an algorithm applies.  It is only in the rare circumstances where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed."  *Ergo*, 673 F.3d at 1365.

## IX.   THE DISTRICT COURT ERRED IN DENYING NEWEGG'S REQUEST UNDER 35 U.S.C. § 285

### A.   Site Update's Conscious and Continued Disregard for Well-Settled MPF Law was Objectively Baseless

The district court erred in refusing to find Site Update objectively baseless based on its continued and conscious disregard to follow controlling Federal Circuit MPF law by not including an algorithm for any of the eight computer-implemented MPF terms.

1.    **Site Update Knew the Law, Recognized the Law, but Failed for Two Years in Two Briefs in Two Venues to Follow or Address the Law**

The litany of Federal Circuit decisions outlining the algorithm requirement for computer-implemented MPF terms is undisputed, as is Site Update's knowledge of this Federal Circuit controlling authority. Site Update's experienced patent counsel, having almost six decades of combined patent litigation experience, have litigated issues based on controlling Federal Circuit MPF law numerous times in both district courts and before the Federal Circuit. *See supra* p. 6.

In addition to knowing the MPF law, Site Update recognized the algorithm requirement for computer-implemented MPFs as the controlling legal standard by citing to it in the Legal Standards section of its EDTX Brief:

> For computer-implemented inventions with terms in means plus function format, the particular structure disclosed must be more than just a general purpose computer or microprocessor. *Aristocrat Techs. Austl. Pty Ltd. V. Int'l Game Tech.,* 521 F.3d 1328, 1333 (Fed. Cir. 2008). The patent must disclose, to the satisfaction of one of ordinary skill in the art, ***enough of an algorithm to provide the necessary structure under § 112, ¶ 6***. *Finisar Corp. v. DirecTV Group, Inc.,* 523 F.3d 1323, 1340 (Fed. Cir. 2008).
>
> A649-50 (emphasis added).

Yet Site Update's entire EDTX Brief, filed over a year after suing Newegg—which addresses **<u>eight</u>** means-plus-function terms—is devoid of any discussion of an

-33-

algorithm or an exception to the algorithm requirement. A1335-48. The word "algorithm" is found nowhere else in the brief, other than a recitation of Defendants' proposed constructions. A653, 655. Simply put, Site Update knew the law, recognized the law, but consciously disregarded the law in its EDTX brief.

Defendants' responsive EDTX brief repeatedly identified Site Update's failure to include the necessary linked algorithm for performing the claimed functions. (*See, e.g.*, "[t]his entire algorithm is 'necessary' to perform the claimed function, which is why defendants' construction includes these steps" (A992); "[t]he specification, however, does not identify any particular structure or algorithm for performing this transmitting function." (A994); "[t]his specific algorithm is the only structure disclosed in the specification that shows how to perform any updating at the search engine." (A1003); [w]ithout disclosing an algorithm to transform a general purpose computer to a special purpose computer programmed to perform the disclosed algorithm, plaintiff's construction renders the claim indefinite." (A1007)). Not only did Site Update know the law and recognize the law on its own, it was provided a detailed explanation of the law in Defendants' brief, which placed Site Update on notice of their conscious disregard of the law.

As the case moved to NDCA, Site Update had over a year to consider Defendants' EDTX Brief and correct its untenable positions, but failed to do so. Site Update's NDCA Brief only purported to fix its problems. "Plaintiff has carefully considered Defendants' positions and has modified certain of its constructions to include additional structure, in addition to the CGI script." A1331. But Site Update's modifications did not meaningfully address or correct its deficiencies in round two, failing again to include any algorithm or explain its failure to do so. While Site Update's "modified" constructions in NDCA may appear less egregious, they simply disguise their continued conscious disregard of this Court's MPF law.

Site Update's NDCA Brief continued to cite *Aristocrat* and *Finisar* for the correct legal standard as it did in EDTX. A1331-2. And just like in EDTX, now for the **second time**, Site Update briefed its claim construction positions with no mention or discussion of an algorithm or justification for not including one. A1335-48. Nowhere in the brief is there any authority contradicting this well-settled MPF law and its requirement for an algorithm. Yet Site Update pretends that no such requirement exists, despite knowing the law, recognizing the law, being reminded of the law, and having multiple opportunities to correct its positions to follow the law. All Site Update did was disguise its claim construction

-35-

positions as more palatable by adding general computer terms, like web server and database, to its original identification of a CGI program or script. But as the district court confirmed, these generic structures are insufficient, and did not excuse Site Update from abiding by controlling MPF law's requirement of an algorithm. A23.

As of its NDCA Brief, Site Update had asserted this single means-plus-function claim for over two years through litigation and Markman briefing in both EDTX and NDCA. But its conscious disregard of controlling law demonstrates that Site Update's positions were objectively baseless. Indeed, the Federal Circuit has confirmed that such disregard is sanctionable. *See Abbs v. Principi*, 237 F.3d 1342, 1345-46 (Fed. Cir. 2001) (citing *Refac Int'l, Ltd. v. IBM*, 790 F.2d 79, 81 (Fed. Cir. 1986)) (failing to cite authority and ignoring opponent's contrary cited authority); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 919 F.2d 1579, 1583-84 (Fed. Cir. 1990) (citing irrelevant or inapplicable authority); *Klein v. Dep't of Transp.*, 768 F.2d 336, 338 (Fed. Cir. 1985) (failing to reference or discuss court decisions); *McEnery v. Merit Sys. Prot. Bd.*, 963 F.2d 1512, 1516 (Fed. Cir. 1992) (failing to reference or discuss controlling precedents). Other appellate courts have confirmed the appropriateness of issuing sanctions when a party ignores controlling law. *Borowski v. DePuy, Inc.*, 850 F.2d 297, 304-05 (7th Cir. 1988)

(sanctioning Plaintiff for the "ostrich-like tactic of pretending that potentially dispositive authority against [his] contention does not exist") (citations omitted); *Robb v. Elec. Data Sys. Corp.*, No. 92-1875, 1993 WL 129777, at *1 (5th Cir. Apr. 16, 1993) (failing to cite controlling law—especially when one is on notice that controlling precedent exists—is a breach of duty to the court—a breach that can be sanctionable).

This Court has held: "[r]easonable minds can differ as to claim construction positions and losing constructions can nevertheless be nonfrivolous. But there is a threshold below which a claim construction is 'so unreasonable that no reasonable litigant could believe it would succeed.'" *Raylon*, 700 F.3d at 1368 (internal quotations omitted). Site Update knew of and recognized the controlling MPF law in its EDTX Brief, but disregarded it, failing to include an algorithm or provide any justification for not doing so. Then, despite Defendants' explanation of the law and Site Update's failure to follow it, and more than a year to fix its positions prior to its NDCA Brief, Site Update continued its conscious disregard for the law by failing again to include any algorithm in its constructions or provide any justification for not doing so. Just as in *Raylon,* no reasonable litigant could believe that Site Update's positions could succeed.

### 2. Site Update's Purported "Misunderstanding" of the Law in its Reply Brief Does Not Excuse Its Objectively Baseless Positions

Site Update's NDCA Reply—coming after over two years of litigation and briefing as described above—for the **first** time attempts to reconcile its conscious disregard for MPF law to include the linked algorithms in its proposed constructions. A1567-69. But Site Update's manufactured justification still finds no support in Federal Circuit precedent and Site Update continues to disregard this Court's controlling MPF law. Plaintiff's reply contended its proposed structures— some combination of a web server, database, form and CGI script—were "special purpose computers" that do not require an algorithm. In its Reply, Site Update appears to either blindly misunderstand or tactically mischaracterize the Federal Circuit's decisions in *Ergo* and *In re Katz*. As explained above, *Ergo* follows longstanding Federal Circuit precedent requiring the disclosure of specific algorithms to provide structure for computer-implemented means-plus-function claims—nowhere in *Ergo* does Site Update find support for its position. *Ergo* also clarifies *In re Katz*. Specifically, *Ergo* explained that *In re Katz* detailed only a "narrow exception" to the requirement that an algorithm must be disclosed for computer-implemented means-plus-function claims—when the function "can be achieved by any general purpose computer without special programming." *Ergo*, 673 F.3d at 1365. But the functions of claim 8 do not fall within *In re Katz's*

"narrow exception" and Site Update appears not to even argue so. The district court rejected Site Update's unsupported "no algorithm" argument—a continuation of Site Update's conscious disregard for this Court's controlling MPF law.

Thereafter, in defense of Newegg's Fee Motion, Site Update contended that its losing positions were reasonable ones because the case "involved complicated issues involving M-P-Fs claims which received well-reasoned and substantial briefing and arguments from both sides." A2374. As this brief has set out in detail, the issues were not complicated, but rather straightforward. Site Update indisputably knew and recognized the law, but chose not to follow it. *See supra* p. 6 (Site Update counsel listed as counsel of record for Federal Circuit opinions involving MPF issues).

The district court found that: "SUS misunderstood the Federal Circuit's guidance both during claim construction and again here in its defense to this [motion]" and that SUS's positions were "not entirely frivolous". A22-23. But the district court incorrectly let Site Update off the hook by reasoning that "the Federal Circuit and district courts have created a complicated framework from which to determine whether a particular computer-related structure does or does not satisfy Section 112(6)." A23. Neither the district court nor Site Update has cited to any controlling authority that contradicts or challenges the requirements of *Aristocrat*

-39-

and its progeny. The algorithm requirement is not complicated and has been

confirmed repeatedly in Federal Circuit opinions for over a decade. Moreover,

Site Update and its counsel consciously disregarded the law from the outset of the

case all the way through its defense of Newegg's Fee Motion. *See* Section IX.A.1.

*supra.* There is simply no reasonable basis or explanation for Site Update's

purported "misunderstanding" of the law. By excusing Site Update, the district

court erred.

      3.    **Site Update's Conscious Disregard of MPF Law for Almost 26 Months of Litigation was Objectively Baseless**

Assuming arguendo that Site Update's justification for consciously

disregarding the *Aristocrat* line of Federal Circuit cases —set forth for the **<u>first</u>**

time in its NDCA Reply—is considered a non-frivolous one (despite being

unsupported by any Federal Circuit MPF authority), Site Update has no

justification for its disregard of MPF law over the two years and two rounds of

briefing in two venues, that preceded Site Update's purported justification. The

timeline below is illustrative:



Site Update's EDTX constructions cannot rely on Site Update's eleventh-hour 'justification' because they did not contain the "additional structures" that Site Update contended were, in combination, "special purpose computers." Indeed, the district court stated that it would likely find Site Update's EDTX arguments frivolous. A25. Site Update filed a complaint and litigated this case against thirty-seven companies, premised on those frivolous positions, for twenty-five months (from filing the Complaint until it modified its constructions in its NDCA Brief). Site Update has no justification for this bad faith litigation conduct.

Site Update had over twelve months to consider Defendants' EDTX Brief in order to correct its baseless EDTX positions in its NDCA Brief, but it failed to do

so. As this appeal has outlined in detail, Site Update's modified constructions in NDCA continued to disregard controlling MPF law.

In total, Site Update litigated this case for almost twenty-six months before providing its unsupportable justification for its conscious disregard of the law. Even accepting this last-ditch effort to find support for an untenable position, it still does not excuse Site Update's continued assertion of objectively baseless positions, with **<u>no justification whatsoever</u>**, for over two years. By not finding this action objectively baseless alone, the district court erred.

**B.     Site Update's Failure to Include the Tables for "Creating and Modifying the [Website] Database" as Necessary Linked Structure was Objectively Baseless**

The district court erred by not finding objectively baseless Site Update's insistence that the tables of the website database disclosed in the specification were not necessary linked structure for the "means for creating and modifying the [website] database" term.

**1.     The Markman Transcript Clearly Evidences that Site Update Disregarded the Law and Contradicted the Intrinsic Record While Urging the Court to Adopt a Position that the Court Believed Would "Get [the Court] in Trouble"**

As previously explained, a key aspect of the '683 Patent is the Tables of Files within the Table of Search Engines. The specification clearly links these

tables of the website database to the "means for creating and modifying the [website] database" function.   The district court recognized the specific linkage and addressed it during argument Site Update's counsel:

> The Court: "I'm just asking, whether I do it here or whether I do it somewhere else in the claim, it would seem to me that column 7 is specifically linking the table of files, table of search engines database to the one or more structures performed in one or more of these functions and I better include it somewhere or else I'm going to get in trouble. Isn't that fair?"

A1772:3-10.

The requirement of the Table of Files within the Table of Search Engines as necessary linked structure was so abundantly clear that the district court recognized that it would "get in trouble" if it did not include it.   Nevertheless, Site Update insisted that it was not necessary.   In doing so, Site Update's counsel consciously disregarded MPF law by arguing that these tables were simply a specific preferred embodiment.

> The Court: Well, perhaps you're right that the creation and modification is agnostic as to whether there's a Table of Files or a Table of Search Engines in the database.   But this would certainly suggest that somewhere in this construction, I have to explain that the way that this invention works is that there is a Table of Files and a Table of Search Engines.   Right?
>
> Ms. Lipski:  Well, I believe there has to be a website database.  I don't think there has to be a Table of Files and a Table of Search Engines.

The Court:  But isn't the – isn't the inventor teaching this very specific structure, and how can I ignore what is clearly linked?

Ms. Lipski:  The inventor is giving a specific preferred embodiment, and they go so far as to –

The Court:   Yeah, but this is a 112(6) claim, right?  So --

Ms. Lipski:  I understand that, your honor.

A1771:7-25.

After the court rejected Site Update's baseless preferred embodiment argument, Site Update sought to divert the court from the requirements of 35 U.S.C. § 112(6) by discussing the claim term "website database".  The court again rejected Site Update's diversion, returning to its sound understanding of controlling Federal Circuit MPF law:

> Ms. Lipski:  Well, I think that the claim language that was used by the patentee is "website database," so I think that's kind of where the issue you're concerned about comes in.  What is claimed is a website database not necessarily using this Table of Files and Table of Search Engines specifically, and "website database" is, of course, not a means-plus-function term.
>
> The Court:  No.  But what's claimed as a means-plus-function term, it just seems to me that the inventor is specifically saying to the ordinarily skilled artisan, "this is what structure performs one of these functions," and I'll grant you, it may not be this particular function[s], it might be somewhere else, but since you brought this up, I'm just at a loss as to how I can ignore that specific teaching that this is linked to that.
>
> A1772:11-25.

The district court clearly recognized that these tables were necessary linked structure for the "means for creating" limitation. Nevertheless, Site Update's counsel insisted that this structure was not linked to any claimed functions:

> Ms. Lipski: I don't believe that the Table of Files and the Table of Search Engines is specifically linked to any of these functions.
>
> The Court: Okay. So your response to that concern is that there is, in fact, no specific linkage and, absent a specific linkage, it would be erroneous for me to import that restriction into the definition of structure?
>
> Ms. Lipski: Yes, your honor.
>
> A1773:6-13.

As previously discussed in detail, Site Update and their counsel are well-versed and familiar with controlling MPF law. Yet, Site Update urged the court not to follow MPF law by not requiring the Table of Files within the Table of Search Engines, because it was simply a "specific preferred embodiment". Site Update argued that a generic "website database" was sufficient because that was part of the claim and then maintained its incredible position despite the court's expressed difficulties and belief that it would "get in trouble." In rejecting this position, and several others Site Update made throughout the argument, the court needed to purportedly remind counsel that this was a 112(6) claim. Site Update's claim construction argument was "so unreasonable that no reasonable litigant

could believe it would succeed." *Raylon*, 700 F.3d at 1368 (internal quotations omitted).

> ### 2. Site Update's Disregard of the Table of Files within the Table of Search Engines Cannot Be Excused by a its Purported "Misunderstanding" of MPF Law

The district court's Order focused on whether Site Update's NDCA Reply brief position in the context of the "means for creating" term —that no algorithm was required because its proposed structures were "special purpose computers" — was objectively baseless. As discussed above, the court erred in characterizing Site Update's conscious disregard for MPF law as a "misunderstanding of Federal Circuit guidance." Site Update's "misunderstanding" **was not** of MPF law generally. It was whether Site Update's "no algorithm" rationale for an admitted "special purpose computer" found any support in controlling authority. It did not.

Even if Site Update's "no algorithm" position was a reasonable one or a correct one (it is neither)—the algorithm issue fails to reconcile Site Update's insistence that the Table of Files within the Table of Search Engines was not linked structure. These specific tables were a component of the court's construction independent of the algorithm the court also required. The court's construction, as shown and annotated below, make this clear:

| "a means for creating and modifying a database of a website where in said website database contains content capable of being indexed by an internet search engine" | Function: Creating and modifying a database of a website wherein said website database contains content capable of being indexed by an internet search engine |
| | Structure: A website server or surrogate website server; the table of files which is a field in the table of search engines; and the disclosed server algorithm which builds the table of files list containing records that store URL's that are obtained from either a manually entered list, a specified map page, or a spider crawling from specified entry points of the website and modifies records in the table of files list when content is added, altered, or removed |

A12 (annotated, emphasis added) ((1) tables; (2) algorithm).

Algorithm or no algorithm, Site Update had no reasonable basis to exclude the Table of Files within the Table of Search Engines as corresponding structure. Nevertheless, it took the objectively baseless position that these specific tables were not linked structure, despite the clear disclosure in the specification.

Site Update cannot hide behind the court's belief that it "misunderstood" MPF law to excuse its frivolous position here. Moreover, the district court erred by not addressing whether the specific issue—Site Update's unsupported contention that these specific tables were not required structure—was objectively baseless, despite all of the contrary evidence and law described above.

The Federal Circuit explained in *Eon-Net* that "because the written description clearly refutes Eon-Net's claim construction, the district court did not clearly err in finding that Eon-Net pursued objectively baseless infringement claims." *Eon-Net*, 652 F.3d at 1326. In *Raylon,* this Court cited to substantial

-47-

evidence in the intrinsic record that refuted Raylon's proposed claim construction in finding it frivolous and remanding for a § 285 analysis. *Raylon*, 700 F.3d at 1365, 68-70.  Similarly, the written description here clearly refutes Site Update's position.  Site Update's claim construction position with respect to the Table of Files within the Table of Search Engines was objectively baseless.

**C.    Site Update's Insistence that the Website Database Need Not Be Separate and Distinct from the Website or Resources of the Website Themselves was Objectively Baseless**

The district court erred in refusing to find objectively baseless Site Update's disingenuous infringement position that relied on its unsupportable claim construction of "website database."

**1.    The Court Recognized that Site Update's Infringement Position, vis-à-vis its Proposed Claim Construction of "Website Database", was Unsupportable**

As Newegg thoroughly explained throughout the Markman process and in its Fee Motion and Reply, the critical issue between the parties on the term "website database" was whether the website database needed to be distinguished from the underlying website itself.  A2233-34; A3234-36.  An excerpt of Site Update's barebones infringement contentions, shown below, alleged that the content on a website or the website itself satisfied the "means for creating and

modifying a [website] database" limitation of the claim, as opposed to pointing to the claim required "website database".

| A means for creating and modifying a <mark>database of a web site</mark> wherein said <mark>website database</mark> contains content capable of being indexed by an internet search engine; | <mark>The database is the collection of content on the website, including but not limited to all html files.</mark><br><br>Web crawlers usually discover pages from links within the site and from other sites. Sitemaps supplement this data to allow crawlers that support Sitemaps to pick up all URLs in the Sitemap and learn about those URLs using the associated metadata.<br><br>From: http://www.sitemaps.org/index.php |

A1876-77 (annotated).

Site Update, in turn, proposed a broad construction—"record of resources on the website"—for the term "website database". The court agreed with, and shared, Defendants' concern that Site Update's proposed construction could arguably permit the website database in the claim to be satisfied by the website or the resources on the website themselves. The district court rejected this position and found it contrary to the intrinsic record, similar to the objectively baseless positions found in *Eon-Net* and *Raylon*.

> The court construed "website database" as a "record of resources on the website, other than the resources of the website itself." ***The court agreed with Newegg's concerns that the website database had to be distinguished from the underlying website to fit within the claims and the specifications in the RE'683 Patent.***

> The language of the claim in which "website database" appears requires that any construction of the term include a distinction between the website and the resulting database. The claim states "a means for creating and modifying a database of a web site wherein said website database," which, in conjunction with the language of the Summary of Invention, supports that the "website database" is separate from the underlying resources on the website itself. The inventor likewise noted during reexamination that "the process in the . . . invention checks a database representing a historical version of a web site against the current version of the Web site to detect changes."

A14-15 (emphasis added).

As Newegg explained in detail in its Fee Motion Reply, Site Update's incredible position was the very type that the Federal Circuit found objectively baseless in *Raylon.* A3234-36. The district court erred in not finding it objectively baseless.

### 2. The District Court Clearly Erred in Finding that Site Update Finally Agreed that its Position was Untenable Because Site Update Reneged on Any Alleged Agreement

The district court's opinion erred by finding that Site Update agreed with the court's (and Defendants') concerns, when it ultimately did not. The district court's opinion says that "SUS, however, agreed at the hearing that the 'website database' had to be distinct from just the content of the website," citing to the Markman Transcript:

The Court:  So perhaps the database could be on the website, but wouldn't it have to be separate from?  In other words, there has to be something more than just the site itself.  Would you agree with that?  Or do you have a problem with that notion?

Ms. Lipski:  I would agree with that, your honor.

A1785:19-24.

However, counsel later backed away from this "agreement" when the court asked whether or not she would agree to a compromised construction—"record of resources on the website, **other than the resources of the website themselves**" (A1790:21-91:12)—that addressed the court's (and Defendants') concern that the website database be distinguished from the website or its resources.

The Court:   Ms. Lipski, does that construction meet your satisfaction?

Ms. Lipski:  **I think we'd rather stay with our proposed construction, your honor.**

The Court:  All right.  And that's your right, and so I'm happy to make a decision on this, but let me just make sure I don't misunderstand your position in any way.  You believe that the explicit language which distinguished—well, **you believe that the clause that I proposed, as modified by the defendants, would introduce error by suggesting that there's a separate and distinct requirement that there, in fact, is not?**

Ms. Lipski:  **Yes, your honor.**

A1791:1-12 (emphasis added).

Contrary to the district court's Order, the Markman transcript shows that Site Update rejected a construction that made clear the distinction between (1) the

website database and (2) the website or its resources.  Site Update took this

position, despite the court's agreement with Newegg that the website database and

website could not be the same.  Site Update's proposed construction effectively

eviscerated the word "database" from the claim.  All that would then be required to

satisfy the limitation was the website or resources on the website themselves.

Nevertheless, Site Update warned the court that adding a distinction between (1)

the website database and (2) the website or its resources—a distinction the court

proposed to resolve its concern that the proper construction fit into the claim—

would introduce error.

The district court erroneously gave credit to Site Update for conceding the

distinction requirement when it eventually did the opposite.  This mistake

permeated the court's entire analysis of whether Site Update's infringement

positions, vis-à-vis its proposed claim construction of "website database", was

objectively baseless.   The court clearly rejected such an interpretation, reasoning

that it would "in fact contradict the intrinsic evidence":

> Newegg   argues   that   because   SUS's   proposed
> construction could be read as including the website itself,
> SUS's position was untenable and baseless. It is true that
> SUS's proposal could be read to include the website,
> which SUS at one point forwarded as an argument and
> which would in fact contradict the intrinsic evidence, but
> that interpretation is not the only one.

A16.

The court then, relying on its mistaken belief that Site Update abandoned this interpretation, reasoned that because Site Update's proposed construction could theoretically be interpreted another way, the construction was problematic but not frivolous.

> First, at the hearing, SUS agreed that this interpretation of "website database" or its construction was not supported by the claim or the specification. Second, although SUS's construction could have swept in the website itself, "record of resources" likewise suggests that the record is separate from the website. The construction was problematic, but the court cannot say that it was so clearly unsupported by the patent and the specification as to be frivolous.

A16.

The district court erred by excusing Site Update for an interpretation that Site Update did not endorse. Site Update, instead, insisted on the opposite one (that the website database need not be distinct from the website or its resources) —the interpretation the court reasoned would "in fact contradict the intrinsic evidence." A1791:1-12 and p. 51 *supra*. This interpretation was the frivolous one, and the court erred by not determining so. In review of the entire record, Site Update's infringement position, based on its unsupportable interpretation of its proposed construction of "website database", was objectively baseless.

### D.     Site Update's Conduct Rises to Subjective Bad Faith Under Federal Circuit Precedent

The district court's order concludes that Newegg did not meet its burden in proving the subjective bad faith prong for an exceptional case, largely because it did not find the objectively baseless prong met.

> As described at length above, the court does not find that SUS's positions in this case were objectively baseless. Because SUS's argument is not frivolous – because it is only a losing argument – the court cannot say that SUS's settlements with the defendants for amounts below the cost of defense are, by themselves, enough to warrant a finding of subjective bad faith. Patentees with meritorious arguments can seek settlements far below the cost of defense, especially if they do not want to spend significant amounts of money to protect their patents. SUS's settlement pattern raises some eyebrows but because its positions were not entirely baseless, its attempts to settle claims early in the litigation for costs lower than the amounts of a defense are not sufficient, alone, to find subjective bad faith.

A28.

The Order states that Site Update's "settlement pattern raises some eyebrows" but the district court did not find subjective bad faith because it did not find its positions objectively baseless.  As Newegg has set forth above, the district court erred in refusing to find Site Update's positions objectively baseless on several different grounds.  The district court does not address whether it would find subjective bad faith if it had found the objectively baseless prong met, or for

example, whether Site Update's assertion of its EDTX positions (which the court agreed were frivolous) for over two years demonstrated subjective bad faith. Newegg submits that, at a minimum, the Order suggests that if the objectively baseless prong were met, sufficient evidence supports subjective bad faith.

### 1.    Frivolous Claim Construction Positions Support a Finding of Subjective Bad Faith

Although Site Update's conduct throughout this litigation further evidences subjective bad faith, the Federal Circuit in *MarcTec* supports finding subjective bad faith based on the assertion of frivolous positions.  This Court stated in *MarcTec* that "MarcTec's proposed claim construction, which ignored the entirety of the specification and the prosecution history, and thus was unsupported by the intrinsic record, was frivolous and supports a finding of bad faith." *MarcTec,* 664 F.3d at 918.  As discussed at length above, Site Update's most egregious claim construction positions were unsupported or contradicted by the intrinsic record, as well as devoid of any controlling authority that supported its positions.  They were objectively baseless, and in turn, support a finding of bad faith.

### 2.    Site Update's Shakedown Approach to Litigation Further Evidences Subjective Bad Faith

Site Update's shakedown approach to this litigation is outlined in detail in its Fee Motion and Reply Brief, but summarized herein.

Plaintiff sued thirty-seven Defendants in a single lawsuit under an identical barebones infringement theory, amending its Complaint three times and ultimately suing thirty-seven unrelated companies.  Within weeks of Defendants filing their answer and counterclaims, Site Update began settling with Defendants for five-figure nuisance values far below the projected high costs of patent litigation defense.  Site Update's settlement pattern mirrors the conduct this Court warned of, and found exceptional, in *Eon-Net.*  In *Eon-Net*, the Federal Circuit affirmed an exceptional case finding and award of attorneys' fees to the accused infringer (Flagstar) where Eon-net filed its infringement complaint against Flagstar "to extract a nuisance value settlement by exploiting the high cost imposed on Flagstar to defend against Eon-Net's baseless claims."  *Eon-Net*, 654 F.3d at 1328.  Like Site Update, Eon-Net concurrently filed complaints against a multitude of defendants, followed by a "demand for a quick settlement at a price [from $25,000 to $75,000] far lower than the cost of litigation…" *Id.* at 1327 (internal quotations omitted).  The Federal Circuit was critical of this practice:

> Viewed against Eon-Net's $25,000 to $75,000 settlement range, it becomes apparent why the vast majority of those that Eon-Net accused of infringement chose to settle early in the litigation rather than expend the resources required to [prove non-infringement]. Thus, those low settlement offers—less than ten percent of the cost that Flagstar expended to defend the suit—effectively ensured that Eon-Net's baseless infringement allegations remained unexposed, allowing Eon-Net to continue to collect additional nuisance value settlements.

*Id.*

Here, as in *Eon-Net*, Plaintiff settled with many defendants for substantially less than the cost to defend against Plaintiff's baseless infringement allegations.[2] Site Update's first four settlements were for $75,000; $25,000; $25,000; and $75,000, similar to the amounts in *Eon-Net.* These were followed by more five-figure or low-six figure deals—settlements of $30,000; $75,000; $90,000; $115,000; and $150,000. Site Update settled with three other Defendants, presumably also for nuisance values, but refused to produce the agreements despite long-outstanding discovery requests to do so. A2225-8. Despite arguments by Site Update to the contrary, Site Update's settlement pattern is clearly consistent with the nuisance-value settlements in *Eon-Net*.

Site Update has contended that its settlement metric "was not arbitrary and based solely on a defendants' ability to pay higher amounts," and that it "took into account the URL count, with flexibility given if the accused functionality was less important to the business, including in consideration of feedback from defendants, ALEXA ratings, how many visitors reached the site from search engines, and how many visitors are from the U.S." A27; A2370. Curiously, Site Update never provided any of these alleged metrics in discovery to Newegg when making

---

[2] The only substantial settlement Site Update was able to obtain, that Newegg is aware of, was for $425,000 very early in the case (December 2010).

settlement demands, or in support of its Opposition to Newegg's Fee Motion. Indeed, as Newegg pointed out in response to these phantom metrics, any such metric fails to explain Site Update's 80% reduction of its settlement demand on Newegg from $500,000 at the outset of the case to only $100,000 less than a year later.  A2227-28.

Despite successfully extorting a dozen or so Defendants who were unwilling to bear the costs of patent defense, Newegg and twenty-two other Defendants, drew a line in the sand.  As explained above, Defendants represented by McDermott and Weil banded together in joint defense that significantly reduced litigation costs and allowed them to lead the defense group into Markman and expose Site Update's frivolous positions.  The typical troll plan, as explained in *Eon-Net* in avoiding exposure at Markman, was thwarted by Defendants.  Shortly after Defendants prevailed at Markman, Site Update dismissed its infringement claims with prejudice.

Most Defendants will view the dismissal with prejudice, without having to pay Site Update, a victory.  But each of these Defendants still incurred substantial litigation defense costs.   On the other hand, Site Update was still able to exploit the costs of patent defense in extorting a dozen or so Defendants for a combined total of at least a million dollars on a patent that the district court confirmed had no

basis of being litigated in the first place.  The combination of meritless

infringement positions, vis-à-vis its unsupportable claim construction positions,

and the "eyebrow raising" settlement pattern of Site Update clearly supports a

finding of subjective bad faith under the Federal Circuit's recent exceptional case

holdings in *Eon-Net*, *MarcTec* and *Raylon*.

## X.    RECENT POLICY CONSIDERATIONS SUPPORT FINDING OF AN EXCEPTIONAL CASE

In addition to the overwhelming evidence set forth by Newegg that

demonstrates that the district court erred in not finding this case exceptional, recent

policy considerations aimed at controlling the type of abusive conduct

demonstrated by Site Update here further support a finding of an exceptional case.

Frivolous patent litigation has quickly caught the attention of the Executive

and Legislative branches, as well as the popular media.  Site Update's actions in

this case are the exact type President Obama recently remarked on when discussing

the need to reduce the impact of baseless patent litigation by non-practicing entities

on this country's economy:

> The folks that you're talking about are a classic example.
> They don't actually produce anything themselves.
> They're just trying to essentially leverage and hijack
> somebody else's idea and see if they can extort some
> money out of them.

Barack Obama, United States President, Fireside Hangout on Google+ (Feb. 14, 2013)[3].

Congress also has devoted its energy to remedying these problems by, among other things, ensuring that patent trolls whose cases lack any merit be required to pay their opponent's fees and costs of litigation. *See* Saving High-Tech Innovators from Egregious Legal Disputes Act of 2013, H.R. 845 113th Cong. (2013) (allowing fee shifting and earlier movement for judgment in some patent defenses); Patent Abuse and Reduction Act of 2013, S. 1013, 113th Cong. (2013) (requiring heightened pleading, addressing asymmetry in discovery by requiring parties to pay for anything beyond core documents, and including a fee shifting provision that awards costs and expenses including fees to the prevailing party unless the loser's position was substantially justified or exceptional circumstances make the reward unjust); and Patent Litigation and Innovation Act of 2013, H.R. 2639, 113th Cong. (2013) (adding procedural requirements to patent suits).

---

[3] Available at http://www.youtube.com/watch?v=kp_zigxMS-Y.1. The White House more recently formalized these comments with legislative recommendations to allow more discretion in fee shifting, and executive orders to create greater transparency in the patent system. *See Fact Sheet: White House Task Force on High-Tech Patent Issues*, (June 4, 2013), http://www.whitehouse.gov/the-press-office/2013/06/04/factsheet- white-house-task-force-high-tech-patent-issues (last accessed Sept. 3, 2013).

And as Newegg explained at the outset of this brief, Chief Judge Rader has recently cautioned against the effect baseless litigations brought by patent trolls has on our country:

> The onslaught of litigation brought by "patent trolls" — who typically buy up a slew of patents, then sue anyone and everyone who might be using or selling the claimed inventions — has slowed the development of new products, increased costs for businesses and consumers, and clogged our judicial system.

The Chief Judge elaborated on the problem:

> With huge advantages in cost and risk, trolls can afford to file patent-infringement lawsuits that have just a slim chance of success. When they lose a case, after all, they are typically out little more than their own court-filing fees. Defendants, on the other hand, have much more to lose from a protracted legal fight and so they often end up settling.[4]

---

[4] The troll's advantage is exacerbated even after a court awards reimbursement to its prevailing litigation targets. Because trolls are not "real" companies, Defendants are even more hesitant to seek fees in frivolous suits, fearing the troll has already dispersed its extortion proceeds and will just declare bankruptcy to side-step any judgment. A dozen companies, including Newegg, experienced this troll maneuver recently, where they were the prevailing party and awarded costs. But shortly after, the troll (Kelora Systems, LLC) filed for bankruptcy despite successfully extorting other Defendants for settlements earlier in the case. *Kelora Systems, LLC v. Target Corp.*, No. C 11-1548 CW (LB), Order Taxing Costs, ECF No. 532 (N.D. Cal. Apr. 5, 2013) (awarding costs to prevailing party); *Kelora Systems, LLC v. Target Corp.*, No C 11-1548 CW (LB), Order Vacating Order Granting Motion for Appointment of Receiver Based Upon Intervening Bankruptcy, ECF No. 551 (N.D. Cal. Jun. 24, 2013) (vacating appointment of receiver of judgment in view of Plaintiff's filing for bankruptcy). While

Rader Article.

This matter before the Court is a prime example.  The district court's Markman Order, and Newegg's detailed recitation of the objectively baseless nature of Site Update's claims demonstrate that Site Update had no chance of success.  Site Update conceded defeat after Markman, and like most patent trolls, were under a contingency fee agreement with their counsel and incurred few fees or costs.  On the other hand, one group of Defendants spent hundreds of thousands of dollars litigating for over two years while another group paid Site Update off to avoid defense costs.

But Judge Rader noted that judges have the authority to curtail these tactics by making trolls pay for abusive litigation under 35 U.S.C. § 285 and encouraged judges to look more closely for signs of abuse—such as when a patent holder sues a slew of companies with a demand for a quick settlement at a fraction of the cost of defense (as Site Update did here).  The facts in this case demonstrate that this matter is the very type of patent-troll shakedown that President Obama and Chief Judge Rader have recently warned about and further support a finding of an exceptional case.

---

Defendants there explore possible recourse, the example further evidences the continued abuse of our judicial system by patent trolls that must be stopped.

## XI.    FEES REQUESTED

As of the December 28, 2012 filing of Newegg's Reply Brief in Support of its Fee Motion, Newegg's fees and costs through November 2012 were $144,129.09.  A3244.  As Newegg's moving papers and accompanying exhibits and declarations fully outline, Newegg's requested fees and costs are well-documented, more than reasonable, and significantly lower than the average costs of patent litigation defense.

## XII.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Site Update's entire infringement case against Newegg was based on either a knowingly or willfully blind disregard for fundamental principles governing the claim construction of means-plus-function terms.  Site Update chose to assert a claim governed by 35 U.S.C. § 112(6), but completely ignored the law from its Opening EDTX Brief, through the entire Markman process in NDCA, and even continuing through its opposition of Newegg's Fee Motion.  As this Court has reminded, there is a threshold below which a claim construction is "so unreasonable that no litigant could believe it would succeed."  Site Update crossed that threshold, but the district court erred by characterizing Site Update's continuous and conscious disregard for MPF law as a "misunderstanding of Federal Circuit guidance" and refusing to find the case exceptional.  The court then

erred in its analysis of two other objectively baseless positions—"the Table of Files within the Table of Search Engines" as corresponding structure for the "means for creating" term and Site Update's infringement position, vis-à-vis its claim construction of "website database"—two positions that cannot be excused by Site Update's purported "misunderstanding" of MPF law. This Court should not let Site Update off the hook so easily.

Site Update sued thirty-seven companies under a disingenuous theory that any website following the robots.txt and XML Sitemaps protocols (including the U.S. Courts' website) infringed the '683 Patent. They successfully exploited the costs to defend a patent case by extracting nuisance-value settlements from almost a dozen or so companies. But Newegg and the remaining Defendants banned together and refused to be bullied, exposing Site Update's hollow claims at Markman and forcing Site Update into dropping its allegations. Nevertheless, Site Update walked away from this shake-down with over a million dollars of extortion proceeds, leaving all thirty-seven Defendants with emptier pockets from defense costs, even though Site Update never had a chance of succeeding on the merits.

These are the types of situations 35 U.S.C. §285 is intended to discourage and that President Obama and Chief Judge Radar have recently warned about—a patent lawsuit pursued to take improper advantage of a defendant by using the

threat of litigation cost, rather than the merits of a claim, to bully a defendant into settling.  This is exactly what Site Update has done here.  This Court should sanction Site Update by enforcing Section 285 and finding this case exceptional.

Dated:        September 5, 2013

Respectfully submitted,

McDERMOTT WILL & EMERY LLP

By: */s/ Yar R. Chaikovsky*
Yar R. Chaikovsky
Philip Ou
McDERMOTT WILL & EMERY LLP
275 Middlefield Road
Suite 100
Menlo Park, California  94025-4004
+1 650 815 7400

Counsel for: Defendant-Appellant

# ADDENDUM

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SITE UPDATE SOLUTIONS, LLC, | ) Case No.: 11-3306 PSG |
| Plaintiffs, | ) **ORDER DENYING DECLARATION** |
| v. | ) **OF EXCEPTIONAL CASE AND** |
| | ) **AWARD OF ATTORNEYS' FEES** |
| ACCOR NORTH AMERICA, INC., et al, | ) |
| | ) **(Re: Docket No. 649)** |
| Defendants. | ) |

In this patent infringement case, Defendant Newegg Inc. ("Newegg") moves to declare this

case exceptional and for an award of attorneys' fees pursuant to 35 U.S.C. § 285. Plaintiff Site

Update Solutions, LLC ("SUS") opposes. The parties appeared for a hearing. Having carefully

considered the parties' papers and oral arguments, the court DENIES Newegg's motion.

**I.    BACKGROUND**

This case originated in the Eastern District of Texas in May 2010 when SUS filed suit

against Newegg and thirty-four other defendants.[1]  In its complaint, SUS alleged that the various

---

[1] *See* Docket No. 209. The other named defendants were Accor North America, Inc., Adobe
Systems Incorporated, Amazon.com, Inc., American Broadcasting Companies, Inc., CBS
Interactive Inc., CDW, Choice Hotels International, Inc., CNN Interactive Group, Inc., Deli
Management, Inc., Daily News L.P., Electronic Arts, Inc., Enterprise Rent-A-Car Company,
Facebook, Inc., Gannett Satellite Information Network, Inc., HSN, Inc., Intuit, Inc., Linkedin
Corporation, Monster Worldwide, Inc., Myspace, Inc., MSNBC Interactive News LLC, NBC
Universal, Inc., Nissan North America, Inc., Office Max, Inc., Overstock.com, Inc., Red Hat, Inc.,

A1

**United States District Court**
For the Northern District of California

defendants infringed on United States Reissue Patent No. RE40,683 ("RE'683 Patent"), a reissue of United States Patent No. 6,253,198, titled "Process for Maintaining Ongoing Registration for Pages on a Given Search Engine."[2]

The case arrived in this court on July 6, 2011, following an order on June 8, 2011 from the Eastern District of Texas granting a request to change venue.[3]  The defendants[4] first requested the transfer on November 3, 2010, noting in particular that several search engine companies with evidence relevant to the case fell within the jurisdiction of the Northern District of California.[5]  In its two-page opposition, SUS stated that it "disagree[d] with the contentions and allegations made in the Motion to Transfer" and pointing to the speed with which the Eastern District of Texas could move the case to trial in comparison to this district.[6]  But SUS concluded that it was "agreeable to the transfer if the Court deems that such transfer is in the interests of justice of all the parties."[7]

In the seven months between the request and the district court's order, the parties moved forward toward claim construction, which the court had set for July 13, 2011.[8]  The parties jointly sought extension of the claim construction deadlines on March 7, 2011 and the district court, granting the request, moved the claim construction hearing back to August 3, 2011.[9]  SUS,

---

Salesforce.com, Inc., Sears, Roebuck and Co., Staples, Inc., Starwood Hotels & Resorts Worldwide, Inc., Target Corporation, Thomson Reuters Holdings, Inc., Ticketmaster LLC, Time, Inc., Wal-Mart Stores, Inc., and Wyndham Worldwide, Inc.  *See id.*

[2] *See id.*

[3] *See* Docket No.

[4] Enterprise Rent-A-Car Company, CDW LLC, and Wal-Mart Stores, Inc. did not join the motion but they did not oppose transfer.  *See* Docket No. 503.

[5] *See* Docket No. 373.

[6] Docket No. 410.

[7] *See id.*

[8] *See* Docket No. 357 Ex. 1.

[9] *See* Docket Nos. 467, 468.

2

Case No.: 11-3306 PSG
ORDER

A2

however, opposed the defendants' subsequent request to vacate altogether the claim construction

hearing until the motion to change venue was resolved.[10]  The district court denied the request to

vacate the dates, finding that the claim construction preparation could follow the case to this

district if the motion was granted but that if the hearing was vacated and the transfer request

denied, the case would be unnecessarily delayed.[11]  Pursuant to the court's order, the parties filed

their claim construction briefs and a motion for summary judgment before the district court's order

granting the transfer request.[12]

Throughout the litigation, SUS regularly dismissed defendants, beginning with MSNBC

Interactive News LLC in mid-October 2010.[13]  From the end of 2010 until July 2012, SUS

dismissed fourteen defendants,[14] at least nine of which were subject to settlement agreements

between SUS and the individual defendants.[15]  The amounts of those settlement agreements ranged

from ████████████████.[16]

Once the case moved to this court, the parties again filed their claim construction briefs and

sought construction of twelve terms.[17]  The court held a tutorial on July 13, 2012[18] and a claim

---

[10] *See* Docket No. 476.

[11] *See* Docket No. 480.

[12] *See* Docket Nos. 494, 499, 500, 501.

[13] *See* Docket No. 355.

[14] *See* Docket Nos. 372 (Salesforce.com on Oct. 29, 2010), 380 (Accor North America, Inc. on Nov. 11, 2010), 415 (Office Max, Inc. on Dec. 3, 2010), 429 (Wyndham Worldwide Corp. on Jan. 5, 2011), 432 (Thomson Reuters Holdings, Inc. on Jan. 6, 2011), 433 (Nissan North America, Inc. on Jan. 7, 2011), 451 (Deli Management, Inc. on Jan. 20, 2011), 489 (Starwood Hotels & Resorts Worldwide, Inc. on May 6, 2011), 490 (Red Hat, Inc. on May 6, 2011), 537 (MySpace, Inc. on Aug. 22, 2011), 538 (Monster Worldwide, Inc. on Aug. 22, 2011), 572 (Wal-Mart Stores, Inc. on Dec. 6, 2011), 600 (CDW on Apr. 24, 2012), 611 (HSN, Inc. on July 6, 2012).

[15] *See* Docket No. 649 Exs. B – J.

[16] *See id.*

3

Case No.: 11-3306 PSG
ORDER

A3

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

construction hearing on July 20, 2012.[19]  At the hearing, the court issued its constructions from the bench.[20]  As part of its construction, the court declined to construe four of the terms, citing concerns that the terms were indefinite.[21]  The court then invited the defendants to move for summary judgment on indefiniteness grounds.[22]

Following the claim construction hearing, SUS and all of the remaining defendants except for Newegg stipulated to a dismissal of all claims brought by SUS.[23]  Newegg refused to dismiss its declaratory relief counterclaims and indicated that it would file a summary judgment motion in line with the court's suggestion.[24]  On October 18, 2012, SUS filed a motion to dismiss its claims with an accompanying covenant not to sue to end the dispute between the parties.[25]  Newegg opposed SUS's motion because it believed the covenant not to sue was inadequate to protect against future suit by SUS.[26]  Following SUS's amendment of the covenant not to sue, Newegg and SUS agreed to dismiss the claims between them.[27]

---

[17] *See* Docket Nos. 603, 605, 607.

[18] *See* Docket No. 618.

[19] *See* Docket No. 619.

[20] *See* Docket No. 632 at 153:3-10.  The court assured the parties that an order with its reasoning would precede any entry of judgment.  *See id.*

[21] *See id.* at 157:5-15.

[22] *See id.* at 157:16-19.

[23] *See* Docket No. 624 (Amazon.com Inc., American Broadcasting Companies, Inc., CBS Interactive Inc., Choice Hotels International, Inc., CNN Interactive Group, Inc., Daily News L.P., Electronic Arts, Inc., Enterprise Rent-A-Car Company, Facebook, Inc., Gannett Satellite Information Network, Inc., Home Box Office, Inc., Intuit Inc., Linkedin Corporation, NBC Universal, Inc., Newegg, Inc., Overstock.com, Sears, Roebuck and Co., Staples, Inc., Target Corporation, Ticketmaster L.L.C., and Time Inc. on Aug. 13, 2012).

[24] *See* Docket No. 623.

[25] *See* Docket No. 642.

[26] *See* Docket No. 645.

4

Case No.: 11-3306 PSG
ORDER

A4

United States District Court
For the Northern District of California

1   Newegg then filed this motion requesting the court to determine this case exceptional and to

2   award Newegg its attorneys' fees.

3   ## II.   LEGAL STANDARDS

4   Although under the traditional "American rule" parties to litigation are responsible for their

5   own legal costs and fees,[28] Congress determined that in certain "exceptional cases" the court may

6   award to the prevailing party "reasonable attorney fees."[29]  The statute does not define what an

7   "exceptional case" is, but the Federal Circuit has established two instances in which a party's

8   behavior may transform an ordinary case into an "exceptional" one, specifically when a party either

9   engages in litigation misconduct or pursues a "frivolous claim."[30]  If the court determines that the

10  case is "exceptional" under one of the two criteria, it must then ascertain "whether an award of

11  attorneys' fees is appropriate and, if so, the amount of the award."[31]  "The amount of the attorney

12  fees awarded depends on the extent to which the case is exceptional."[32]  "To receive attorney fees

13  under § 285, a prevailing party must establish by clear and convincing evidence that the case is

14  exceptional."[33]

16  ## III.   DISCUSSION

17  Newegg primarily accuses SUS of pursuing frivolous claims that were both objectively

18  baseless and brought in bad faith.  Newegg also points to other behavior by SUS during the

---

22  [27] *See* Docket No. 646.

23  [28] *See Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 711 F.3d 1341, 1345 (Fed. Cir. 2013).

24  [29] *See* 35 U.S.C. § 285.

25  [30] *See Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012).

26  [31] *Id.*

27  [32] *Id.*

28  [33] *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 711 F.3d 1341, 1346 (Fed. Cir. 2013).

5

Case No.: 11-3306 PSG
ORDER

A5

litigation in what appears to be an argument that SUS engaged in litigation misconduct.[34]  The

court thus considers whether the case is exceptional under both prongs.

**A.    Frivolous Claims**

To be "frivolous," a claim must meet two criteria: (1) it must be "brought in subjective bad

faith" and (2) it must be "objectively baseless."[35]  "To be objectively baseless, the infringement

allegations must be such that no reasonable litigant could reasonably expect success on the

merits."[36]  To satisfy the subjective prong, the prevailing party must show "that [the] lack of

objective foundation for the claim was either known or so obvious that it should have been known

by the party asserting the claim."[37]  "[T]here is a presumption that an assertion of infringement of a

duly granted patent is made in good faith" and so the subjective prong "must be established with

clear and convincing evidence."[38]

Newegg asserts that SUS's infringement claims were objectively baseless because they

ignored "well-established" means-plus-function law in arguing for its constructions.  For the

subjective prong, Newegg points to the settlements and dismissals with other defendants earlier in

the case to argue that SUS sought "nuisance, shake-down" settlements, which, according to

Newegg, evince its bad faith in bringing the claims.  SUS unsurprisingly disputes both of these

arguments, asserting that its positions during claim construction were reasonable given the

complicated issues involved in the construction and that the settlements reflect only its right to

pursue royalties from infringers.

---

[34] Newegg offers these other actions as evidence of subjective bad faith, but the conduct does not
fall within the framework that the Federal Circuit has established for the "frivolous claim" basis for
an exceptional case finding.  *See Checkpoint Sys., Inc.*, 711 F.3d at 1346.  The court therefore
considers the conduct under the litigation misconduct prong.

[35] *Id.*

[36] *Id.*

[37] *Id.* (internal quotations and citations omitted).

[38] *Id.* at 1309.

6

Case No.: 11-3306 PSG
ORDER

A6

The court begins with an evaluation of SUS's positions during claim construction and in alleging infringement. The merits of SUS's arguments and claims necessarily color the settlements it reached with other defendants and whether bad faith may be inferred from those agreements.

### 1.    Claim Construction

To ascertain the legitimacy of SUS's position, the court must engage in a type of "meta-claim construction."[39] Because the court did not have the opportunity to issue a complete claim construction opinion before all claims were dismissed, it must explain here why it construed the terms in the manner in which it did before it can explain the merit, or lack thereof, of SUS's arguments. Rather than present an entire claim construction analysis, against which it also has to determine the validity of SUS's arguments, the court limits itself to explaining its construction of the terms for which Newegg challenges SUS's positions. But first, the court provides the background of the claim construction and the claim at issue.

SUS pursued an infringement claim against the defendants for only Claim 8 of the RE'683 Patent.[40] The parties agreed that Claim 8 was a means-plus-function claim under 35 U.S.C. § 112(6).[41] Claim 8 describes:

> An apparatus for updating an internet search engine database with current content from a web site, comprising:
>
>> a means for creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine;
>>
>> a means for identifying, using said web site database, new, deleted, [unmodified] or modified content;

---

[39] *See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1319 (Fed. Cir. 2011)(noting that without an explanation of the claim construction determinations, an exceptional case finding on grounds that positions during claim construction were baseless is not supported); *see also Eon-Net LP v. Flagstar Bancorp*, 249 Fed. Appx. 189, 198 (Fed. Cir. 2007) (remanding to district court for "full claim construction analysis" to determine whether position was baseless).

[40] *See* Docket Nos. 605, 607.

[41] *See* Docket Nos. 605, 607.

Case No.: 11-3306 PSG
ORDER

A7

a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted, unmodified or modified database content;

a means for opening, by a user, a form on a computer to enable or disable internet search engines to be updated with information;

a means for enabling or disabling, by said user, the appropriate internet search engines on said form;

a means for submitting, by said user, said information to a script;

a means for parsing, through the user of said script, said information from said form; and

a means for updating, through the use of said script, said database of search engine.[42]

The parties sought construction of twelve terms from the claim.  At issue in this motion, however, are only seven terms for which Newegg asserts SUS's positions were "objectively baseless":

| Term | SUS Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "information" | Plain meaning | Indefinite because it is used in the claim in a contradictory and irreconcilable way |
| "website database" | Record of resources on the website | Structure of fields or records built by software that catalogues the resources of a website, other than the resources themselves |
| "a means for creating and modifying a database of a website where in said website database contains content capable of being indexed by an internet search engine" | Function: creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine<br><br>Structure: The combination of a web server, Common Gateway Interface script, website database and form and equivalents | Function: creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine<br><br>Structure:<br>(i) a website server or surrogate website server; (ii) the Table of Files, which is a field in the Table of Search Engines (as described at 6:51–7:18; 7:29-50); and (iii) the disclosed server algorithm, which: (1) builds the Table of Files list containing |

---

[42] See Docket No. 605 Ex. A.

8

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

A8

| | | |
|---|---|---|
| | | records that store URLs that are obtained from either (a) a manually entered list; (b) a specified map page; or (c) a spider crawling from specified entry points of the web site; and (2) modifies records in the Table of Files list when content is added, altered, or removed (all as described at 7:55-8:13 and Fig. 1a, boxes 203a-c, 204a-c, and 206b-c). |
| "a means for identifying, using said web site database, new, deleted, or modified content" | Function: identifying, using said web site database, new deleted or modified content<br><br>Structure: the combination of a web server, Common Gateway Interface (CGI) program, website database, form and equivalents | Function: identifying, using said web site database, new deleted or modified content<br><br>Structure: (i) a website server or surrogate website server; and (ii) the server algorithm that automatically checks a database representing a historical version of a website against the current version of the website to detect changes, and: (1) marks a resource as new if it is present on a website server but not yet in the website database; (2) marks a resource as deleted if it is listed in the web site database but cannot be retrieved; (3) marks a resource as modified if the date and time of last modification in the web site database for the resource is earlier than the date and time of last modification provided by a web server for the resource; and (4) does not mark any unmodified resources (all as described at 4:56-67 and 9:30-10:25) |
| "a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted or modified database content" | Function: transmitting to said internet search engine a set of indices, wherein said set of indices comprises new, deleted or modified database content<br><br>Structure: the combination of web server and Common Gateway Interface (CGI) script and equivalents | Function: transmitting to said internet search engine a set of indices, wherein said set of indices comprises new, deleted or modified database content<br><br>**Indefinite:** The patent discloses no structure for "transmitting to said internet search engine a set of indices, wherein said set of indices comprises new, deleted, or modified database content." Although the specification implies that the |

Case No.: 11-3306 PSG
ORDER

A9

United States District Court
For the Northern District of California

| | | |
|---|---|---|
| | | website server or surrogate transmits information relating to a resource to a search engine, the specification does not disclose the function of transmitting a "set of indices" to a search engine, and does not disclose any specific structure that transmits anything to a search engine.<br><br>**Structure**: The structure disclosed in the specification that comes closest to performing the claimed function is at most incomplete and does not perform the complete claimed function. Specifically, that disclosed structure is a website server or surrogate website server, which implicitly transmits resources (but not a "set of indices") to the search engine index (as described at 10:42-44). |
| "a means for parsing, through the use of said script, said information from said form" | Function: parsing information from a form<br><br>Structure: agents (programs that can travel over the internet and access remote resources) and their equivalents | Function: parsing, through the user of said script, said information from said form.<br><br>**Indefinite:** The patent discloses no structure for performing the claimed function. Although the specification states that a "web site server or surrogate parses CGI script," the parsing of CGI script is not the same as the parsing of "said information from said form," and the specification fails to identify an algorithm for performing parsing.<br><br>**Structure:** The structure disclosed in the specification that comes closest to performing the claimed function is at most incomplete and does not perform the complete claimed function. Specifically, that disclosed structure is: (i) a website server or surrogate website server, which parses CGI script (as shown by Fig. 1b, box 103). |
| "a means for updating, | Function: (agreed to by ALL parties) updating, through the | Function: (agreed to by ALL parties) updating, through the use of said |

10

United States District Court
For the Northern District of California

A10

| | | |
|---|---|---|
| through the use of said script, said database of search engine" | use of said script, said database of search engine.<br><br>Structure: Common Gateway Interface (CGI) program of search engines and equivalents | script, said database of search engine.<br><br>**Indefinite:** The patent discloses no structure for "updating, though the use of said script, said database of search engine." Although the specification does disclose that a search engine executes a particular script to update its database (10:44-11:44; 12:18-13:44; Figs. 3a and 3b), that script is executed by the search engine, and must be different from the script that parses said information from said form, which executes on the website server or surrogate. The specification discloses no script that performs both functions, and thus cannot disclose any structure for executing such a script.<br><br>**Structure:** The structure disclosed in the specification that comes closest to performing the claimed function is at most incomplete and does not perform the complete claimed function. Specifically, that disclosed structure is: (i) a search engine; and (ii) the "register file" CGI script executed by the search engine (as described at 10:39-41 and 10:43-44), that (1) removes entries from the search engine database for files that no longer exist; (2) adds entries to the search engine database for newly registered files; and (3) updates entries in the search engine database for files that have changed (all as described at 10:46-11:44; at 12:18-13:44; and in Figs. 3a and 3b). |

The court construed those terms as follows[43]:

| Term | Court's Constructions |
|---|---|
| "information" | Not construed because of concerns regarding indefiniteness |
| "website database" | Record of resources on the website, other than the resources of the |

---

[43] *See* Docket No. 632 at 153:17 – 157:15.

11

Case No.: 11-3306 PSG
ORDER

| | website themselves |
|---|---|
| "a means for creating and modifying a database of a website where in said website database contains content capable of being indexed by an internet search engine" | Function: Creating and modifying a database of a website wherein said website database contains content capable of being indexed by an internet search engine<br><br>Structure: A website server or surrogate website server; the table of files which is a field in the table of search engines; and the disclosed server algorithm which builds the table of files list containing records that store URL's that are obtained from either a manually entered list, a specified map page, or a spider crawling from specified entry points of the website and modifies records in the table of files list when content is added, altered, or removed |
| "a means for identifying, using said web site database, new, deleted, or modified content" | Function: Identifying, using said website database, new, deleted, or modified content<br><br>Structure: A website server or surrogate website server and the server algorithm that automatically checks the database representing a historical version of a website against a current version of a website to detect changes, and marks a resource as new if it is present on a website server but not yet in the website database; marks a resource as deleted if it is listed in the website database, but cannot be retrieved; marks a resource as modified if the date and time of last modification in the website database for the resource is earlier than the date and time of last modification provided by a web server for the resource, and does not mark any modified, unmodified, resources |
| "a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted or modified database content" | Not construed because of concerns regarding indefiniteness |
| "a means for parsing, through the use of said script, said information from said form" | Not construed because of concerns regarding indefiniteness |
| "a means for updating, through the use of said script, said database of search engine" | Not construed because of concerns regarding indefiniteness |

Newegg asserts that SUS's position regarding "website database" ignored the specifications, that SUS's positions regarding "means for creating" and "means for identifying" ignored means-plus-function case law, and that SUS should have known that several of its terms

12

A12

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

were indefinite.  Newegg also suggests that SUS's claim construction positions before the Eastern District of Texas were so contrary to means-plus-function law that they also were objectively baseless.

In its discussion of both its constructions and the merit of SUS's arguments, the court keeps in mind the Federal Circuit's guidance regarding claim construction.  "To construe a claim term, the trial court must determine the meaning of any disputed words from the perspective of one of ordinary skill in the pertinent art at the time of filing."[44]  This requires a careful review of the intrinsic record, comprised of the claim terms, written description, and prosecution history of the patent.[45]  While claim terms "are generally given their ordinary and customary meaning," the claims themselves and the context in which the terms appear "provide substantial guidance as to the meaning of particular claim terms."  Indeed, a patent's specification "is always highly relevant to the claim construction analysis."[46]  Claims "must be read in view of the specification, of which they are part."[47]

Although the patent's prosecution history "lacks the clarity of the specification and thus is less useful for claim construction purposes," it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."[48]  The court also has the discretion to consider extrinsic evidence, including dictionaries, scientific treatises, and testimony from experts and inventors. Such evidence,

[44] *Chamberlain Group, Inc. v. Lear Corp.,* 516 F.3d 1331, 1335 (Fed. Cir. 2008).

[45] *Id.*; *Phillips v. AWH Corp,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal citations omitted).

[46] *Phillips,* 415 F.3d at 1312-15.

[47] *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996). *See also Ultimax Cement Mfg. Corp v. CTS Cement Mfg. Corp.*, 587 F. 3d 1339, 1347 (Fed. Cir. 2009).

[48] *Phillips,* 415 F.3d at 1317 (internal quotations omitted).

13
Case No.: 11-3306 PSG
ORDER

A13

United States District Court
For the Northern District of California

however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language."[49]

The court turns now to the terms at issue and the merit of SUS's arguments.

> **a.   "Website Database"**

SUS argued that the "website database" is "simply [a] record of resources on the website" and pointed to the Summary of Invention in the RE'683 Patent.[50]  The Summary of Invention states that "[u]pon initial execution, the software builds a database of the resources on the website" and that "[t]he resources catalogued can be specified by the user, or automatically through spidering function of the software."[51]  The summary further provides that "[t]he database consists of one record per resource indexed on the site."[52]

Newegg[53] argued that SUS's construction was "so vague that it would encompass the website itself" and that Newegg's construction more properly established that the resources on the website are distinct from the website itself.  Newegg also looked to the Summary of Invention, highlighting its description of the database as "consist[ing] of one record per resource indexed on the site" and that "[e]ach record contains fields."[54]

The court construed "website database" as a "record of resources on the website, other than the resources of the website itself."  The court agreed with Newegg's concerns that the website database had to be distinguished from the underlying website to fit within the claims and the

---

[49] *Id.* (internal quotations omitted).

[50] *See* Docket No. 605.

[51] RE'683 Patent at 4:35-39.

[52] *Id.*

[53] The twenty-two remaining defendants filed a joint claim construction brief opposing SUS's constructions, but for convenience, the court refers only to Newegg as maintaining the arguments.

[54] RE'683 Patent at 4:35-40.

14

Case No.: 11-3306 PSG
ORDER

A14

United States District Court
For the Northern District of California

specifications in the RE'683 Patent.[55]  The language of the claim in which "website database"

appears requires that any construction of the term include a distinction between the website and the

resulting database.  The claim states "a means for creating and modifying a database of a web site

wherein said website database," which, in conjunction with the language of the Summary of

Invention, supports that the "website database" is separate from the underlying resources on the

website itself.[56]  The inventor likewise noted during reexamination that "the process in the . . .

invention checks a database representing a historical version of a web site against the current

version of the Web site to detect changes."[57]

Although the court added a clause distinguishing the "record of resources" from the

"resources on the website itself," it found less support for Newegg's position that the term meant a

"structure of fields or records built by software that catalogues the resources of a website."  The

Summary of Invention references "fields" in describing the database, but the intrinsic evidence

does not support that a person of ordinary skill in the art would consider a "website database" to be

limited to a "structure" built by "software that catalogues the resources of a website."  Newegg in

fact pointed to no other intrinsic evidence to support the extra language in its construction.[58]

Having now explained the reasoning for its construction, the court cannot say that SUS's

position was "objectively baseless."  Its proposed construction, although broadly worded, was not

entirely unsupported by the intrinsic evidence.  SUS's construction came from language in the

Summary of Invention and is not so problematic that the court finds it was frivolous.  As SUS

explained at the hearing, it was concerned that Newegg's construction suggested a "separate and

---

[55] *See* Docket No. 632 at 90:25 – 91:12.

[56] RE'683 Patent at 15:28-29.

[57] *See* Docket No. 607 Ex. 2.

[58] *See* Docket No. 607.

15

Case No.: 11-3306 PSG
ORDER

A15

distinct" database that was not an included limitation in the claim language and that appeared to preclude the website itself from hosting the database.[59]  SUS, however, agreed at the hearing that the "website database" had to be distinct from just the content of the website.[60]

The court in fact adopted its description – "record of resources on the website" – and added the limiting clause in part because of Newegg's concerns.  Newegg argues that because SUS's proposed construction could be read as including the website itself, SUS's position was untenable and baseless.  It is true that SUS's proposal could be read to include the website, which SUS at one point forwarded as an argument[61] and which would in fact contradict the intrinsic evidence, but that interpretation is not the only one.  First, at the hearing, SUS agreed that this interpretation of "website database" or its construction was not supported by the claim or the specification.  Second, although SUS's construction could have swept in the website itself, "record of resources" likewise suggests that the record is separate from the website.  The construction was problematic, but the court cannot say that it was so clearly unsupported by the patent and the specification as to be frivolous.[62]

The types of claim construction positions the Federal Circuit has held to be frivolous are illustrative.  In *Raylon, LLC v. Comoplus Data Innovations, Inc.*, for example, the plaintiff proposed a construction of a "display being pivotally mounted on said housing" to mean "an electronic device attached to a housing for the visual presentation of information, the display capable of being moved or pivoted relative to the viewer's perspective."[63]  Both the figures in the

---

[59] *See* Docket No. 632 at 88:15-18.

[60] *See id.* at 88:19-24.

[61] *See* Docket No. 608.

[62] *See iLOR, LLC v. Google, Inc.*, 631 F3d 1372, 1378-89 (Fed. Cir. 2011) ("The question is whether [the] broader claim construction was so unreasonable that no reasonable litigant could believe it would succeed.").

16

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

A16

patent and the specification described that the screen itself must pivot relative to the machine, not relative to the user.[64]  The Federal Circuit held that the plaintiff's position was not just unsupported by the patent but actually contradicted by it.[65]  In *Eon-Net LP v. Flagstar Bancorp*, the Federal Circuit agreed with the district court that the patentee's position that the terms "documents" and "files" were not limited to "hard copy documents" was contradicted by the numerous references in the patent to "hard copy documents" as being the essence of the invention at issue.[66]  SUS's proposed construction does not reach those levels of speciousness.

> **b.    "Means for Creating" and "Means for Identifying"**

The parties disputed only the construction of the structures that performed the functions "a means for creating and modifying a database of a website where in said website database contains content capable of being indexed by an internet search engine" and  "a means for identifying, using said web site database, new, deleted, or modified content."  For the "means for creating" term, SUS sought a construction of the structure as a "combination of a web server, Common Gateway Interface script, website database and form and equivalents."  For the "means for identifying" term, SUS sought a nearly identical construction with only a substitution of "script" for "program" in the "Common Gateway Interface" ("CGI") language.  SUS supported its constructions with references to the specification.  For example, it pointed to language stating that "[i]nstallation of the software tools places a number of CGI scripts, database tables, and HTML forms on the server," and that "[t]he user is provided with an HTML form and CGI script . . . in order to configure the Enabled and Table of Files fields."  Relying on these references, SUS asserted that the structure necessary to create the database consisted of a web server, a CGI program, a website database and a form.

---

[63] 700 F.3d 1361, 1365 (Fed. Cir. 2012).

[64] *See id.* at 1368-69.

[65] *See id.* at 1369.

[66] 653 F.3d at 1326.

17

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Newegg disagreed, asserting that SUS's position improperly referenced only a general

purpose computer or general computer functions in violation of the Federal Circuit's requirements

under computer-related means-plus-functions claims.  Newegg instead asserted that for both

"means for creating" and "means for identifying" the proper structure was not only a website

server or surrogate website server but also "the Table of Files, which is a filed in the Table of

Search Engines . . . [and] the disclosed server algorithm" that builds the Table of Files and

modifies the table's records as content is "added, altered, or removed."  Newegg argued that only

with the addition of the algorithm that explained how the website server and the Table of Files

were created and updated could the structure comply with 35 U.S.C. § 112(6).

The court adopted Newegg's construction of the structure for both "means for identifying"

and "means for creating."  Although the specification described that the user "is provided with an

HTML form and CGI script, hereinafter referred to as a CGI program, in order to configure the

Enabled and Table of Files fields," the court found this instruction insufficient to describe the

requisite structure for means-plus-function claims.  Relying in part on Newegg's expert, the court

found that the CGI program was a general tool for allowing data to move between a web client, a

web server, and different processes on the web server and so it was only a "general purpose

computer" requiring an algorithm to meet the Section 112(6) requirement.[67]

The court then looked to the rest of the specification, which describes both the "Table of

Files" and the algorithm necessary to create both that table and to update it with changes to the

website.  That algorithm explains that the CGI program (a combination of the CGI script and the

HTML form) "configure[s]" the "Table of Files" through one of three methods: (1) "[t]he user may

list all the resources to be registered manually"; (2) "[t]he user may specify a map page"; or (3)

"[t]he user may specify entry points to the web site" at which point "the CGI program will enter the

---

[67] *See* Docket No. 607 Ex. 1 at ¶ 16.

18

Case No.: 11-3306 PSG
ORDER

A18

site and spider to all resources referenced on those entry points" and add them to the Table of Files. The court found this description to be the algorithm necessary to describe what steps the CGI program needed to perform to embody both the "means for creating" and the "means for identifying" terms.

Newegg asserts that SUS's proposed constructions for the structures for "means for creating" and for "means for identifying" were so contrary to means-plus-function case law that they were frivolous. Newegg specifically points to SUS's failure to account for the Table of Files within the Table of Search Engines algorithm in its proposed construction, asserting that SUS's position contradicted the patent itself, which, according to Newegg, taught that structure as the heart of the invention. Newegg contends that, combined with its proposed construction of "website database," SUS's arguments for the structures impermissibly sought an interpretation of the patent far broader than the invention the patent actually described.

SUS responds that its position was not frivolous because the combination of a web server, CGI program, website database, and form acts as a "special-purpose computer," which, pursuant to the Federal Circuit's teachings, does not require an algorithm to explain adequately the structure for the means-plus-function claims. According to SUS, the elements of the structure it proposed already contained sufficient programming such that it did not err by not including an algorithm. SUS maintains that this area of law is complicated and subject to dispute and so its position cannot be considered "objectively baseless."

The court begins by considering the law governing means-plus-functions and computer-related patents in particular. Patents may not claim pure functions – they must recite a structure that performs the function the patentee seeks to protect.[68] The claim itself need not describe the structure: "[a]n element in a claim for a combination may be expressed as a means or step for

---

[68] *See Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012).

19

Case No.: 11-3306 PSG
ORDER

A19

United States District Court
For the Northern District of California

performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."[69]  In other words, in exchange for being excused from describing the structure within the claim, the patentee must limit itself to the structures described in the specification.[70]  Failure to describe a structure that can perform the function in either the specification or the claim renders the patent indefinite.[71]

Computer-related inventions present a special situation under means-plus-function law. Because a computer generally cannot perform a particular function without further instructions, identifying a general purpose computer does not satisfy the "structure" requirement for a computer function.[72]  The specification therefore must describe an algorithm that explains the instructions for the computer to satisfy means-plus-function specificity.[73]  In other words, for a computer apparatus claimed in a means-plus-function manner, the claim and the specification must disclose essentially three elements: (1) the function, (2) the part of the computer that can perform the function, and (3) the algorithm that makes the computer perform that particular function.  The last two elements combine to describe a "special purpose computer" programmed to perform the function described in the claim.[74]  The "special purpose computer" thus described satisfies the structure component of a means-plus-function claim.[75]

---

[69] 35 U.S.C. § 112(6).

[70] *See Ergo Licensing*, 673 F.3d at 1363.

[71] *See id.*

[72] *See id.* at 1364; *see also Aristocrat Tech. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to the corresponding structure, material, or acts that perform the function, as required by section 112 paragraph 6.") (internal quotations omitted).

[73] *See Ergo Licensing*, 673 F.3d at 1363; *Aristocrat*, 521 F.3d at 1333.

20

Case No.: 11-3306 PSG
ORDER

A20

The Federal Circuit also advises that a disclosed algorithm that "supports some, but not all, of the functions associated with a means-plus-function limitation" requires treating the specification "as if no algorithm has been disclosed at all."[76]  An expert's testimony cannot remedy a deficiency in the specification by "supplant[ing] the total absence of structure from the specification."[77]

The Federal Circuit has carved out a limited exception to this requirement that an algorithm must be disclosed.[78]  In situations where the claimed functions can be performed by a general-purpose computer "without special programming," patentees need not "disclose more structure than the general purpose processor that performs those functions."[79]  But "[i]f special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure of an algorithm applies."[80]  "It is only in the rare circumstances where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed."[81]

SUS did not argue at claim construction that the structure it proffered was a "general-purpose computer" that could perform the claimed functions without additional programming. SUS instead argued that the combination of the website server, CGI program, website database,

---

[74] *See Aristocrat*, 521 F.3d at 1333.

[75] *See id.*

[76] *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012).

[77] *Default Proof Credit Card Sys. V. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005); *see also Noah*, 675 F.3d at 1318.

[78] *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011); *see also Ergo*, 673 F.3d at 1364-65 (noting that *Katz* "identified a narrow exception to the requirement that an algorithm must be disclosed for a general-purpose computer to satisfy the disclosure requirement").

[79] *Katz*, 639 F.3d at 1316.

[80] *Ergo*, 673 F.3d at 1365.

[81] *Id.*

21

Case No.: 11-3306 PSG
ORDER

A21

and form is a "special-purpose computer" that does not require an additional algorithm. To support this argument, SUS compared the functions courts have identified "special purpose computers" capable of performing and functions associated with "general purpose computers" and argued that the functions that the CGI program and the web server performed make them "special purpose computers."

Typically, a "special purpose computer" is "what a general purpose computer becomes when an appropriate algorithm is used."[82] It is possible, however, for a structure known by a person with ordinary skill in the art as a special purpose computer to be identified in the specification without any further algorithm.[83] SUS took that premise – that a computer-like structure known to perform in a particular way can stand alone as a "special purpose computer" – and argued that a structure that can perform in a manner beyond general processing without additional programming qualifies as a "special purpose computer" that does not require an algorithm.

SUS misunderstood the Federal Circuit's guidance both during claim construction and again here in its defense to this opposition. A structure can qualify as a stand-alone "special purpose computer" only because a person with ordinary skill in the art knows it can perform in essentially one way and that one way performs the claimed function.[84] The structure therefore is sufficiently specific to qualify under Section 112(6). Underlying the Federal Circuit's guidance in this area is that the trade-off for means-plus-function claims is a sufficiently specific structure identified in the specification. An algorithm explaining how a computer that is able to perform

---

[82] *Goss Intern. Am., Inc. v. Graphic Mgmt. Assoc., Inc.*, 739 F. Supp. 2d 1089, 1100 (N.D. Ill. 2010).

[83] *See id.* (finding that a "controller" is a "known structure that is a type of special purpose computer" as defined by extrinsic sources and so it did not need an algorithm).

[84] *See, e.g., id.*

22

Case No.: 11-3306 PSG
ORDER

A22

United States District Court
For the Northern District of California

1    generalized functions can perform the specific function claimed in the patent respects that trade-

2    off.

3       Here, SUS argued that because the web server "receives requests in HTTP, HTTPS, or a

4    similar standardized web protocol," "generates responses to those requests," "[uses] CGI scripts . .

5    . to pass data between different processes running on the web server," and "passes data between a

6    web server and web client," the web server was a "special purpose computer" when combined with

7    the other structures in its construction.[85]  None of those functions, however, include creating or

8    modifying a website database or identifying changes in the website by using the website database.

9    The structures required an algorithm to reach the level of specificity required under Section 112(6).

10      Although the court disagreed that the combination of a CGI program, a web server, a

11   website database, and a form constituted a special purpose computer, SUS's position was not

12   entirely frivolous.  As the court's lengthy discussion of this area of law makes clear, the Federal

13   Circuit and district courts have created a complicated framework from which to determine whether

14   a particular computer-related structure does or does not satisfy Section 112(6).  SUS's argument

15   overlooks a nuance in the Federal Circuit's case law – namely that the functions the court has

16   identified in its computer-related means-plus-function opinions do not on their own transform

17   general purpose computers into special purpose computers.  But given the disputes within the

18   Federal Circuit regarding this area of law,[86] the court cannot say that SUS's argument is

19   objectively baseless or frivolous.

20      **c. Indefiniteness**

21      For its third argument, Newegg contends that SUS should have realized that several of the

22   terms in claim 8 were indefinite and so should have avoided pursuing its case.  It primarily points

---

[85] *See* Docket No. 608 (quoting the defendants' expert's report); *see also* Docket No. 607 Ex. 1.

[86] *See Ergo*, 673 F.3d at 1365 (Newman, J., dissenting) (noting that the court "again, irregularly and unpredictably, departs from the established protocols of claim drafting").

23

Case No.: 11-3306 PSG
ORDER

A23

to the three means-plus-function terms that the court declined to construe on indefiniteness grounds.[87]  According to Newegg, the terms were so obviously indefinite that SUS's pursuit of infringement causes of action was objectively baseless.  SUS responds that, as with the constructions of "means for creating" and "means for identifying," at least three of the terms could be construed as requiring only the CGI script, web server, website database, and form structures.

The three terms – "a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted or modified database content," "a means for parsing, through the use of said script, said information from said form," and "a means for updating, through the use of said script, said database of search engine" – were indisputably means-plus-function terms that required a sufficiently specific structure to be identified in the specification.[88]  SUS offered the same structure for these three terms as it did for the "means for identifying" and "means for creating" terms.  As the court already has explained, that structure on its own is insufficient to satisfy the requirements of Section 112(6).  But unlike "means for creating" and "means for identifying," the specification lacked the necessary algorithms to explain how the CGI scripts, web server, website database, and form would perform the claimed functions.  The court thus found that the three terms likely were indefinite and so declined to construe them.

The court has explained at length its reasons for why SUS's position regarding the structure for the means-plus-function terms was not objectively baseless.  Newegg's arguments about the three indefinite means-plus-function terms mirror its earlier argument, and so the court adopts that reasoning here.  SUS's position relied on an incorrect but not objectively baseless interpretation of

---

[87] Newegg also includes a reference to "information," which the court also declined to construe on indefiniteness grounds.  Because Newegg provides no further argument about this term than to include it in the description of terms the court found indefinite, the court does not address SUS's position.

[88] *See* 35 U.S.C. § 112(6).

24

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

A24

computer-related means-plus-function law.  The court further finds that the terms were not so

obviously indefinite that SUS's pursuit of infringement causes of action on claim 8 was frivolous.

### d.    Eastern District of Texas Claim Construction Positions

Newegg also offers SUS's claim construction positions before the Eastern District of Texas

as evidence that SUS's causes of action were objectively baseless.  Before the case was transferred

to this court, the parties prepared for claim construction while the defendants' motion for transfer

was pending.  The Eastern District of Texas transferred the case before it performed claim

construction, and so the parties prepared new claim construction briefs pursuant to this court's case

management order.  Newegg asserts that SUS's positions in the earlier claim construction

preparation were so egregious as to warrant an objectively baseless finding.

In its first claim construction papers, SUS asserted that the structure for the six means-plus-

function terms in claim 8 could be satisfied with only a CGI script and further maintained that the

CGI script was only an "exemplary structure."[89]  Newegg contends that these positions were even

more egregious arguments in light of the means-plus-function law that the court described above.

SUS admits that after considering the defendants' opposition in their original briefing, it revised its

positions to add more structure in the means-plus-function constructions.

The court agrees with Newegg that SUS's positions in the Eastern District of Texas

represent worse arguments than its proposed constructions before this court.  Had SUS maintained

those positions in the second claim construction, the court likely would find that SUS's arguments

were frivolous.  But the court cannot say that SUS's highly problematic position in an opening

brief to a claim construction is sufficient, on its own, to warrant a finding of objective baselessness.

SUS had no opportunity to file a reply in the first claim construction, and it amended its proposals

in the claim construction in this court.  SUS thus attempted to correct the defects the defendants

---

[89] *See* Docket No. 494.

25

Case No.: 11-3306 PSG
ORDER

identified.[90]  And so, even if the court were to find that SUS's claim construction proposals before

the Eastern District of Texas were objectively baseless, SUS's attempts to amend them do not

reveal subjective bad-faith.  Newegg has not shown by clear and convincing evidence that this is an

exceptional case on these grounds.

### 2.    Subjective Bad Faith

Although the court has found that SUS's positions were not objectively baseless, it

nevertheless addresses Newegg's arguments regarding subjective bad faith.  Relying on *Eon-Net*

*LP v. Flagstar Bancorp*,[91] Newegg points to SUS's settlement conduct, specifically that SUS

settled early with several defendants for amounts that Newegg asserts reflect SUS's goal of

obtaining nuisance settlements.  To support that argument, Newegg presents SUS's offers to it

during litigation as well as nine settlement agreements with other defendants in the action.

Those nine settlement agreements Newegg submitted reveal that the amounts ranged from

███████████████ with all but two of the settlements within a five-figure range.[92]  The

settlements took place between October 2010 and June 2011.[93]  Newegg also points to SUS's

conduct with respect to its settlement offers to Newegg.  In July 2010, SUS offered to settle the

case with Newegg for ████████ and then in April 2012 dropped the amount of the offer to

██████.[94]  According to Newegg, SUS's settlement conduct mirrors the patentee in *Eon-Net*, and

so the court should find SUS acted with subjective bad faith.

---

[90] *See Raylon*, 700 F.3d at 1365 (noting patentee maintained objectively baseless claim
construction position even after warning from defendants that the construction was entirely
erroneous); *Highmark*, 687 F.3d at 1312 (describing patentee's early agreement that preamble
limited claim but then later claim construction in contradiction of the preamble).

[91] 653 F.3d at 1327.

[92] *See* Docket No. 649 Exs. 6 – 14.

[93] *See id.*

[94] *See* Docket No. 649 Ex. 4 at ¶ 15, Ex. 18.

26

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

A26

**United States District Court**
For the Northern District of California

To underscore its theory that SUS was entirely bent on extracting settlements from noninfringing defendants based on little more than the crushing costs of defense in even the simplest patent case, Newegg highlights the relationship between SUS and its parent corporation Acacia Research Corporation ("Acacia").  According to Newegg, Acacia has a "pattern" of extortionate litigation tactics, including parallel cases between Acacia subsidiaries Adjustacam LLC ("Adjustacam") and Digitech Images Technologies, LLC ("Digitech") and Newegg.  Newegg asserts that Adjustacam decided to drop its claims against Newegg in the parallel case and that, as with this case, Acacia played a substantial role in settlement talks involving both of its subsidiaries. These actions, Newegg asserts, reveal that Acacia is the real problem, and that the actions of Acacia and its subsidiaries in the various actions should serve as evidence of SUS's bad faith here.

SUS responds that at least one of its settlement agreements was for $450,000, which it asserts belies that the agreements were for nuisance values.  It also asserts that unlike in *Eon-Net*, where the patentee used defendants' annual sales to determine appropriate settlement amounts, SUS's valuation resulted from its assessment of "URL count, with flexibility given if the accused functionality was less important to the business, including in consideration of feedback from defendants, ALEXA ratings, how many visitors reached the site from search engine searches, and how many visitors are from the U.S."[95]  In response to Newegg's claims about Acacia, SUS highlights that Newegg has not moved to include Acacia in this case under an alter-ego theory and that Newegg's claims amount to nothing more than bald assertions.

In *Eon-Net*, the Federal Circuit affirmed the district court's exceptional case finding where the patentee, a non-practicing entity, and its related entities "had filed over 100 lawsuits against a number of diverse defendants alleging infringement of one or more patents" and followed the

---

[95] Docket No. 654; *see also* Docket No. 654 Ex. 4.

Case No.: 11-3306 PSG
ORDER

A27

complaints with "a demand for a quick settlement at a price far lower than the cost of litigation."[96] Noting the expense of pursuing a case through claim construction, which is the first opportunity that a court can ascertain the merit of the underlying claims, the Federal Circuit explained that "low settlement offers . . . effectively ensure[] that [the patentee's] baseless infringement allegations remain[] unexposed."[97]  Such requests for low settlement amounts, when combined with meritless infringement claims, thus can support a court's determination that the patentee brought the case in subjective bad faith.[98]

As described at length above, the court does not find that SUS's positions in this case were objectively baseless.  Because SUS's argument is not frivolous – because it is only a losing argument – the court cannot say that SUS's settlements with the defendants for amounts below the cost of defense are, by themselves, enough to warrant a finding of subjective bad faith.  Patentees with meritorious arguments can seek settlements far below the cost of defense, especially if they do not want to spend significant amounts of money to protect their patents.  SUS's settlement pattern raises some eyebrows but because its positions were not entirely baseless, its attempts to settle claims early in the litigation for costs lower than the amounts of a defense are not sufficient, alone, to find subjective bad faith.

The court also briefly addresses Newegg's references to Acacia, Digitech, and Adjustacam in support of its exceptional case argument here.  In *Eon-Net*, the Federal Circuit pointed to the patentee's "related entities" and their pattern of filing numerous lawsuits against "diverse defendants" followed by a "demand for a quick settlement at a price far lower than the cost of

---

[96] 653 F.3d at 1326.

[97] *Id.* at 1327.

[98] *See id.*

28

Case No.: 11-3306 PSG
ORDER

litigation."[99]  Presumably following the Federal Circuit's lead, Newegg presents the parallel

litigations with Digitech and Adjustacam and their relationship to SUS and Acacia in support of its

argument.

        Although the Federal Circuit appears to condone consideration of actions in other cases as a

way to justify an exceptional case finding, the court also looks to the Supreme Court's direction in

*State Farm v. Campbell*.  In holding a punitive damages award violated the defendant's Due

Process rights, the Court opined that a defendant "should be punished for the conduct that harmed

the plaintiff, not for being an unsavory individual or business."[100]  "Due process does not permit

courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical

claims against a defendant under the guise of the reprehensibility analysis" that is required in a

punitive damages assessment.[101]  The Court further observed although "a recidivist may be

punished more severely than a first offender" because "repeated misconduct is more reprehensible

than an individual instance of malfeasance," "in the context of civil actions courts must ensure the

conduct in question replicates the prior transgressions."[102]

        The court finds that reasoning in *State Farm* has equal application in the exceptional case

analysis, specifically that Newegg must show that SUS engaged in repeated conduct that also

harmed Newegg.  Here, Newegg offers the complaint Adjustacam filed against Newegg and

numerous other defendants and a declaration stating that Adjustacam offered to settle for a five-

figure amount.[103]  Newegg also offers screen shots of Acacia's websites purportedly to show that

Acacia and SUS are related because Acacia announced the settlement between SUS and Red Hat

---

[99] *Id.* at 1327.

[100] 538 U.S. 408, 423 (2003).

[101] *Id.*

[102] *Id.*

[103] *See* Docket No. 649 Exs. 2, 3.

29

Case No.: 11-3306 PSG
ORDER

United States District Court
For the Northern District of California

and because the officers who signed on behalf of SUS also serve as executives at Acacia.[104]  Even if this evidence is sufficient to show that Acacia and SUS are related, it is not enough to show the relationship between Acacia and Adjustacam or between SUS and Adjustacam.  Newegg offers nothing to connect Digitech to any of the other entities.

Even if the court presumes the entities are all related, settlement offers for small amounts are not the injury that Newegg claims to suffer at SUS's hands.  It is the defense against a frivolous claim in light of the lure of a small settlement offer that *Eon-Net* identified as a harm warranting an exceptional case finding.  Newegg offers nothing in its disputes with either Adjustacam or Digitech that suggests their positions were objectively baseless.   And if the court considers bad faith actions in other cases as justification for a finding of subjective bad faith in this case, it runs the risk of duplicating an assessment of attorneys' fees against a losing party by awarding attorneys' fees in this case for actions taken in the other cases.[105]  Given those concerns, the court does not address further Newegg's arguments regarding Acacia, Adjustacam, and Digitech.

**B.    Litigation Misconduct**

Newegg offers two other examples of SUS's conduct that it believes supports a finding that this case is exceptional.  While the case was still in the Eastern District of Texas, SUS opposed the defendants' motion to transfer the case to the Northern District of California.[106]  Newegg asserts that the opposition was frivolous because it was only two pages and because SUS concluded its brief argument by stating that it was "agreeable to the transfer if the Court deems that such transfer is in the interests of justice of all parties."[107]  Newegg also points to SUS's initial failure to include

---

[104] *See id.* Exs. O, Q, R, T.

[105] *See State Farm*, 538 U.S. at 423 (noting that consideration of "hypothetical claims" "creates the possibility of multiple punitive damages awards for the same conduct").

[106] *See* Docket No. 410.
[107] *Id.*

30

Case No.: 11-3306 PSG
ORDER

A30

**United States District Court**
For the Northern District of California

Acacia and its other subsidiaries in its initial offer of a covenant not to sue following the claim

construction. Newegg offers these actions as further evidence of SUS's bad faith in this action.

Litigation misconduct "generally involves unethical or unprofessional conduct by a party or

his attorneys during the course of adjudicative proceedings, and includes advancing frivolous

arguments during the course of litigation or otherwise prolonging litigation in bad faith."[108] The

court finds that neither of the actions Newegg offers meets this standard.

In opposing the defendants' motion to change venue to this district, SUS noted that not all

of the defendants had joined the motion, which could result in duplicative proceedings. SUS also

argued that the Eastern District of Texas had a shorter average complaint-to-trial timespan than the

Northern District of California. The court notes that at least two defendants agreed to join the

motion to change venue only after SUS filed its opposition[109] and that the Eastern District of Texas

had entered a scheduling order before the defendants filed their motion.[110] Given these factors, the

court cannot say that SUS frivolously opposed the motion to transfer the case to this district.

The covenant not to sue ("CNS") issue likewise does not amount to bad faith conduct on

SUS's part. Following the court's claim construction, SUS apparently agreed to dismiss its claims

against Newegg and offered a CNS for infringement resulting from Newegg's website as it existed

at the time of the covenant or for any past versions in exchange for Newegg's dismissal of its

counterclaims of invalidity. Newegg claims that it insisted on a covenant that included all future

versions of the website as well. SUS asserts that Newegg in fact asked for a global covenant not to

sue including not only SUS but also Acacia and other subsidiaries. Either way, SUS refused to

provide a version of the covenant that satisfied Newegg and instead sought to divest the court of its

---

[108] *Highmark*, 687 F.3d at 1315-16.

[109] *See* Docket Nos. 417, 424.

[110] *See* Docket Nos. 362, 363, 364, 365.

31

Case No.: 11-3306 PSG
ORDER

A31

United States District Court
For the Northern District of California

1  subject matter jurisdiction over the case by moving to dismiss the case and offering Newegg its

2  covenant not to sue addressing only current and past versions of the site.[111]  Newegg opposed on

3  the grounds that the covenant was not sufficient to prevent an ongoing controversy because

4  Newegg's site changes daily.[112]  Following Newegg's opposition, SUS offered the amended

5  covenant and the parties stipulated to dismiss all claims.[113]

6          Given that Newegg concedes it was engaged in discussions with Acacia for a global

7  resolution,[114] the court does not agree with its contention that SUS is misrepresenting Newegg's

8  position on a global CNS.  Nevertheless, to the extent that the global settlement discussions broke

9  down and the parties attempted to resolve only the CNS relevant to this case, the court again finds

10  SUS's position not objectively baseless.

11

12          To divest a court of its jurisdiction, a patentee is obligated to provide a CNS that removes

13  "immediacy and reality from the declaratory action."[115]  From its review of the potential CNS, the

14  court cannot say that there is no way that SUS could assert that it divested the court's jurisdiction

15  by removing the requisite case or controversy requirement.  To be sure, Newegg's assertion that its

16  ongoing changes of its website created an ongoing controversy is also a plausible argument, but

17  SUS likewise could have argued that because those changes were sufficiently minimal, Newegg's

18  concerns involved nothing more than the "residual possibility of a future infringement suit based

19  on [] future acts [that] is simply too speculative."[116]  The court engages no further in debating the

20  points the parties could have made in support of an order that never came to pass.  It resolves the

21

22  ────────────────

23  [111] *See* Docket No. 642.

24  [112] *See* Docket No. 645.

25  [113] *See* Docket Nos. 646, 647.

26  [114] *See* Docket No. 649.

27  [115] *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 556 F.3d 1294, 1298 (Fed. Cir. 2009) (quoting
   *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1346 (Fed. Cir. 2007)).

28  [116] *Id.*

                                        32

Case No.: 11-3306 PSG
ORDER

A32

issue only with the point that both sides had legitimate arguments and so SUS's position did not

amount to litigation misconduct.

### IV.    CONCLUSION

Having completed its meta-analysis not only of the parties' claim construction positions but

indeed of several other positions taken in this case, the court finds that this case is not exceptional

and so does not warrant an award of attorneys' fees to Newegg.  SUS may have been on the losing

side of several arguments, but losing is not enough to warrant a finding of objective baselessness

and also subjective bad faith.  Newegg's motion is DENIED.

**IT IS SO ORDERED.**

Dated: May 21, 2013

PAUL S. GREWAL
United States Magistrate Judge

Case No.: 11-3306 PSG
ORDER

A33



US00RE40683E

(19) **United States**

(12) **Reissued Patent**
Perkins

(10) Patent Number: **US RE40,683 E**
(45) Date of Reissued Patent: **Mar. 24, 2009**

(54) **PROCESS FOR MAINTAINING ONGOING REGISTRATION FOR PAGES ON A GIVEN SEARCH ENGINE**

(75) Inventor: **Alan Perkins**, Kettering (GB)

(73) Assignee: **Search Mechanics, Inc.**, New York, NY (US)

(21) Appl. No.: **10/600,114**

(22) Filed: **Jun. 20, 2003**

**Related U.S. Patent Documents**
Reissue of:
(64) Patent No.: **6,253,198**
Issued: **Jun. 26, 2001**
Appl. No.: **09/309,681**
Filed: **May 11, 1999**

(51) Int. Cl.
*G06F 17/30* (2006.01)

(52) **U.S. Cl.** ............. **707/3**; 707/9; 707/10; 707/104.01; 709/203; 709/218; 715/201; 715/209; 715/234

(58) **Field of Classification Search** ..................... 707/2, 707/3, 4, 9, 10, 102, 104.1; 709/203, 218; 715/201, 209, 234
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,089,956 | A | * | 2/1992 | MacPhail ...................... 707/1 |
| 5,247,661 | A | * | 9/1993 | Hager et al. ............. 707/104.1 |
| 5,262,942 | A | * | 11/1993 | Earle ........................... 705/37 |
| 5,265,242 | A | * | 11/1993 | Fujisawa et al. .............. 707/3 |
| 5,285,383 | A | * | 2/1994 | Lindsey et al. .............. 705/26 |
| 5,297,031 | A | * | 3/1994 | Gutterman et al. ......... 705/37 |
| 5,297,032 | A | * | 3/1994 | Trojan et al. ................ 705/37 |
| 5,301,350 | A | * | 4/1994 | Rogan et al. ................ 705/33 |
| 5,321,750 | A | * | 6/1994 | Nadan ...................... 380/230 |
| 5,410,693 | A | * | 4/1995 | Yu et al. ................... 707/100 |
| 5,537,586 | A | * | 7/1996 | Amram et al. ................ 707/3 |
| 5,721,908 | A | * | 2/1998 | Lagarde et al. ............. 707/10 |

| | | | | |
|---|---|---|---|---|
| 5,745,899 | A | * | 4/1998 | Burrows ..................... 707/102 |
| 5,778,367 | A | * | 7/1998 | Wesinger et al. ............ 707/10 |
| 5,790,793 | A | * | 8/1998 | Higley ...................... 709/218 |
| 5,819,271 | A | * | 10/1998 | Mahoney et al. ............. 707/9 |
| 5,835,712 | A | * | 11/1998 | DuFresne ................. 709/203 |
| 5,835,718 | A | * | 11/1998 | Blewett ................... 709/218 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO9323836 | * | 11/1993 |
| WO | WO 9608108 | * | 3/1996 |
| WO | WO 9837697 | * | 8/1998 |

*Primary Examiner*—Shahid A Alam
(74) *Attorney, Agent, or Firm*—Kenneth A. Roddy

(57) **ABSTRACT**

A process for maintaining ongoing registration for pages on a given search engine is disclosed. It is a method to actively cause an updating of a specific Internet search engine database regarding a particular WWW resource. The updated information can encompass changed, added, or deleted content of a specific WWW site. The process comprises the steps of having software tools at a local WWW site manually and/or automatically keep an index of added, changed, or deleted content to a particular WWW site since that WWW site was last indexed by a specific Internet search engine. The software tools will notify a specific Internet search engine of the URLs of specific WWW site resources that have been added, changed, or deleted. The Internet search engine will process the list of indices of changes, additions or deletions provided by a web site, or add the URL of resources that require indexing or re-indexing to a database and visit the WWW site to index added or re-index changed content when possible. The benefit to the Internet is the creation of an exception-based, distributed updating system to the Internet search engine as opposed to the cyclical and repetitive inquiring by the Internet search engine to visit all WWW sites to find added, changed, or deleted content. Overall Internet transmissions are reduced by distributing the update and indexing functions locally to web sites and away from the central Internet search engine.

**14 Claims, 6 Drawing Sheets**



**US RE40,683 E**

Page 2

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,848,410 | A | * | 12/1998 | Walls et al. | 707/4 |
| 5,852,820 | A | * | 12/1998 | Burrows | 707/2 |
| 5,859,971 | A | * | 1/1999 | Bittinger et al. | 709/203 |
| 5,864,871 | A | * | 1/1999 | Kitain et al. | 707/104.1 |
| 5,873,077 | A | * | 2/1999 | Kanoh et al. | 707/3 |
| 5,890,172 | A | * | 3/1999 | Borman et al. | 715/205 |
| 5,933,829 | A | * | 8/1999 | Durst et al. | 707/10 |
| 5,956,716 | A | * | 9/1999 | Kenner et al. | 707/10 |
| 5,983,214 | A | * | 11/1999 | Lang et al. | 707/1 |
| 5,987,464 | A | * | 11/1999 | Schneider | 707/10 |
| 5,987,480 | A | * | 11/1999 | Donohue et al. | 715/207 |
| 6,055,538 | A | * | 4/2000 | Kessenich et al. | 707/101 |
| 6,078,917 | A | * | 6/2000 | Paulsen et al. | 707/6 |
| 6,094,649 | A | * | 7/2000 | Bowen et al. | 707/3 |
| 6,105,021 | A | * | 8/2000 | Berstis | 707/3 |
| 6,169,992 | B1 | * | 1/2001 | Beall et al. | 707/103 R |

* cited by examiner

A144



A
100
User opens 'search engine enable' HTML form in browser
101
User user selects search engines to be enabled and disabled
102
User submits form via CGI to web site server or surrogate server (not search engine)
200
User opens modify Table of Files HTML form in browser
201
User user selects method to update Table of Files database
202a
User manually specifies URLs of resources to be indexed
202b
User specifies a Map Page containing URLs of resources to be indexed
202c
User specifies URLs of entry points into site to be indexed
203a
User submits information via CGI to Web site server or surrogate
203b
User submits information via CGI to Web site server or surrogate
203c
User submits information via CGI to Web site server or surrogate
204a
Web site server or surrogate parses CGI script
204b
Web site server or surrogate parses CGI script
204c
Web site server or surrogate parses CGI script

FIG. 1a



F I G. 1b

205c — Web site server or surrogate executes spidering function on entry points

206c — Web site server or surrogate adds all resources found during spidering to Table of Files

207c — At user determined times, enabled search engines are notified of changed data in Table of Files

205b — Web site server or surrogate locates and parses Map page

206b — Web site server or surrogate adds all URLs on Map page to Table of Files

207b — At user determined times, enabled search engines are notified of changed data in Table of Files

205a — Web site server or surrogate updates enabled field in Table of Files

206a — At user determined times, enabled search engines are notified of changed data in Table of Files

103 — Web site server or surrogate parses CGI script

104 — Web site server or surrogate updates enabled fields in Table of search Engines

105 — Web site server or surrogate returns HTML page via HTTP confirming database change

A146



FIG. 2a

State --- 2h
To be Indexed
in error

Site Owner
Warned        3h

Site Incorrectly
Registered        4c

State --- 2g
Correctly
Unregistered

No Action
Taken        3g

Site Owner takes
appropriate steps to
avoid registration    4b

State --- 2f
Wrongly
Unregistered

File Added
To Search
Engine    3f

State ---
Wrongly
registered    2e

File Re-
moved from
Search
Engine    3e

F I G. 2 b

A148



FIG. 3a

The Register CGI script is invoked by the user or automatically ~100

Dose the file exist? 101

Has the resource been registered by search engine? 102

An entry for the resource is removed from the search engine database 103

Will site configuration processes (robots.txt, ROBOTS Meta Tag) allow indexing? 104

Has the resource been registered by search engine? 105

A149



F I G. 3 b

An entry for the resource is removed from the search engine database — 106

Has the resource been registerd by search engine? — 107

An entry for the resource is added to the search engine database — 108

The resource entry in the search engine database is updated — 110

Has the resource changed since it was last indexed? — 109

No Action Taken — 111

A150

US RE40,683 E

1

# PROCESS FOR MAINTAINING ONGOING REGISTRATION FOR PAGES ON A GIVEN SEARCH ENGINE

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

## FIELD OF THE INVENTION

The present invention relates to the process of developing and maintaining the content of Internet search engine databases.

## BACKGROUND OF THE INVENTION

An internet (including, but not limited to, the Internet, intranets, extranets and similar networks), is a network of computers, with each computer being identified by a unique address. The addresses are logically subdivided into domains or domain names (e.g. ibm.com, pbs.org, and oranda.net) which allow a user to reference the various addresses. A web, (including, but not limited to, the World Wide Web (WWW)) is a group of these computers accessible to each other via common communication protocols, or languages, including but not limited to Hypertext Transfer Protocol (HTTP). Resources on the computers in each domain are identified with unique addresses called Uniform Resource Locator (URL) addresses (e.g.http://www.ibm.com/products/laptops.htm). A web site is any destination on a web. It can be an entire individual domain, multiple domains, or even a single URL.

Resources can be of many types. Resources with a ".htm" or."html" URL suffix are text files, or pages, formatted in a specific manner called Hypertext Markup Language (HTML). HTML is a collection of tags used to mark blocks of text and assign meaning to them. A specialized computer application called a browser can decode the HTML files and display the information contained within. A hyperlink is a navigable reference in any resource to another resource on the internet.

An internet Search Engine is a web application consisting of

1. Programs which visit and index the web pages on the internet.

2. A database of pages that have been indexed.

3. Mechanisms for a user to search the database of pages.

Agents are programs that can travel over the internet and access remote resources. The internet search engine uses agent programs called Spiders, Robots, or Worms, among other names, to inspect the text of resources on web sites. Navigable references to other web resources contained in a resource are called hyperlinks. The agents can follow these hyperlinks to other resources. The process of following hyperlinks to other resources, which are then indexed, and following the hyperlinks contained within the new resource, is called spidering.

The main purpose of an internet search engine is to provide users the ability to query the database of internet content to find content that is relevant to them. A user can visit the search engine web site with a browser and enter a query into a form (or page), including but not limited to an HTML form, provided for the task. The query may be in several different forms, but most common are words, phrases, or questions. The query data is sent to the search engine through a standard interface, including but not limited to the Common Gateway Interface (CGI). The CGI is a means of passing data between a client, a computer requesting data or

2

processing and a program or script on a server, a computer providing data or processing. The combination of form and script is hereinafter referred to as a script application. The search engine will inspect its database for the URLs of resources most likely to relate to the submitted query. The list of URL results is returned to the user, with the format of the returned list varying from engine to engine. Usually it will consist of ten or more hyperlinks per search engine page, where each hyperlink is described and ranked for relevance by the search engine by means of various information such as the title, summary, language, and age of the resource. The returned hyperlinks are typically sorted by relevance, with the highest rated resources near the top of the list.

The World Wide Web consists of thousands of domains and millions of pages of information. The indexing and cataloging of content on an Internet search engine takes large amounts of processing power and time to perform. With millions of resources on the web, and some of the content on those resources changing rapidly (by the day, or even minute), a single search engine cannot possibly maintain a perfect database of all Internet content. Spiders and other agents are continually indexing and re-indexing WWW content, but a single World Wide Web site may be visited by an agent once, then not be visited again for months as the queue of sites the search engine must index grows. A site owner can speed up the process by manually requesting that resources on a site be re-indexed, but this process can get unwieldy for large web sites and is in fact, a guarantee of nothing.

Many current internet search engines support two methods of controlling the resource files that are added to their database. These are the robots.txt file, which is a site-wide, search engine specific control mechanism, and the ROBOTS META HTML tag which is resource file specific, but not search engine specific. Most internet search engines respect both methods, and will not index a file if robots.txt, ROBOTS META tag, or both informs the internet search engine to not index a resource. The use of robots.txt, the ROBOTS META tag and other methods of index control is advocated for the purposes of the present invention.

Commonly, when an internet search engine agent visits a web site for indexing, it first checks the existence of robots.txt at the top level of the site. If the search agent finds robots.txt, if analyses the contents of the file for records such as:

User-agent: *
Disallow: /cgi-bin/SRC
Disallow: /stats

The above example would instruct all agents not to index any file in directories names /cgi-bin/SRC or /stats. Each search engine agent has its own agent name. For example, AltaVista (currently the largest Internet search engine) has an agent called Scooter. To allow only AltaVista access to directory lavstuff, the following robots.txt file would be used:

User-agent: Scooter
Disallow:
User-agent: *
Disallow: /avstuff

The ROBOTS META tag is found in the file itself. When the internet search engine agent indexes the file, it will look for a HTML tag like one of the following:
<META NAME="ROBOTS" CONTENT="NOINDEX, NO FOLLOW">
<META NAME="ROBOTS" CONTENT="NOINDEX, FOLLOW">
<META NAME="ROBOTS" CONTENT="INDEX, NO FOLLOW">

**3**

<META NAME="ROBOTS" CONTENT="INDEX, FOL-
LOW">

INDEX and NOINDEX indicate to all agents whether or not the file should be indexed by that agent. FOLLOW and NOFOLLOW indicate to all agents whether or not they should spider hyperlinks in this document.

For current internet search engines, the present invention process uses the CGI program(s) provided by the search engine in order to add, modify an remove files from the search engine index. However, the process can generally only remove a file from the search engine index if the file no longer exists or if the site owner (under the direction of the process) has configured the site, through the use of robots.txt, the ROBOTS META tag or other methods of index control, so that the search engine will remove the file from its index.

The duration of time between the first time a site is indexed and the next time that information is updated has led to several key problems:

A. A resource that is modified or removed by its owner after it is indexed by a search engine could be incorrectly listed in that search engine for months until an agent visits the site to register the change.

B. A resource may be modified since that last time it was indexed, in which case a user may never be directed to the new content, or incorrectly directed to content that is no longer present.

C. Deleted resources can create the impression for a search engine user that a whole web site has shut down, that the information the user is looking for is removed, or that the web site is not being maintained, when the resources may have simply been moved to another location on the site as part of regular site maintenance.

D. Automated tools such as search engines apply their own criteria in order to determine the relevancy of a particular resource for a particular query. These automated criteria can lead to the search engine returning spurious, misleading, or irrelevant results to a particular query. For example, a recent search for the nursery rhyme "Rub a dub dub, three men in a tub" on a particular search engine resulted in the top ten search results containing discussions of various issues among consenting males.

E. Automated agents are not always able to understand the context of the pages they index, as illustrated by the example above. As such, their one-dimensional capabilities allow web masters to create the impression that the resources on a particular site contain information they do not. This is done to direct traffic to sites by providing incorrect or misleading information, a process called spamming.

F. Most automated agents are incapable of processing the content of resources that are binary in nature, such as applications written in the programming language Java. These applications can display text data, but do not use text or HTML files to do so. Instead, the information is encoded in binary form in the application. As such, an agent cannot determine the content of a resource coded in this manner.

The present invention provides a mechanism for search engine and web site managers to maintain as perfect a registration of web site content as is possible. By augmenting or replacing existing agents and manual registration methods with specialized tools on the local web site (and, when feasible, at the search engine), the current problems with search engine registration and integrity can be eliminated.

**4**

SUMMARY OF THE INVENTION

The present invention defeats the key problems with automated agents and manual registration and replaces them with an exception based, distributed processing system. Instead of making the search engine do all the work necessary to index a site, the web site owner is now responsible for that operation. By distributing the work, the search engine is improved in these ways:

1. The search engine can maintain perfect ongoing registration and indexing of pages by re-indexing at a set interval, as frequently as the web site owner chooses.

2. The search engine can maintain an intelligent database, not limited by the conditions that automated agents have imposed on them and not easily corruptible by web site owners with less ethical practices.

3. The search engine provides a guarantee of integrity to all users, ultimately providing a more valuable service to both users and web site owners.

The process is begun by distributing a set of search engine update software tools to the web site owner. These tools can be implemented in one of three ways. The first way is to implement the tools on the web server of the site owner. The software can run automatically, having direct access to all resources on the web site. The second way is to install the software tools on a surrogate server. This surrogate is a computer with proper permissions and access to the resources of the web site and automatically accesses those resources over the network. The third way is through the use of client-side tools. The software will run on each client's computer, check the client's web server via internet protocols, and relay the information on the web server to the search engine.

The software could be written in a variety of different programming languages and would be applicable for as many client and server computers as needed.

Upon initial execution, the software builds a database of the resources on the web site. The resources catalogued can be specified by the user, or automatically through spidering functions of the software. The database consists of one record per resource indexed on the site. Each record contains fields including:

A. The search engines the owner of the web site would like the resource to be indexed by.

B. The date and time of the last index by each search engine.

C. The date and time a resource was last modified according to the local indexing engine.

D. Flags to indicate whether a specific resource requires updating, inclusion, or removal from a particular search engine database.

Upon each subsequent execution the software tools inspect the current state of the web site against the content of the database. When altered, removed, or additional content is found, the software tools make the appropriate changes to the database and then notify the search engine of those changes (see FIG. **1**, Box**206**a, **207**b–c). Changes to the database are made as follows:

A. A resource is marked as deleted if the resource is listed in the current database, but cannot be retrieved.

B. A resource is marked as modified if the date and time of last modification in the current database is earlier than the date and time of last modification provided by the web server for the resource.

C. A resource is added and marked as added if it is present on the web server, but not yet in the database and the web site manager has opted to add it either manually or automatically.

US RE40,683 E

| 5 | 6 |

Through application of the present invention, the following improvements are made in search engine administration:

1. The task of spidering the web site has been distributed to the web site owner (see FIG. 1, Box 205c).

2. The web site owner has the capability to protect brand image from being injured by a search engine pointing potential visitors to deleted, irrelevant, or incorrect resource information.

3. The search engine owner has a higher degree of database integrity. Less information storage space is wasted on spurious, nonexistent or incorrect data.

4. The web site owner can directly indicate the keywords and other descriptions that are most appropriate for each resource in the site, as opposed to using the cumbersome HTML 'Meta' tag to specify the keywords for the agent. Keywords are words that are particularly relevant to a particular resource and might be used on a search engine to locate that resource.

5. The search engine can create a reverse index of keywords that the individual site owners have identified for each resource. For example, a user could query for a list of all web sites that have listed 'dog' as an appropriate keyword.

6. The internet search engine could be used by users to query the content of a particular web site, as opposed to requiring a web site based search engine to index the content. This saves administration effort and computing resources at the web site.

The main aspect of the present invention is to provide a method to index locally at a web site all changes to that site's resource content database which has occurred since the last search engine indexing.

Another aspect of the present invention is to actively transmit said changes to an internet search engine.

Another aspect of the present invention is to automatically transmit batches of updates (a list of content that has changed since the last search engine index), in a predetermined manner.

Other objects of this invention will appear from the following description and appended claims, reference being had to the accompanying drawings forming a part of this specification wherein like reference characters designate corresponding parts in the several views.

BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a flowchart of the steps to select which search engines will receive updates and which files shall be updated on those search engines

FIG. 2 is a diagram of the decision tree for determining the state of a specific resource on a particular search engine database, and the action needed to update the internet search engine as enabled in FIG. 1.

FIG. 3 is a diagram of the Internet search engine update process of updating the files as in FIG. 1 and resources defined by FIG. 2.

Before explaining the disclosed embodiment of the present invention in detail, it is to be understood that the invention is not limited in its application to the details of the particular arrangement shown, since the invention is capable of other embodiments. Also, the terminology used herein is for the purpose of description and not of limitation.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention can be used on new Internet search engine systems, or existing systems can be adapted for use by existing search engines having the following characteristics:

1. The search engine provides a Common Gateway Interface to allow resources to be added to, modified, or deleted from the search engine database.

2. The search engine can update the database index quickly (ideally immediately) in response to additions, modifications, or deletions information provided through the CGI.

3. The search engine can keep the date and time it last indexed a page (or alternatively, the last modification date and time of the page when it was last indexed) and can make this information available to the web site owner.

In addition, if a search engine allows search results to be constrained to one particular site, that completes the functionality requirements of the present invention.

The technical effort required to apply the present invention to existing Internet search engines is similar to that required to apply the invention to a new search engine. The most complex instance would be to apply the invention to a range of search engines, some of which have been designed with the invention in mind, some of which have not. The aforementioned instance will be assumed here.

As implemented, the invention is a server-side process, running either on a surrogate server or the actual server upon which the web site is stored. The process is coded as a program in the Perl programming language, although other languages such as C++ or Java could be used. The process is invoked regularly by the operating system of the computer on which the program resides or manually by a web site manager.

As such, there are three main areas of the preferred embodiment that need to be understood. They are:

I. The implementation and construction of the server side tools, which consist of the database and tools to update the database.

II. The process by which the database is constructed and updated.

III. The process by which a search engine is updated by a site using this process.

I. The Implementation and Construction of the Server Side Tools, Which Consist of the Database and Tools to Update the Database

Installation of the software places a number of CGI scripts, database tables, and HTML forms on the server. Each element performs a specific function relevant to the process and is outlined below. Initially, there is a database Table of Search Engines, containing an entry for each Internet search engine. The table below illustrates the format of a typical search engine record.

| Field | Type | Default | Description |
|---|---|---|---|
| Name | String | None | The name of the search engine |
| Enabled | Boolean | True | Whether the search engine is to be informed of changes to content |
| Table of Files | Table | None | Database table of files indexed on this site and for which changes must be tracked |
| Register by default | Boolean | True | Whether to register a resource on this search engine in the absence of explicit information provided by the site manager |

US RE40,683 E

| 7 | | | 8 |
|---|---|---|---|

-continued

| Field | Type | Default | Description |
|---|---|---|---|
| Max registrations | Integer | None | The maximum number of registrations allowed per day by this search engine |
| Limit to site | Boolean | None | Whether the search engine allows searches to be restricted to one web site only |
| Lists index date | Boolean | None | Whether the search engine will report the date a resource was last indexed |
| Lists index time | Boolean | None | Whether the search engine will report the time a resource was last indexed |
| Index time | Integer | None | Typical delay between registration time and indexing of a site by the search engine |
| Supports file lookup | Boolean | None | Whether the search engine will allow a particular file to be searched for |

The user is provided with an HTML form and CGI script, hereinafter referred to as a CGI program, in order to configure the Enabled and Table of Files fields (see FIG. **1**, Box **100–101**). The information the user inputs is submitted over the Common Gateway Interface (FIG. **1**, Box **102**) and the referenced CGI script updates the database tables as instructed (FIG. **1**, Box **103–105**). The user can thus enable (i.e., select) and disable a particular search engine using this interface. A search engine that is disabled in the database is simply skipped during an update.

The Table of Files is a field in the Table of Search Engines database. It is initially configured by the user through a CGI program (FIG. **1**, Box **200**) to list the files the user wishes to be registered with this search engine. This table contains a record for each resource. Each record contains the following fields:

| Field | Type | Default | Description |
|---|---|---|---|
| Name | String | None | The URL of the resource |
| To Be Registered | Boolean | False | Whether the resource needs to be registered with this search engine |
| To Be Un-registered | Boolean | False | Whether the resource needs to be unregistered (removed) from this search engine |
| Date and time last registered | Date and Time | None | Date and time the file was last registered with the search engine |
| Register | Enum (True, False, By default) | By default | Whether the site manager wants the file to be registered on this search engine. The 'By default' value indicates to follow the value of the 'Register by default' field of the search engine record of the database |

The Table of Files is a list of the above records. The list is built by first obtaining the set of resources the user wishes to maintain and register with a search engine (FIG. **1**, Box **201**). The user enters the files they wish to monitor into a CGI program and submits the form (FIG. **1**, Box **203**a–c, Box **204**a—c). The form allows the user to choose from many methods of building the Table of Files. These methods include, but are not limited to:

A. The user may list all the resources to be registered manually. These listed resources are added to the Table of Files (FIG. **1**, Box **202**a, **205**a).

B. The user may specify a map page. If the user specifies a map page, this map page is retrieved. All of the hyperlinked resources on the map page referring to this web site are added to the Table of Files (FIG. **1**, Box **202**b, **205**b, **206**b).

C. The user may specify entry points to the web site. If the user specifies entry points, the CGI program will enter the site and spider to all resources referenced on those entry points, adding those resources to the Table of Files (FIG. **1**, Box **202**c, **205**c, **207**c).

The list of pages built by the above process forms the Name fields of the Table of Files records for each search engine. This process can be performed globally (on all search engines in the table of search engines), on a group of search engines or on an individual search engine, as indicated by the user (FIG. **1**, Box **206**a, **207**b, **207**c).

Submitting the above form also invokes a CGI script to set the Enabled and 'Register by default' fields of the appropriate search engine record according to the preferences of the user. Additionally, a page is provided where the title, URL and Meta Description of each page would be substituted in the appropriate place in the table for each search engine.

Submitting this additional information invokes a CGI script to set the Register field of the Table of Files field for the appropriate search engine record, according to preferences of the user.

IV. The Process by Which the Database is Constructed and Updated

The process now looks up each file and determines whether the file is registered, current, out of date, or deleted with respect to its registration on the search engine.

There are eight possible states for the file to be in with respect to its registration. In order for the process to be deterministic, all random spidering activity by the search engine is ignored in determining the state of the file. The state is determined purely by the current registration and the data the process has stored in the database of activities performed by previous invocations of itself.

FIG. **2** illustrates the decision process to determine the state of a resource on the search engine (Box **1**) and the action, which must be taken. A resource can be in the following states:

| Deleted (2a) | The resource no longer exists on the web site. If the resource exists in the search engine database, an error is signaled. |
|---|---|
| Awaiting indexing (2b) | The resource is not in state 2a. The resource should shortly be indexed by the search engine and should not be registered now. |
| Out of date (2c) | The resource is not in state 2a, 2b . . . The resource is not due to be indexed by the search engine, but has been modified since it was last indexed by the search engine. |
| Well registered (2d) | The resource is not in state 2a, 2b, 2c. The resource has not been modified since last indexed and its listing on the search engine is correct. |
| Wrongly registered (2e) | The resource is not in state 2a, 2b, 2c, 2d. The resource is listed on the search engine, but the web site manager does not want it to be. |
| Wrongly unregistered (2f) | The resource is not in state 2a, 2b, 2c, 2d, 2e. The web site manager wishes the resource to be registered by the search engine, but the resource is not registered by the search engine or due to be indexed by the search engine. |
| Correctly unregistered (2g) | The resource is not in state 2a, 2b, 2c, 2d, 2e, 2f. The resource is not registered, not due to be indexed, and the user does not wish it to be. |
| Will be indexed in error (2h) | The resource is not in state 2a, 2b, 2c, 2d, 2e, 2f, or 2g. The site manager does not wish it to be. However, the file will shortly be indexed by the search engine and the site configuration currently would not prevent this. |

A154

US RE40,683 E

9 | 10

The following are the actions to be taken in each state (see FIG. **2**):

| | |
|---|---|
| Deleted (3a) | The resource no longer exists on the web site. The process attempts to remove the resource entry from the search engine database with a CGI program provided by the engine for this purpose (4a). |
| Awaiting indexing (3b) | No action is taken. |
| Out of date (3c) | The resource has been modified since it was last indexed by the search engine. The process attempts to register the resource for re-indexing with CGI program provided by the engine for this purpose. |
| Well registered (3d) | No action is taken. |
| Wrongly registered (3e) | The process attempts to remove the resource entry from the search engine index using a CGI program provided by the search engine for this purpose. |
| Wrongly unregistered (3f) | The process attempts to add the resource to the search engine index using a CGI program provided by the search engine for this purpose. |
| Correctly unregistered (3g) | No action is taken. |
| Will be indexed in error (3h) | The web site manager is warned through the process reporting mechanism (e-mail, a web page, or other method) that the manager does not want the resource to be indexed, but the search engine will shortly index it and there are no safeguards in place to prevent this. Site manager can take appropriate steps to avoid registration (4b) or registration will take place (4c). |

The following psuedo code indicates the necessary steps in programming which must be taken determine the state of a resource and take the appropriate action.

```
For each enabled search engine in DatabaseLookup(table of
                                                 search engines)
    list of files = search engine table of files
    If search engine.limit to site
        search engine files = SearchEngineLookup(all files
                                    reported by search engine for this site)
        list of files = list of files + search engine files
    End if
    For each file in list of files
        last index date time = GetIndexDateTime(file, search engine)
        If FileExists(file, list of files)
            If search engine.table of files.file.toberegistered
                RegisterFile(file, search engine)
                Next For [each file in list of files]
            End if
            last modification date time =
                GetLastModificationDateTime(file)
            will be indexed = WillBeIndexed(file, search engine,
                last index date time)
            should be registered = ShouldBeRegistered(file,
                search engine)
            If last index date time != not found
                If should be registered
                    If last modification date time >
                        last index date time
                        If will be indexed
                            AddReport("awaiting
                                indexing", file)
                        Else
                            AddReport("out of date",
                                file)
                            RegisterFile(file,
                                search engine)
                        End if
                    Else
                        AddReport("well registered"",
                            file)
                    End if
```

Else [File is registered but should not be]
    AddReport("wrongly registered", file)
    UnRegisterFile(file)
  End if
  Else [File is not registered]
    If should be registered
      AddReport("correctly unregistered", file)
      RegisterFile(file, search engine)
    Else
      If will be indexed
        AddReport("will be indexed in error", file)
      Else
        AddReport("well unregistered", file)
      End if
    End if
  End if
  Else [File Does not exist]
    AddReport("deleted", file)
    If last index date time != not found
      UnRegisterFile(file, search engine)
    End if
  End if [File Exists]
End For
End For

III. The Process by Which a Search Engine is Updated by a Web Site Using This Process

There are three ways the process may update a search engine:

1. It can register a resource in an attempt to have that file added to the search engine database (FIG. **3**, Box **104**).

2. It can register a resource in an attempt to update the resource's listing in the search engine database (FIG. **3**, Box **105**).

3. It can unregister a resource in an attempt to remove the file from the search engine index (FIG. **3**, Box **103**).

In practice, these three activities are usually performed by the same CGI program on current search engines. This CGI program is the 'register file' program and is run manually by the user of automatically (FIG. **3**, Box **100**). An HTML form is provided for the purpose of adding a resource to the search engine index. On submitting the form, a CGI script is invoked. The most common mode of action for this script is as follows:

1. If the file exists (FIG. **3**, Box **101**), the search engine determines whether the configuration of the web site will allow indexing through Robots.txt and/or ROBOTS Meta Tag (FIG. **3**, Box **104**). If the file does not exist and the file has been registered by the search engine (FIG. **3**, Box **101**, **102**), it is removed immediately from the search engine database index (FIG. **3**, Box **103**).

2. If the site can be indexed, the search engine determines if the resource is registered by the search engine. If the resource is registered, the search engine determines if the resource has changed since it was last indexed (FIG. **3**, Box **109**). If the resource has changed since it was last indexed, the resource entry in the search engine database is updated with new data (FIG. **3**, Box **109**, **110**). If the resource has not changed since it was last indexed, then no action is taken. (FIG. **3**, Box **111**). If the site can not be indexed, and the resource has been indexed by the search engine (FIG. **3**, Box **105**), the entry for the resource is removed from the search engine database (FIG. **3**, Box **106**).

3. In a case where the site can be indexed and the resource does not exist in the search engine database, the

**11**

resource URL is added to a list of URLs the search engine will index (FIG. **3**, Box **108**). Some search engines will index resources submitted in this way within a day or two of submission. Other search engines may take weeks or months.

The Following Pseudo Code Illustrates the Above Processes:

```
On RegisterFile(file, search engine)
    Check that the file is appropriate for the search engine
    If file is appropriate or IsRegistered(file, search engine)
        If file is not appropriate
            AddReport("inappropriate file registered", file)
        End if
        If!(file in DatabaseLookup(search engine, table of files))
            AddFileToDatabase(search engine, file)
        End if
        If SearchEngineRegistrationsOK(file, search engine)
            SearchEngineRegisterFile(file)
            If file registered OK
                search engine.table of files.file.date last
                    registered = todays's date
                search engine.table of files.file.time last
                    registered = now
                AddReport("file registered", file)
                search engine.table of files
                    file.toberegistered = false
            Else
                AddReport("Registration failed", file)
                search engine.table of files
                    file.toberegistered = true
            End if
        Else
            AddReport("registration delayed", file)
            search engine.table of files.file.
                toberegistered = true
        End if
    Else
        AddReport("registration failed - inappropriate file", file)
    End if
End RegisterFile
On UnRegisterFile(file, search engine)
    SearchEngineUnRegisterFile(file)
    If file unregistered OK
        AddReport("file unregistered", file)
        search engine.table of files.file.tobeunregistered = false
    Else
        AddReport("Unregistration failed", file)
        search engine.table of files.file.tobeunregistered = true
    End if
End UnRegisterFile
```

The present invention would:

1. Significantly improve the quality of a sites registration on a range of search engines. Out of date registrations and registrations pointing at deleted files would be quickly cleaned up. Unregistered files that the site owner wanted registered would be quickly registered, and currently indexed files that the site owner wanted removed from the index would quickly be removed. Registration would always be within the rules of each search engine to which the process was applied.

2. Provide a new method for search engines to gather and distribute information. The process works best when the search engine and site owner cooperate for mutual benefit. The search engine should offer the following features in order for the process to work most efficiently:
   a. Provide confirmation that a particular file is in the index.
   b. Provide the date and time the file was indexed or guarantee immediate indexing
   c. Provide the current date and time according to the search engine index

**12**

   d. Provide a means to add a file to the index (ideally immediately)
   e. Provide a means of removing a file from the index (ideally immediately)
   f. Impose no practical limit on the number of files that may be registered within a fixed period
   g. Provide a means of restricting searches to a particular site through a hidden field in the search CGI, the state of which is maintained on each page delivered by the search engine. Once a site has a perfect ongoing registration on a powerful search engine, that search engine is perfect for searches within that site.

The following functions are describe further the above processes.

```
On DatabaseLookup(table of search engines)
    return table of search engines
End DatabaseLookup(table of search engines)
On DatabaseLookup(search engine, table of files)
    return table of files(search engine)
End DatabaseLookup(search engine, table of files)
On AddFileToDatabase(search engine, file)
    table of files(search engine) += file
End AddFileToDatabase(search engine, file)
On SearchEngineLookup(all files reported by search engine for site)
    list of files = ( )
    page number = 1
    site links = SearchEngineGetPage(search engine, site, page number)
    while number of site links > 0
        list of files += site links
        increment page number
        site links = SearchEngineGetPage(search engine,
                                site, page number)
    end while
    return list of files
End SearchEngineLookup(all files reported by search engine for site)
On FileExists(file, list of files)
    If file is local
        Perform stat of file
        return stat.exists
    else
        Perform HTTP head request of file
        If head request indicates that file exists
            Return file exists
        else
            Return file not exists
        end if
    end if
End FileExists(file)
OnGetLastModificationDate(file)
    If file is local
        Perform stat of file
        return stat.LastModificationDate
    else
        Perform HTTP head request of file
        return response.LastModifiedDate
    end if
End GetLastModificationDate(file)
On GetIndexDateTime(file, search engine)
    If search engine.lists index date
        If search engine supports file lookup
            If(!LookupFile(search engine, file))
                last index date time = not found
            Else
                last index date time = lookup.date
                If search engine.lists index time
                    last index date time += lookup.time
            End if
        End if
    Else
        last index date time = not found
        For each phrase in file
            While GetNextSearchEnginePage(search engine,
                                        phrase)
                If search engine page lists file
                    last index date time =
```

US RE40,683 E

13

-continued

```
                                        searchpage.file.date
    If search engine.lists index time
      last index date time +=
                                        lookup.time
         End if
         Exit For [each phrase in file]
      End if
    End While
  End For
End if
If last index date time!= not found
  Translate last index date time to server time
End if
return last index date time
Else
  If file.date and time last registered is set
    return file.date and time last registered +
                                        search engine.index time
  End If
  return not found
End If
End GetIndexDateTime(search engine, file)
On WillBeIndexed(file, search engine, last index date time)
  If file.date and time last registered is set
    If last index date time > file.date and time last
                                        registered
      return false
    End if
    predicted index date time = file.date and
                                time last registered + search engine.index time
    return (predicted index date time > today now)
  Else
    return false
  End If
End
On ShouldBeRegistered(file, search engine)
  If search engine supports ROBOTS tag
    If file contains ROBOTS tag
      return !(ROBOTS tag contains NOINDEX)
    End If
  End if
  If search engine supports robots.txt file
    If site has robots.txt file
      return !(file excluded by robots.txt)
    End if
  End if
  return search engine.register by default
End ShouldBeRegistered(file, search engine)
on AddReport(descriptive text, file)
  set report = report + file + descriptive text
end
```

Additionally, proxy files could be used in place of any other files. This could be achieved simply by extending the FILE RECORD with a proxy filename, as follows:

| Field | Type | Format | Description |
|---|---|---|---|
| Proxy | String | None | The location of the proxy for the file |

Whenever the process registers a resource with the search engine, it could deliver the proxy to the search engine in place of the resource itself. The format of the proxy file could be plain text, or HTML to allow current indexing techniques to continue to work. The format of the proxy file could also be any other markup language, for instance XML. The principle remains the same a text file is used in place of any other file or set of files. This method will allow, for example, Java, embedded objects, graphics, frames, and other file formats to be indexed.

Spamming is a potential problem when using proxy files. The idea of the proxy file is that the search engine uses it to

14

create an index, but the search engine user links to the real file in response to a search query. Clearly, if the contents of the proxy file and the real file do not match, the user will not get what they are expecting. For example, a rogue site owner may set up the proxy file to catch a lot of queries about sex (the most searched for term on the Internet), when in fact their page is trying to persuade you to join their online gambling syndicate.

Spamming will only occur when there is a breakdown of trust between the site owner and search engine owner. The site owners could sign an online contract to guarantee that they will not spam. By signing the contract, they are provided with the embodiment of the process in order to register and maintain their registration with the search engine. If, through spamming, the contract is broken, the search engine can discontinue listing pages temporarily or permanently for the web site in question. It may also be able to take legal action. There are also programmable and scalable methods of defeating spamming—they are irrelevant to this discussion.

It is important to emphasize that web site owners do not have to use the tools provided for their sites to be registered. The search engine can still spider sites whose owners do not use the tools provided, in the same way as conventional search engines spider sites. For sites that are deemed appropriate, the search engine can even set up a surrogate server to implement the present invention on behalf of a non-participating site owner. The present invention is not limited in its application to the details of the particular arrangement shown, since the invention is capable of other embodiments. Also, the terminology used herein is for the purpose of description and not of limitation.

I claim:

**1**. A method to update an internet search engine database with current content from a web site, comprising the step of:

creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine;

identifying, using said web site database, new, deleted, unmodified or modified content;

transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted, [unmodified] or modified database content;

opening, by a user, a form on a computer to enable or disable internet search engines to be updated with information;

enabling or disabling, by said user, the appropriate internet search engines on said form;

submitting, by said user, said information to a script;

parsing, through the use of said script, said information from said form; and

updating, through the use of said script, said database of search engine.

**2**. The method of claim **1**, wherein said web site database further comprises a database having one record per resource indexed on said web site.

**3**. The method of claim **2**, wherein said one record contains fields including:

a. search engines by which the owner of the web site would like the page to be indexed,

b. a date and time of the last index by search engine,

c. a date and time a page was last modified according to the local indexing engine, and

d. flags to indicate whether a specific resource requires updating, inclusion or removal from a particular search engine database.

US RE40,683 E

15

**4**. The method of claim **2**, wherein said content of said web site database further comprises:

   a proxy file field referencing a proxy file containing a description of said resource;

      wherein said transmitting means further comprises a means for transmitting said proxy file to said internet search engine; and

said proxy file is used in lieu of new or modified content of said web site database.

**5**. The method of claim **1**, wherein said form is an HTML form, said script is a CGI script and said page is an HTML page.

**6**. The method of claim **1**, further comprising the steps of:

   a. implementing a form to specify web resources a web site manager wishes the process to manage;

   b. submitting said form to a script on web server or said surrogate server;

   c. parsing, through the use of a script, said new information from said form; and

   d. creating a table of files, contained in said search engine database, via said script.

**7**. The method of claim **6**, wherein said form is an HTML form, said script is a CGI script and said web resource is a WWW resource.

**8**. An apparatus for updating an internet search engine database with current content from a web site, comprising:

   a means for creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine;

   a means for identifying, using said web site database, new, deleted, [unmodified] or modified content;

   a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted, unmodified or modified database content;

   a means for opening, by a user, a form on a computer to enable or disable internet search engines to be updated with information;

   a means for enabling or disabling, by said user, the appropriate internet search engines on said form;

   a means for submitting, by said user, said information to a script;

16

   a means for parsing, through the user of said script, said information from said form; and

   a means for updating, through the use of said script, said database of search engine.

**9**. The apparatus of claim **8**, wherein said web site database further comprises a database having one record per resource indexed on said web site.

**10**. The apparatus of claim **9**, wherein said one record contains fields including:

   a. search engines by which the owner of the web site would like the page to be indexed,

   b. a date and time of the last index by search engine,

   c. a date and time a page was last modified according to the local indexing engine, and

   d. flags to indicate whether a specific resource requires updating, inclusion or removal from a particular search engine database.

**11**. The apparatus of claim **9**, wherein said content of said web site database further comprises:

   a proxy file field referencing a proxy file containing a description of said resource;

      wherein said transmitting means further comprises a means for transmitting said proxy file to said internet search engine; and

said proxy file is used in lieu of new or modified content of said web site database.

**12**. The apparatus of claim **8**, wherein said form is an HTML form, said script is a CGI script and said page is an HTML page.

**13**. The apparatus of claim **8**, further comprising:

   a. a means for implementing a form to specify web resources a web site manager wishes the process to manage;

   b. a means for submitting said form to a script on web server or said surrogate server;

   c. a means for parsing, through the use of a script, said new information from said form; and

   d. a means for creating a table of files, contained in said search engine database, via said script.

**14**. The apparatus of claim **13**, wherein said form is an HTML form, said script is a CGI script and said web resource is a WWW resource.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : RE 40,683 E | Page 1 of 1 |
| APPLICATION NO. | : 10/600114 | |
| DATED | : March 24, 2009 | |
| INVENTOR(S) | : Alan Perkins | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 14, Claim 1, line 7, delete "unmodified" and insert -- [unmodified] --.

In column 15, Claim 8, line 10, delete "unmodified" and insert -- [unmodified] --.

Signed and Sealed this

Fifth Day of May, 2009

*John Doll*

JOHN DOLL
*Acting Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.           : RE40,683 E                                    Page 1 of 1
APPLICATION NO.      : 10/600114
DATED                : March 24, 2009
INVENTOR(S)          : Alan Perkins

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 16, line 1, change "user" to --use--.

Signed and Sealed this
Eleventh Day of October, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

A160

# United States Court of Appeals
## for the Federal Circuit

*SITE UPDATE SOLUTIONS, LLC V ACCOR NORTH AMERICA, INC., 2013-1458*

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by MCDERMOTT WILL & EMERY LLP, Attorneys for Defendant-Appellant to print this document. I am an employee of Counsel Press.

On **September 5, 2013** Counsel for Defendant-Appellant has authorized me to electronically file the foregoing **Brief for Defendant-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

> JOHN J. EDMONDS
> COLLINS, EDMONDS, POGORZELSKI, SCHLATHER & TOWER, PLLC
> 1616 S. Voss Road, Suite 125
> Houston, Texas 77057
> Telephone: (713) 364-5291
> Facsimile: (832) 415-2535
> jedmonds@cepiplaw.com
> *Counsel for Appellee*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

September 5, 2013

/s/John C. Kruesi, Jr.
Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
## TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  It contains 13,383 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Word 2010 Times New Roman 14 point font.

By: _/s/ Yar R. Chaikovsky_
Yar R. Chaikovsky
McDERMOTT WILL & EMERY LLP
275 Middlefield Road
Suite 100
Menlo Park, California  94025-4004
+1 650 815 7400

Counsel for: Defendant-Appellant

 Dated:  September 5, 2013

DM_US 44875997-1.071850.0015