2013-1458

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————◆◆———————

SITE UPDATE SOLUTIONS, LLC,

Plaintiff-Appellee

v.

ACCOR NORTH AMERICA, INC., CBS CORP.,
TICKETMASTER ENTERTAINMENT, INC., JASON'S DELI CORP.,
THE WALT DISNEY COMPANY, and TIME WARNER, INC.,

Defendants,

and

NEWEGG, INC.,

Defendant-Appellant.

_____

*Appeal from the United States District Court for the Northern District of California in case no. 11-CV-3306, Magistrate Judge Paul S. Grewal*

_____

## BRIEF OF PLAINTIFF-APPELLEE
_____

NOVEMBER 8, 2013

John J. Edmonds
Stephen F. Schlather
Shea Palavan
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone: (281) 501-3425
Facsimile: (832) 415-2535
jedmonds@cepiplaw.com
sschlather@cepiplaw.com
spalavan@cepiplaw.com

*Attorneys for Plaintiff-Appellee*
*SITE UPDATE SOLUTIONS, LLC*

## CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, the undersigned counsel for Plaintiff-Appellee hereby certifies that:

1.    The full names of every party or amicus represented by me is:

Site Update Solutions, LLC

2.    The names of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Acacia Research Corporation is the ultimate parent of Plaintiff-Appellee.

4.    The names of all law firms and the partners or associates that appeared for any of the parties represented by me in the District Court or are expected to appear in this court are:

John J. Edmonds, Stephen F. Schlather and Shea Palavan of COLLINS, EDMONDS, POGORZELSKI, SCHLATHER & TOWER, PLLC represent Plaintiff-Appellee for this appeal; and

Edward W. Goldstein of GOLDSTEIN LAW, PLLC and Alisa A. Lipski formerly of that that firm represented Plaintiff-Appellee in the District Court.

Dated: November 8, 2013                          */s/ John J. Edmonds*
                                                 John J. Edmonds

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES ...................................................................v

    CASES ............................................................................................ v

    STATUTES .................................................................................... vii

    OTHER AUTHORITIES ................................................................... vii

STATEMENT OF RELATED CASES ................................................. viii

I.     STATEMENT OF JURISDICTION ..............................................1

II.    STATEMENT OF THE ISSUES ...................................................2

III.   STATEMENT OF THE CASE AND THE FACTS.........................4

    A. The '683 patent...........................................................................4

    B. Newegg's Accused Instrumentality...........................................7

    C. Claim construction. ....................................................................9

    D. Post-claim construction dismissals........................................ 15

    E. The District Court's denial of Newegg's Motion. .................. 16

    F. Newegg's many irrelevant, baseless, unsupported allegations should be disregarded........................................................................................... 16

IV.   SUMMARY OF THE ARGUMENT. .........................................18

V.    ARGUMENT ...............................................................................19

    A. Legal Authorities .................................................................... 19

      1.    Standards for exceptional cases.......................................... 19

      2.    Standards for claim construction. ....................................... 21

B. The District Court properly denied Newegg's Motion brought under 35 U.S.C. § 285. ................................................................................................................. 23

1.   SUS's claim construction positions on special purpose computers and algorithms were reasonable and not objectively baseless.............................................. 23

2.   Newegg's fallback position of a purported "26 month" timeline for claim construction is a baseless overreach and stretch of the facts. ................................................... 33

3.   SUS's non-inclusion of a Table of Files within the Table of Search Engines as necessary linked structure for "creating and modifying the [website] database" was reasonable and not objectively baseless.............................................................. 35

4.   The District Court did not commit clear error in finding that SUS's non-inclusion of a Table of Files within the Table of Search Engines as necessary linked structure for "creating and modifying the [website] database" did not constitute bad faith. .................................... 38

5.   As to claim construction, Newegg's reliance upon *Eon-Net* and *Raylon* is misplaced and conflates a rejected claim construction position (this case) with baseless infringement positions (*Eon-Net* and *Raylon*). .......................................................... 38

6.   Newegg's arguments about "website database" are baseless and constitute a blatant distortion of the facts. ...................................................................................... 41

7.   Newegg has failed to show that the District Court clearly erred in finding that Newegg had not shown clear and convincing evidence of subjective bad faith. ............................... 45

8.   Newegg has failed to show that the District Court clearly erred in finding that Newegg had not shown clear and convincing evidence of subjective bad faith due to SUS's claim construction positions. ...................................................................................... 45

9.   Newegg's reliance upon *MarTec* is misplaced.......................................................... 45

10.  This is not "Shake-down Litigation" Nor was it brought for any improper purpose of obtaining nuisance-value settlements. ................................................................... 46

11.  Newegg's Reliance upon *Eon-Net* for objective bad faith is misplaced. ................... 48

12.  SUS's post-*Markman* dismissals reflect reasonableness, not subjective bad faith. ... 50

C. Newegg has not shown that the District Court committed clear error in finding Newegg had not shown by clear and convincing evidence that SUS had brought meritless infringement claims. In fact, Newegg can point to no evidence in the record that SUS's infringement claims lacked merit. ...........51

D. Newegg's discussion of "recent policy considerations" is irrelevant. ..........52

     E. Newegg's fee request is inappropriate and unfounded..................................53

VI.    CONCLUSION ................................................................................................54

VII.   CERTIFICATE OF SERVICE .......................................................................56

VIII. CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPE-FACE         REQUIREMENTS,         AND         TYPE-STYLE REQUIREMENTS ............................................................................................57

# TABLE OF AUTHORITIES

**CASES**

*American Technology v. American Future,*
  2012 WL 859345 (M.D. Fla. 2012) ...................................................51

*Aristocrat Techs. v. Int'l Game Tech.,*
  521 F.3d 1328 (Fed. Cir. 2008)............................................... 14, 22

*ArrivalStar v. Meitek,*
  No. 2:12-cv-01225-JVS, Dkt No. 55 (C.D. Cal. Nov. 20, 2012) ...................46

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,*
  460 F.3d 1349 (Fed. Cir. 2006)......................................................12

*Daubert v. Merrell Dow Pharmaceuticals,*
  509 U.S. 579 (1993) ................................................................26

*Diagnostics Corp. v. Elekta AB,*
  344 F.3d 1205 (Fed. Cir. 2003)......................................................21

*Eon-Net LP v. Flagstar Bancorp,*
  653 F.3d 1314 (Fed. Cir. 2011)................................... 39, 48, 49, 53

*EpicRealm, Licensing, LLC v. AutoFlex Leasing, Inc.,*
  No. 2:05CV163, 2006 WL 3099603 (E.D. Tex. 2006)........................... 23, 25

*Ergo Licensing v. CareFusion,*
  673 F.3d 1361 (Fed. Cir. 2012)................................... 14, 22, 23, 24

*Finisar Corp. v. DirecTV Group, Inc.,*
  523 F.3d 1323 (Fed. Cir. 2008)......................................................22

*Fleischmann Distilling Corp. v. Maier Brewing Co.,*
  386 U.S. 714 (1967) ................................................................19

*Froessl v. Hewlett-Packard,*
  No. C-01-20924, 2002 WL 34455177 (N.D. Cal. 2002) ................... 14, 22, 24

*Gates v. Deukmejian,*
  987 F.2d 1392 (9th Cir.1992)........................................................53

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
    527 F.3d 1318 (Fed. Cir. 2008) ....................................................................12

*Goss Int'l Americas, Inc. v. Graphic Mgmt. Assocs., Inc.*,
    39 F. Supp. 2d 1089 (N.D. Ill. 2010) ...................................................... 23, 24

*Group One v. Hallmark*,
    407 F.3d 1297 (Fed. Cir. 2005) ....................................................................53

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    687 F.3d 1300 (Fed.Cir.2012) ...................................................... 19, 20, 53, 54

*HTC Corp. v. IPCom GmbH & Co.*,
    667 F.3d 1270 (Fed. Cir. 2012) ............................................................. 22, 24

*IMS Tech., Inc. v. Hass Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000) ....................................................................22

*In Re Katz Interactive Call Processing Patent Litigation*,
    No. MDL 2:07-ML-1816-B-RGK (C.D. Cal., May 24, 2012) ......................25

*Katz Interactive Call Processing Patent Litig. v. Am. Airlines, Inc.*,
    639 F.3d 1303 (Fed. Cir. 2011) ....................................................................23

*MarcTec, LLC v. Johnson & Johnson*,
    664 F.3d 907 (Fed. Cir. 2012) ......................................................................46

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ..............................21

*Noah Sys. Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012) ....................................................................23

*Pavilion Techs., v. Emerson Elec.*,
    2006 WL 6210180 (W.D. Tex. Sept. 5, 2006)............................. 14, 22, 23, 24

*Phillips v. AWH*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................................................21

*Raylon, LLC v. Complus Data Innovations, Inc.*,

700 F.3d 1361 (Fed. Cir. 2012) ............................................... 16, 20, 30, 39, 40

*Singleton v. Wulff,*
    428 U.S. 106 (1976) .................................................................................12

*U.S. Ethernet Innovations, LLC v. Acer, Inc.*,
    2012 U.S. Dist. LEXIS 17918 (N.D. Cal. 2012) .............................................41

*Uniloc v. Microsoft*,
    632 F.3d 1292 (Fed.Cir. 2011) ................................................................ 17, 50

*Villa San Clemente LLC v. County of Orange*,
    2012 WL 3834629 (Cal.App. 4 Dist. Sept. 4, 2012) ......................................53

*Visto Corp. v. Sproqit Techs., Inc.,*
    No. C–04–0651 EMC, 2007 WL 160942 (N.D.Cal. Jan.17, 2007).......... 20, 51

## STATUTES

35 U.S.C. § 112 ..............................................................................................21

35 U.S.C. § 284 ..............................................................................................46

35 USC § 282 ........................................................................................... 10, 16

Fed. R. App. P. 4 ...............................................................................................1

## OTHER AUTHORITIES

Shawn Miller, *Do "Fuzzy" Software Boundaries Explain High Claim Construction
    Reversal Rates?* 2012 George Mason University,
    http://mason.gmu.edu/~smille9/ ShawnMillerJobMarketPaper.pdf ...............21

## STATEMENT OF RELATED CASES

There have been no other appeals before this or any other appellate court stemming from the civil action giving rise to this appeal.

# I.    STATEMENT OF JURISDICTION

Plaintiff-Appellee, Site Update Solutions, LLC ("SUS"), brings this Appeal from the United States District Court for the Northern District of California (the "District Court") to the United States Court of Appeals for the Federal Circuit in accordance with 28 U.S.C. § 1295(a)(1). *See* Fed. R. App. P. 4(a)(4)(B)(i).

This is a case arising under the United States Patent Laws and jurisdiction is in accordance with and pursuant to 28 U.S.C. §§ 1338(a) and 1400(b).  This Appeal has been timely taken within thirty (30) days of the final order in the District Court pursuant to 28 U.S.C. § 2107.

## II.    STATEMENT OF THE ISSUES

1.  Whether Newegg's brief, which is rife with unsupported and irrelevant hyperbole, provides factual proof that the District Court erred in holding that Newegg failed to prove by clear and convincing evidence that this was an exceptional case justifying an award of attorney's fees under 35 U.S.C. § 285.

2.  Whether the District Court erred in holding that Newegg failed to prove by clear and convincing evidence that SUS's bringing of this lawsuit was objectively baseless.

3.  Whether the District Court committed clear error in finding that Newegg failed to prove by clear and convincing evidence that this lawsuit was brought in subjective bad faith.

4.  Whether the District Court erred in finding a lack of clear and convincing evidence that the objectively baseless prong was met, where SUS advanced reasonable claim construction positions of means plus function terms consistent with the presumption of validity.

5.  Whether the District Court erred in finding a lack of clear and convincing evidence that the objectively baseless prong was met, where SUS advanced reasonable claim construction for "means for creating and modifying a database of a website…" which reasonably reflected SUS's good faith belief of the structure in the specification clearly linked to the agreed function.

6. Whether the District Court erred in finding a lack of clear and convincing evidence that the objectively baseless prong was met, where SUS advanced reasonable claim construction for website database which was consistent with the ordinary meaning of those words and with the intrinsic evidence.

7. Whether the district committed clear error in finding a lack of clear and convincing evidence of subjective bad faith with respect to SUS's claim construction positions.

8. Whether, even if one or more of SUS's claim construction positions was deemed "frivolous" (which they were not), that would meet the threshold necessary to show clear and convincing evidence that the objectively baseless prong was met.

9. Whether, even if one or more of SUS's claim construction positions was deemed "frivolous" (which they were not), that would meet the threshold necessary to show that the district committed clear error in finding a lack of clear and convincing evidence that the subjective prong was met.

10. Whether Newegg's unsupported hyperbole shows "Eon-Net like indicia of extortion behavior."

11. Whether the District Court committed clear error in finding a lack of clear and convincing evidence of subjective bad faith with respect to what Newegg has erroneously and baselessly alleged to be "Eon-Net like indicia of extortion behavior."

### III.    STATEMENT OF THE CASE AND THE FACTS

**A. The '683 patent.**

On May 11, 2010, SUS filed a complaint against Newegg and others for infringement of claim 8 of U.S Patent No. RE 40,683 (the "'683 Patent'). A235-56. The '683 patent is entitled "[p]rocess for maintaining ongoing registration for pages on a given search engine relates to the process of developing and maintaining the content of Internet search engine databases." A143. The '683 Patent initially issued in 2001 and it was reissued by the Patent Office in 2009. The only claim at issue in this case was claim 8. For claim 8, the only change with reissuance was deletion of the word "unmodified."

The invention of the '683 patent relates to the process of developing and maintaining the content of Internet search engine databases. A151, 1:10-12. Internet search engines use agent programs called Spiders, Robots, or Worms, among other names, to inspect the text of resources on web sites. *Id*. at 1:48-50. Navigable references to other web resources contained in a resource are called hyperlinks. The agents can follow these hyperlinks to other resources. *Id*. at 1:51-52. The process of following hyperlinks to other resources, which are then indexed, and following the hyperlinks contained within the new resource, is called spidering. *Id*. at 1:52-56.

The search engine will inspect its database for the URLs of resources most likely to relate to a submitted query. *Id*. at 2:3-5. The list of URL results is returned to the user, typically sorted by relevance. *Id*. at 2:5-7.

With millions of resources on the web, and some of the content on those resources changing rapidly (by the day, or even minute), a single search engine cannot possibly maintain a perfect database of all Internet content. *Id*. at 2:17-21. Spiders and other agents are continually indexing and re-indexing web content, but a single web site may be visited by an agent once, then not be visited again for months as the queue of sites the search engine must index grows. *Id*. at 2:20-25.

Many current internet search engines support a method of controlling the resource files that are added to their database comprising the robots.txt file, which is a site-wide, search engine specific control mechanism. *Id*. at 2:29-31. Commonly, when an internet search engine agent visits a web site for indexing, it first checks the existence of robots.txt at the top level of the site. *Id*. at 2:40-43. For current internet search engines, embodiments of the invention use a common gateway interface ("CGI") program(s) provided by the search engine in order to add, modify and remove files from the search engine index. A152, 3:7-10.

Embodiments disclosed in the '683 patent provide, *inter alia*, a mechanism for search engines and web site managers to maintain as complete a registration of web site content as is possible. *Id*. at 3:61-63. By augmenting or replacing existing

agents and manual registration methods with specialized tools on the local web site (and, when feasible, at the search engine), problems with search engine registration and integrity can be eliminated. *Id*. at 3:63-67.

Further, embodiments disclosed in the '683 patent overcome key problems with automated agents and manual registration. *Id*. at 4:1-2.  Instead of making the search engine do all the work necessary to index a site, the web site owner can now be responsible for that operation. *Id*. at 4:4-7.

Processes embodied in the '683 patent comprise software building a database of the resources on the web site. *Id*. at 4:35-36. The resources catalogued can be specified by the user, or automatically through spidering functions of the software. *Id*. at 4:37-39. The database consists of one record per resource indexed on the site. *Id*. at 4:39-41.

The Table of Files can be a field in the Table of Search Engines database. A154 7:29-30. It may initially be configured through a CGI program to list the files the user wishes to be registered with this search engine. *Id*. at 7:30-32. This table contains a record for each resource. *Id*. at 7:32-33. The Table of Files is a list of such records. *Id*. at 7:33-34.

Claim 8 of the '683 Patent, the only asserted claim, is directed to the following:

> 8. An apparatus for updating an internet search engine database with current content from a web site, comprising: a means for creating and

modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine; a means for identifying, using said web site database, new, deleted, or modified content;

a means for transmitting to said internet search engine a set of indices, wherein said set of indices comprises said new, deleted, unmodified or modified database content; a means for opening, by a user, a form on a computer to enable or disable internet search engines to be updated with information;

a means for enabling or disabling, by said user, the appropriate internet search engines on said form;

a means for submitting, by said user, said information to a script; a means for parsing, through the user of said script, said information from said form;

and a means for updating, through the use of said script, said database of search engine.

A158, 15:26-16:4.

**B. Newegg's Accused Instrumentality.**

SUS accused Newegg of infringement based functionality comprising Newegg's XML Sitemaps. A1877. Sitemaps are a way for webmasters to inform search engines about pages on their sites that are available for crawling. *Id.* The Sitemap provides an index of the content that the website owner would like to be found by Search Engines, which may be different from the uniform resource locators ("URLs") previously listed. *Id.* at A1881. In its simplest form, a Sitemap is an XML file that lists URLs for a site along with additional metadata about each URL so that search engines can more intelligently crawl the site. *Id.* at 1877. A Sitemap may identify new, deleted or modified content. *Id.*

Web crawlers usually discover pages from links within the site and from other sites. *Id.*at 1881. Sitemaps supplement this data to allow crawlers to pick up all URLs in the Sitemap and learn about those URLs using the associated metadata. *Id.*

Use of the Sitemap enables the search engine to update its database. *Id.* at A1884. Newegg notifies the search engines that it has a Sitemap containing this information by specifying the location of its Sitemap(s) in its website's robots.txt file. *Id.* at A1881. Search engines request Newegg's robots.txt file, and in response, Newegg transmits its robots.txt file to the search engine. *Id.* Newegg's robots.txt file contains a reference to Newegg's Sitemap file(s) which comprises indices of resources on Newegg's website. *Id.* After search engines are notified where the Sitemaps are located, the search engine requests the Sitemap files from Newegg, and Newegg transmits the Sitemap files to the search engines. *Id.* There are other means for transmitting Sitemaps to search engines including submitting the Sitemaps through webmaster tools features from search engines and a ping command directly to the search engine (this is a common feature in automatic Sitemap generators and server software). *Id.*

Newegg can choose to allow or disallow various search engines via manipulation of its robots.txt file. *Id.* Newegg can either submit its Sitemap to a specific search engine via the search engine's submission interface, by specifying the location in its robots.txt file, or by sending an HTTP request. *Id.* at

A1883. Newegg's current chosen practice is to submit its Sitemap by (at least) specifying its location (the "information") in a robots.txt file. *Id.*

The Robots Exclusion Protocol enables the search engine to find the information submitted in the Sitemap by Newegg. *Id.* This Protocol informs web site owners how to structure their robots.txt file(s) to give instructions about their site to web robots used by search engines. Search engines follow this standard. *Id.* Newegg uses and follows this protocol. *Id.*

## C. Claim construction.

The claim construction issues in this case were legitimately and reasonably disputed. On July 20, 2012, the District Court held its claim construction or *Markman* hearing. A1681. After the parties finished their arguments, the District Court characterized both sides' presentations as "excellent." A1850, lns. 1-2.

In coming to its decisions on claim construction, and as evidenced by its insightful questions, the District Court clearly applied careful thought to complicated issues that were in legitimate dispute. During the hearing, Newegg's counsel even conceded that "the Federal Circuit judges are not all in accord on this issue ... I think there's a little bit of a tug of war on exactly how stringent it's going to be, and that's why some of the cites you saw from the other side about were generous . . ." A1806, lns. 1-10.

The District Court then issued an oral decision on claim construction, while reserving the right to change its mind once a written opinion was rendered. *Id*. at lns. 6-10. The District Court stated constructions for multiple terms/phrases. A1850, ln. 7 – A1854, ln. 4. However, as to four terms/phrases, the District Court stated it was "declining to construe these four terms because [it had] concerns that the terms are indefinite." A1854, lns. 5-15. The District Court also stated that, "[i]n light of a construction at this time, I'm going to invite, not require, but invite the defendants to present a motion for summary judgment on indefiniteness…" *Id*. at lns. 16-22. Finally, the District Court stated that, "[i]f I either decline their motion or they elect not to bring a motion … I will offer whatever construction I believe I can consistent with my obligations under 35 U.S.C. 112(2)." A1854, ln. 23 – A1855, ln. 1.

SUS brought and maintained this suit in good faith asserting a claim which duly issued twice (the second time in reissue) from the Patent Office and which is presumed valid under the law. *See* 35 USC § 282.  However, despite SUS's good faith and reasoned belief in the definiteness of claim 8 (as evidenced by the reasoned arguments in SUS's *Markman* briefing), the District Court held otherwise. A1698. Thus, when the District Court indicated verbally at the *Markman* hearing that it had concerns that four terms were indefinite, rather than prolong the litigation, and in deference to the District Court's determination, SUS acted prudently by promptly

offering to dismiss its claims against the remaining Defendants, including Newegg.

A1682; A1901.

Newegg's exceptional case motion below complained of SUS's construction

of seven terms, which include five means-plus-function terms, namely:

- "information";
- "website database";
- "a means for creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine";
- "a means for identifying, using said web site database, new, deleted, unmodified or modified content";
- "a means for transmitting to said internet search engine a set of indices, wherein said set "of indices comprises said new, deleted, unmodified or modified database content";
- "a means for parsing, through the use of said script, said information from said form"; and
- "a means for updating, through the use of said script, said database of search engine".

A8-A9; A1912.   However, in its appellate brief, Newegg complains that "[t]he

district court erred in refusing to find Site Update objectively baseless based on its

continued and conscious disregard to follow controlling Federal Circuit MPF law by

not including an algorithm for any of the eight computer implemented MPF terms."

Brief of Appellant, p. 32 (Dkt. 14). As to the three means plus function terms that

Newegg did not raise in its motion in the District Court, those arguments have been

waived and are not properly on appeal before this Court.[1]    Further, although Newegg's motion argued that SUS's "plain meaning" construction of the term "information" was baseless, Newegg has not urged that ground on appeal. Accordingly, it too is waived.

Next, Newegg complains that SUS acted in an objectively baseless manner by advancing a construction of "means for creating and modifying a database of a website…" that did not include a structure comprising a Table of Files within the Table of Search Engines. *Id.* at 42.  SUS's proposed construction for this term was "the combination of a web server, Common Gateway Interface script, website database and form and equivalents."  A1335-1336.  SUS's proposed construction was reasonable and reflected SUS's good faith belief of the structure in the specification clearly linked to the agreed function.  It should be noted that while the District Court did not agree with SUS's construction, it did not fully agree with Newegg's construction of this term either. *Compare* A1851, ln. 11 – A1852, ln. 3 *with* A1775, lns. 1-17; *See also* A8-A12.  Under Newegg's self-servingly

---

[1] In the Federal Circuit, the general rule is "that a federal appellate court does not consider an issue not passed upon below." *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)).  "'[P]rudential considerations' articulated by the Supreme Court counsel against hearing new arguments for the first time on appeal absent limited circumstances." *Id.* at 1323.  Moreover, waiver is not limited to questions of fact. *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358 (Fed. Cir. 2006) ("[L]egal issues in patent infringement suits are not immune to the doctrine of waiver on appeal. . . .").

inconsistent view, it is inconsequential that Newegg's proposed construction did not get adopted by the District Court, but somehow "objectively baseless" that SUS's construction did not get adopted.

Next, Newegg alleges that SUS acted in an objectively baseless manner by advancing a construction of "website database" that was a "record of resources on the website." Newegg's arguments about "website database" are baseless and constitute a blatant distortion of the facts. SUS's construction was reasonable and consistent with the intrinsic evidence and the plain meaning of an easily understood term. Newegg's real complaint is not that SUS's proposed construction was baseless; rather Newegg complains that SUS's proposed construction failed to draw a distinction that the "'website database'" is separate from the underlying resources on the website itself." However, no such distinction was necessary for purpose of claim construction.

SUS did not contend in its infringement contentions that a website database was not separate from the underlying resources on the website itself. Newegg has not pointed to, and cannot point to, anything in SUS's infringement contentions that makes such a contention.

Further, Newegg has not pointed to, and cannot point to, anywhere in SUS's claim construction briefing where SUS argued that a website database was not separate from the underlying resources on the website itself. In fact, SUS agreed on

the record during the claim construction hearing that the database would have to be something more than the site itself, as follows:

> The Court: So perhaps the database could be on the website, but wouldn't it have to be separate from? In other words, there has to be something more than just the site itself. Would you agree with that? Or do you have a problem with that notion?

> Ms. Lipski: I would agree with that, your honor.

A1785:19-24. Newegg's allegation that SUS contended to the contrary is baseless.

The primary issue in dispute with regard to claim construction, as borne out in the *Markman* briefing and at the *Markman* hearing, was whether the combination of a web server, CGI interface script, and website database was a general purpose computer or special purpose computer. If it was the latter, then the construction of the disputed "means for" terms would be limited to algorithms disclosed in the specification (or indefinite, absent disclosure of such algorithms). *See generally Aristocrat Techs. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008), and its progeny. If it was the former, such a limitation would be improper. *See, e.g.*, *Ergo Licensing v. CareFusion*, 673 F.3d 1361, 1364-65 (Fed. Cir. 2012); *Pavilion Techs., v. Emerson Elec.*, 2006 WL 6210180, *8-*9 (W.D. Tex. Sept. 5, 2006); *see also Froessl v. Hewlett-Packard*, No. C-01-20924, 2002 WL 34455177, at *3–*5 (N.D. Cal. 2002). These complicated issues involving means-plus-function claims received well reasoned and substantial briefing, evidence in the form of expert declarations, and argument. *See*, e.g., A1335-A1348; A1561; and A1698. At the

*Markman* hearing, the Court characterized both sides' presentations, which focused primarily on this issue, as "excellent." A1850, lns. 1-2.

Whether or not the disputed means plus function terms were directed to a general purpose computer or special purpose computer was a matter of legitimate dispute, including legitimate factual dispute, between persons having at least ordinary skill in the art. Both sides submitted declarations from experts in the field supporting their proposed constructions. The declaration of SUS's technical expert, Dr. Lavian – whose qualifications were not challenged – was thorough and well reasoned in maintaining that a special purpose computer was involved. *See* A1588.

### D. Post-claim construction dismissals.

Following the claim construction hearing, SUS and twenty-three Defendants, including six represented by the same law firm as Newegg, amicably stipulated to their dismissal, including agreement that "all costs and expenses relating to this litigation (including attorney and expert fees and expenses) shall be borne solely by the party incurring same." A1683. The sole hold out was Newegg, who initially required SUS to file an opposed motion to dismiss in accordance with the *Super Sack* case, (A1858), but who subsequently relented to being dismissed, (A1901), and finally filed a Motion seeking fees. A1097; A1912; A2211. The District Court's claim constructions are reiterated in its Order denying Newegg's Motion. A7-12.

**E. The District Court's denial of Newegg's Motion.**

After careful consideration of Newegg's motion and all of the relevant factual and legal issues in the case, the District Court denied Newegg's motion.  A1-33. Newegg has appealed that ruling. A3323-24.  In view of the District Court's better perspective of this entire case and of the facts and issues in the case, this Court should give considerable deference to the District Court's findings and ruling.

SUS's claim construction positions were reasonable, made in good faith, and rightly supported the definiteness of issued claims which the law presumes to be valid. *See* 35 USC § 282.  Newegg's allegation that SUS somehow "consciously disregarded" the law is unfounded.  *See* Brief of Appellant, pp. 6, 8-11, 13-14, 25, 32, 34-40, 42-43, 46. Even were this true, Newegg has still not met its heavy burden of showing that the District Court has abused its discretion in any respect, including in finding that SUS's claim construction positions were not "so unreasonable that no reasonable litigant could believe it would succeed." *See Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1368 (Fed. Cir. 2012).

**F. Newegg's many irrelevant, baseless, unsupported allegations should be disregarded.**

Newegg's many pejorative references to SUS as a "patent troll" and to this case as a "shake down," and the like, are baseless and unprofessional, and should not distract this Court from the lack of legal or factual merit in Newegg's appeal.  Likewise, Newegg's tirade against "patent trolls" in general is not applicable

to SUS or the facts of this case, and should not distract this Court from the lack of legal or factual merit in Newegg's appeal. Similarly, Newegg's many allegations with no evidentiary support in the record should be given no weight.

Newegg's allegation that SUS settled with other Defendants for "arbitrary" and "nuisance-value, shakedown settlements" is erroneous and unfounded. Newegg's only support for this erroneous allegation is its citation to ten of SUS's settlements with other defendants which average $111,000 and are as high as $450,000. A1912. Further, the amounts of SUS's settlements, as reflected by their varying amounts, were based upon reasonable judgment using available information about the extent of use and relative importance of the patented technology in general and available information about the extent of use and relative importance of the patented technology specifically to each defendant. A2570. *See Uniloc v. Microsoft*, 632 F.3d 1292, 1312–15 (Fed.Cir. 2011). In view of the patented technology, in calculating settlement metrics, SUS took into account factors comprising the URL count, with flexibility given if the accused functionality was less important to the business, including in consideration of feedback from defendants, ALEXA ratings, how many visitors reached the site from search engine searches, and how many visitors are from the United States. *Id.* Newegg's allegations of improper settlement practices by SUS constitute baseless and erroneous speculation which should be given no weight. Similarly, Newegg's suggestion that SUS sought to be "paid off"

by Newegg "simply to avoid costs of defense" is baseless, unsupported by any evidence, and downright mendacious.

## IV.    SUMMARY OF THE ARGUMENT.

Newegg's brief is rife with unsupported and irrelevant complaints and hyperbole.  Newegg provides no factual proof that the District Court abused its discretion in holding that Newegg failed to prove by clear and convincing evidence that this was an exceptional case justifying an award of attorney's fees under 35 U.S.C. § 285.  SUS's claim construction positions in this case were reasonable and consistent with the presumption of validity and the intrinsic evidence. Newegg has failed to prove that: (1)  the District Court erred in holding that Newegg failed to prove by clear and convincing evidence that SUS's claim construction positions, or its bringing of this lawsuit, was objectively baseless; or (2) the District Court abused its discretion in holding that Newegg failed to prove by clear and convincing evidence that SUS's claim construction positions, or its bringing of this lawsuit, or any other actions by SUS, were made with subjective bad faith.

In short, Newegg's unsupported hyperbole does not show "*Eon-Net* like indicia of extortion behavior" nor does it prove that (1) the District Court erred in holding that Newegg failed to prove by clear and convincing evidence that SUS's bringing of this lawsuit, was objectively baseless; or (2) the District Court abused its

discretion in holding that Newegg failed to prove subjective bad faith by clear and convincing evidence.

## V.   ARGUMENT

### A. Legal Authorities

#### 1.  Standards for exceptional cases.

The general rule, called the "American Rule," is that each side shall bear its litigation burdens. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967). However, the American Rule is not absolute, for the policy of avoiding undue burden on access to judicial remedy gives way when litigation is devoid of any justification, or is tainted by grievous misconduct. Section 285 codifies for patent cases the policy of "compensating the prevailing party for the costs it incurred in the prosecution or defense of a case where it would be grossly unjust, based on the baselessness of the suit or because of litigation or Patent Office misconduct, to require it to bear its own costs." *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1309–10 n. 1 (Fed.Cir.2012). To receive attorney fees under § 285, "a prevailing party must establish by clear and convincing evidence that the case is 'exceptional.'" *Id.* at 1308.

In turn, patentees seeking to assert their patent rights, and accused infringers with grounds for believing the patent to be invalid or not infringed, are shielded from the additional litigation burden of fee-shifting when their positions are reasonable.

"It is established law under section 285 that absent misconduct in the course of the litigation or in securing the patent, sanctions may be imposed against the patentee *only* if two separate criteria are satisfied: (1) the litigation is brought in subjective bad faith, *and* (2) the litigation is objectively baseless." *Id.* "To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits." *Id.* at 1309. For subjective bad faith, it must be shown that lack of objective foundation for the claim "was either known or so obvious that it should have been known" by the party asserting the claim." *Id.*

On appellate review of an attorney fee ruling this court determines *de novo* whether the litigation was objectively baseless, (*Id.* at 1309–10 & n. 1), and the district court's findings regarding subjective bad faith are reviewed for clear error. *Id.* at 1310. Thus, this Court may conduct "a retrospective assessment of the merits of the entire litigation" to determine "whether the record established in the proceeding supports a reasonable argument as to the facts and law." *Id.* at 1310 n. 1.

Reasonable minds can differ as to claim construction positions and un-adopted constructions are not necessarily frivolous. *Raylon*, 700 F.3d at 1368. *See Visto Corp. v. Sproqit Techs., Inc.,* No. C–04–0651 EMC, 2007 WL 160942, at *5 (N.D.Cal. Jan.17, 2007) ("Given the vagaries often inherent in the claims construction process, it appears to be the exception, and not the rule, for a court to find terms of a patent so obvious on its face, and thus the construction offered by a

party so obviously unreasonable, that sanctions under § 285 would be warranted."). In fact, a recent study indicates that even the well reasoned claim construction decisions by federal district judges are reversed by the this Court 45% percent of the time with software patents and 29% of the time with non-software patents. *See* Do "Fuzzy" Software Boundaries Explain High Claim Construction Reversal Rates?, at p. 3, by Professor Shawn P. Miller at George Mason University, http://mason.gmu.edu/~smille9/ ShawnMillerJobMarketPaper.pdf (last updated 11/13/2012) (concluding that "the Federal Circuit found claim construction error in 45.1 percent of the opinions involving software patents and 28.9 percent of the opinions involving non-software patents.").

## 2. Standards for claim construction.

Claim construction is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). In general, this Court's decision in the *Philips* case provides the basic legal framework for properly construing the claims of a patent. *See Phillips v. AWH*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

As to the means-plus-function claim at issue in this case, (*see* 35 U.S.C. § 112(6)), its means-plus-function elements covers the structure disclosed in the specification that performs, and is clearly linked to, the claimed function. *Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003). During claim

construction, the court is tasked with identifying the claimed function and determining the corresponding structure disclosed in the specification that performs that function. *IMS Tech., Inc. v. Hass Automation, Inc.*, 206 F.3d 1422, 1430 (Fed. Cir. 2000).

For computer-implemented inventions with terms in means-plus-function format, the particular structure disclosed must be more than just a general purpose computer or microprocessor. *Aristocrat Techs.*, 521 F.3d at 1333. Where the only structure identified for performing the function described by a mean-plus-function limitation is a general purpose computer, an algorithm is required to achieve a specific, non-general, purpose. *See*, *e.g., Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008); *Ergo Licensing*, 673 F.3d at 1364-65; *Pavilion Techs.*, 2006 WL 6210180 at *8-*9; *see also Froessl*, 2002 WL 34455177 at *3–*5.

General purpose computers are like "processors." *HTC Corp. v. IPCom GmbH & Co.,* 667 F.3d 1270, 1280 (Fed. Cir. 2012). The kind of general, non-special purposes that general computers achieve are:

- processing (*Ergo Licensing,* 673 F.3d at 1365);
- receiving data (*Id*.);
- storing data (*Id*.);
- retrieving data (*Pavilion Techs*., 2006 WL 6210180 at *5);
- simple arithmetical operations (*Id*. at *9); and
- functions performable by a general purpose computer using only off-the-shelf software (*Id*. at *9).

On the other hand, a special purpose computer can be as simple as a controller (*Goss Int'l Americas, Inc. v. Graphic Mgmt. Assocs., Inc.*, 739 F. Supp. 2d 1089, 1100 (N.D. Ill. 2010). Examples of non-general, special purposes include:

- controlling adjusting means (*Ergo Licensing*, 673 F.3d at 1365);
- "entering," "deleting," "reviewing," and "adjusting" financial transaction data (*Noah Sys. Inc. v. Intuit Inc.*, 675 F.3d 1302, 1315 (Fed. Cir. 2012));
- assigning numbers to stopping positions (*Pavilion Techs.*, 2006 WL 6210180, at *8);
- time domain processing (*Id.*);
- and assigning a plurality of numbers representing the angular positions of each slot reel in a slot machine *(Katz Interactive Call Processing Patent Litig. v. Am. Airlines, Inc.*, 639 F.3d 1303, 1314 (Fed. Cir. 2011)).

Further, at least one court has held that a web server "[is] software, or a machine having software, that receives web page requests and returns web pages in response to the requests" and, accordingly, was a special purpose computer. *EpicRealm, Licensing, LLC v. AutoFlex Leasing, Inc.,* No. 2:05CV163, 2006 WL 3099603, *9 (E.D. Tex. 2006).

## B. The District Court properly denied Newegg's Motion brought under 35 U.S.C. § 285.

### 1. SUS's claim construction positions on special purpose computers and algorithms were reasonable and not objectively baseless.

SUS's claim construction positions on algorithms were reasonable and not objectively baseless. As stated above, Newegg's Motion in the District Court complained of SUS's construction of seven terms, which include five means-plus-function terms. A8-A9; A1912. However, in its appellate brief, Newegg complains

that "[t]he district court erred in refusing to find Site Update objectively baseless based on its continued and conscious disregard to follow controlling Federal Circuit MPF law by not including an algorithm for any of the eight computer implemented MPF terms." Brief of Appellant, p. 32 (Dkt. 14). As to the three means plus function terms that Newegg did not raise in its motion in the District Court, those arguments have been waived and are not properly on appeal before this Court.

As to the means plus function terms that Newegg did complain about in its Fee Motion to the District Court, as noted above, the law is that an algorithm is required in a means-plus-function corresponding structure only when a general purpose computer is being used, in a claim, to achieve a specific, non-general, purpose such that an algorithm is needed by the general purpose computer to achieve the purpose. *E.g., Ergo Licensing*, 673 F.3d at 1365; *Pavilion Techs.*, 2006 WL 6210180 at *8-*9; *see also Froessl*, 2002 WL 34455177 at *3–*5.

General purpose computers are like "processors." *HTC Corp.*, 667 F.3d at 1280. The kind of general, non-special, purposes general computers achieve are discussed in V.A.2 above. On the other hand, a special purpose computer can be as simple as a controller. *Goss Int'l*, 739 F. Supp. 2d at 1100. Examples of non-general, special purposes are discussed in V.A.2 above.

Comparing and contrasting these examples and purposes of general purpose computers and special purpose computers with the means-plus-function

corresponding structures in the present case shows that SUS reasonably believed that the corresponding structures are special purpose computers rather than general purpose computers. Further, at least one court has held that a web server: "[is] software, or a machine having software, that receives web page requests and returns web pages in response to the requests" and is therefore a special purpose computer. *EpicRealm,* 2006 WL 3099603 at *9 (E.D. Tex. 2006).

Further, for the algorithm requirement to apply, Newegg had to present at least substantial evidence that a general purpose computer cannot perform the relevant means-plus-function functions. *In Re Katz Interactive Call Processing Patent Litigation*, No. MDL 2:07-ML-1816-B-RGK at 3 (C.D. Cal., May 24, 2012). Yet Newegg's own expert, Dr. Maggs, admitted that a web server "receives requests in HTTP, HTTPS, or a similar standardized web protocol," A1429 at ¶ 17); "generates responses to those requests," *Id.*; "[uses] CGI scripts . . . to pass data between different processes running on the web server," *Id.* at ¶ 16); and "passes data between a web server and web client, [using] a standardized web protocol . . ., such as HTTP or HTTPS." *Id.* at ¶ 16). At a minimum, the evidence, which both sides presented via expert declarations, was legitimately factually disputed. *See* A1423; A1589.

SUS was reasonable in relying in good faith upon the well reasoned analysis and opinions of its technical expert Dr. Lavian, whose credentials were not challenged and whose opinions were not challenged as being unreliable under

Federal Rule of Evidence 702 or *Daubert. See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993).   Dr. Lavian's analysis and opinions comprised the following:

"CGI script" does not merely describe a general purpose computing program, not would a person of ordinary skill in the art consider it to be one in 1999 or any other relevant time period; it serves specific purposes, including passing data between a client, a computer requesting data or processing and a program or script on a server, a computer providing data or processing, as described in the patent at 1:66 – 2: 2.

Neither I nor a person of ordinary skill would expect, in 1999 or any other relevant time period, that a general purpose computer without more would be able to achieve those purposes. It is not even a computer. It can achieve these specific purposes because it contains hardware and software (i.e., specific programming) specifically designed to achieve those special purposes. Every general purpose computer cannot perform these specific purposes, and no general purpose computer can perform those specific purposes (special hardware and special programming is required, which are not present in a general purpose computer).

While a general purpose computer can process, store and retrieve data, and perform simple arithmetic calculations, it cannot perform passing data between a client, a computer requesting data or processing and a program or script on a server, a computer providing data or processing without special programming. A user cannot buy any computer from a retail store and use that computer to achieve these specific purposes…

"Web server" does not merely describe a general purpose computer, not would a person of ordinary skill in the art consider it to be one in 1999 or any other relevant time period; it serves specific purposes, including providing documents, files and scripts when requested by a client. Neither I nor a person of ordinary skill would expect, in 1999 or any other relevant time period, that a general purpose computer without more would be able to achieve those purposes. It is not even a computer. It can achieve these specific purposes because it contains hardware and software (i.e., specific programming) specifically designed to achieve those special purposes.

Every general purpose computer cannot perform these specific purposes, and no general purpose computer can perform those specific purposes (special hardware and special programming is required, which are not present in a general purpose computer). While a general purpose computer can process, store and retrieve data, and perform simple arithmetic calculations, it cannot perform providing documents, files and scripts when requested without special programming. A user cannot buy any computer from a retail store and use that computer to achieve these specific purposes….

"Database" does not merely describe a general purpose computer, not would a person of ordinary skill in the art consider it to be one in 1999 or any other relevant time period; it serves specific purposes, including recording resources. Neither I nor a person of ordinary skill would expect, in 1999 or any other relevant time period, that a general purpose computer without more would be able to achieve those purposes. It is not even a computer.

It can achieve these specific purposes because it contains hardware and software (i.e., specific programming) specifically designed to achieve those special purposes.

Every general purpose computer cannot perform these specific purposes, and no general purpose computer can perform those specific purposes (special hardware and special programming is required, which are not present in a general purpose computer). While a general purpose computer can process, store and retrieve data, and perform simple arithmetic calculations, it cannot record resources when requested without special programming. A user cannot buy any computer from a retail store and use that computer to achieve these specific purposes.

A1588-A1619. Newegg admits that SUS cited the "correct legal standard" in its claim construction briefing. Brief of Appellant, p 35. However, the parties had a reasonable and legitimate **_factual_** dispute, including a battle of experts, over whether the recited functions were performed by a general purpose computer or a special purpose computer. This factual dispute was addressed in SUS's claim construction

briefing and extensively at the District Court's claim construction hearing, including as follows:

> ... MS. LIPSKI: ... THE DEFENDANTS IMPROPERLY SEEK TO HAVE THE STRUCTURE INCLUDE BOTH THE SPECIAL-PURPOSE COMPUTER THAT'S DISCLOSED, AS WELL AS ANY OTHER ALGORITHMS THAT MIGHT BE DISCLOSED IN THE PATENT AS WELL. HOWEVER, WE DO NOT BELIEVE THAT'S THE REQUIREMENT. JUST A FEW CASE CITES HERE. "A SPECIALLY ADAPTED COMPUTER IS NOT A GENERAL PURPOSE COMPUTER," AND WHAT WE HAVE HERE ARE SPECIALLY ADAPTED COMPUTERS…
>
> … MS. LIPSKI: IF SPECIAL PROGRAMMING IS REQUIRED FOR A GENERAL-PURPOSE COMPUTER TO PERFORM THE CORRESPONDING CLAIMED FUNCTION, THEN THE DEFAULT RULE REQUIRING AN ALGORITHM DOES APPLY. BUT WMS GAMING DID NOT IMPOSE A REQUIREMENT THAT WHENEVER THE STRUCTURE, CORRESPONDING STRUCTURE IS A COMPUTER, THEN THE SPECIFICATION MUST ALSO DISCLOSE AN ALGORITHM…
>
> AND A SPECIAL-PURPOSE COMPUTER CAN BE AS SIMPLE AS A CONTROLLER. SO YOU HAVE A COMPUTER AND IT'S ALREADY BEEN PROGRAMMED TO CONTROL…
>
> … NOW, IN THIS CASE … THEY SAY "INSTALLATION OF SOFTWARE TOOLS PLACES A NUMBER OF CGI SCRIPTS, DATABASE TABLES, AND HTML FORMS ON THE SERVER. EACH ELEMENT PERFORMS A SPECIFIC FUNCTION RELEVANT TO THE PROCESS AND IS OUTLINED BELOW." AND IT'S OUR POSITION THAT ONE OF SKILL IN THE ART, LOOKING AT THIS, WOULD KNOW ALREADY THAT A CGI SCRIPT IS PROGRAMMED FOR A SPECIAL FUNCTION…
>
> … MS. LIPSKI: SO IN THE PATENT, IT STATES THAT "THE USER IS PROVIDED WITH AN HTML FORM AND CGI SCRIPT, HEREIN REFERRED TO AS A CGI PROGRAM, IN ORDER TO CONFIGURE THE ENABLE AND TABLE OF FILES FIELDS." NOW, WE BELIEVE THAT THIS IS DIRECTLY LINKED TO THE MEANS FOR ENABLING OR DISABLING, BY SAID USER, THE APPROPRIATE INTERNET SEARCH ENGINES ON SAID FORM.

… MS. LIPSKI: NOW, WE BELIEVE, AND WE FEEL THIS IS SUPPORTED BY THE CASE LAW, THAT THE COMBINATION OF A WEB SERVER, CGI SCRIPT, AND FORM IS A SPECIAL-PURPOSE COMPUTER… AND WE BELIEVE THAT BECAUSE ONE OF SKILL IN THE ART WOULD ALREADY KNOW THAT A WEB SERVER AND A CGI SCRIPT ARE PREPROGRAMMED TO DO CERTAIN THINGS. IT'S NOT JUST AN OFF-THE-SHELF --

… A WEB SERVER ISN'T JUST SOMETHING THAT'S AN OFF-THE-SHELF TYPE OF COMPUTER. YOU KNOW WHAT IT'S SUPPOSED TO DO AND YOU KNOW WHAT IT'S PROGRAMMED TO DO AND YOU KNOW THAT THE CGI SCRIPT CAN INTERFACE WITH IT AND INTERACT WITH IT. … WHEN YOU'RE PRESENTED IN THIS CONTEXT WITH A WEB SERVER, IT'S BEEN PROGRAMED TO DO CERTAIN THINGS, AND WHEN YOU ARE PRESENTED WITH THE CGI SCRIPT OR PROGRAM, WHICH ITSELF IS A PROGRAM, THEN YOU KNOW THAT IT CAN INTERACT WITH THE WEB SERVER IN A CERTAIN WAY. YOU KNOW IT'S ALREADY BEEN PROGRAMED TO DO THAT…

… THE COURT: SO YOUR POINT IS IT'S SUFFICIENTLY LIKE A CONTROLLER IN THE EXAMPLE OF THE FEDERAL CIRCUIT CASE YOU CITED EARLIER?

MS. LIPSKI: YES, YOUR HONOR.

A1698-A1857.

Further, the District Court "rel[ied] in part on Newegg's expert" in resolving the factual dispute as to whether a CGI program was sufficient to make a web server a special purpose computer. A18.  There was nothing objectively baseless about SUS having its expert's reasoned opinions weighed against those of Newegg's expert for the Court to decide which views would be adopted.

Despite Newegg's admission that SUS cited the "correct legal standard" in its claim construction briefing, Newegg alleges that somehow SUS acted in "conscious

disregard of controlling law" and that it "ignored controlling law." Brief of Appellant, p. 63.  This allegation is baseless.   Again, the parties had a reasonable and legitimate *__factual__* dispute in a complex area of the law over whether the recited functions were performed by a general purpose computer or a special purpose computer.

As noted above, "[r]easonable minds can differ as to claim construction positions." *Raylon*, 700 F.3d at 1368.  That is especially true when there is a factual dispute, including a battle of experts, that must be resolved by the Court in order to determine which claim construction should apply.

Newegg's erroneously claims that SUS should have known that claim 8 of its *presumptively valid* patent – which issued in 2001 and then re-issued in 2009 -- was invalid due to the lack of an algorithm.  To the contrary, SUS was reasonable in relying on the presumption of validity, and the heavy burden of clear and convincing evidence for overcoming validity, in support of its view that the means plus function elements at issue involved a special purpose computer.  SUS is not aware of any decisions from this Court which hold that relying on the presumption of validity or requiring an adverse party to prove invalidity, including when there are factual disputes involving competing experts, is objectively (or subjectively) baseless behavior.

Newegg's allegation that SUS failed to provide "any justification" for not including an algorithm in its proposed constructions is baseless.  It was crystal clear from SUS's claim construction briefing (A1327-A1374; A1561-A1656) and arguments at the claim construction hearing (A1698-A1857) that SUS did not believe that disclosure of algorithms was necessary because a special purpose computer was involved.

Further, this is not a case in which there is any showing that no reasonable claim construction could result in infringement. Newegg has no evidence that it would not have infringed the claims had the disputed means-plus-function elements not been deemed indefinite. Newegg's basic complaint is that SUS should have known that claim 8 was indefinite. However, the facts show SUS had well reasoned and substantial claim construction positions, and that it brought and maintained this suit in good faith asserting a claim which duly issued – twice – from the USPTO and which is presumed valid under the law.

Moreover, at a minimum, the District Court, even though it disagreed with many of SUS's claim construction positions (and many of Newegg's as well), was correct when it found that, at worst, "SUS misunderstood the Federal Circuit's guidance" in an area where "the Federal Circuit and district courts have created a complicated framework from which to determine whether a particular computer-

related structure does or does not satisfy Section 112(6)." A22 - A23. Thus, at worst, SUS did not act in bad faith.  As found by the District Court:

> Although the court disagreed that the combination of a CGI program, a web server, a website database, and a form constituted a special purpose computer, SUS's position was not entirely frivolous. As the court's lengthy discussion of this area of law makes clear, the Federal Circuit and district courts have created a complicated framework from which to determine whether a particular computer-related structure does or does not satisfy Section 112(6). SUS's argument overlooks a nuance in the Federal Circuit's case law – namely that the functions the court has identified in its computer-related means-plus-function opinions do not on their own transform general purpose computers into special purpose computers. But given the disputes within the Federal Circuit regarding this area of law, the court cannot say that SUS's argument is objectively baseless or frivolous.

A23.  Further, the District Court specifically found that "the terms were not so obviously indefinite that SUS's pursuit of infringement causes of action on claim 8 was frivolous." A24. The District Court did not commit clear error in finding that SUS's suit and claim construction positions, including its positions on special purpose computers and algorithms were not brought in subjective bad faith.

For at least the same reasons (stated above) that Newegg has not shown that SUS's claim construction positions were objectively baseless, Newegg has not shown that the District Court committed clear error in finding that SUS's suit and claim construction positions were not brought in subjective bad faith.

### 2. Newegg's fallback position of a purported "26 month" timeline for claim construction is a baseless overreach and stretch of the facts.

Newegg's fallback position – *i.e.,* if this Court does not find that SUS's claim construction positions addressed at the District Court's *Markman* hearing were objectively baseless – is that an exceptional case should still be found because SUS's original claim construction positions prior to the venue transfer were allegedly improperly different than its positions post transfer. Newegg's fallback position is a baseless, unsupported overreach and stretch of the facts. Newegg's fallback position also lacks specificity and is inadequately briefed, and leaves nothing of substance to meaningfully respond to. As such, this Court would be justified in disregarding, or summarily rejecting, Newegg's arguments due to inadequate briefing.

Moreover, SUS's original constructions during the first round of briefing were not materially different from its constructions during the second round. It's constructions of the disputed "means for" terms comprised a "[w]eb server adapted as described in Col. 4, lines 19-34 and equivalents" and also comprised "[a] Common Gateway Interface (CGI) program and equivalents." A653-A666. Moreover, the "[w]eb server adapted as described in Col. 4, lines 19-34" refers to a web server with "software tools," with software tools referring to software comprising a CGI program, and with such software "build[ing] a database of the resources on the website." A228, 4:19-34 & 36-37. Further, SUS had the same

fundamental position in its original claim construction briefing that an algorithm was not required because special purpose computers were involved.

It should also be noted that Newegg's claim construction positions for the disputed means-plus-function terms were revised between the first and second rounds of claim construction briefing. Under Newegg's myopic and self-serving view, it is inconsequential that Newegg's proposed constructions were revised, but somehow "objectively baseless" that SUS's constructions were revised.

In any event, the fact that SUS revised its claim construction positions during subsequent claim construction proceedings, shows, if anything, reasonableness on SUS's part. No objective baselessness or bad faith is shown when a party improves its claim construction positions or when it modifies them to address criticisms leveled by opposing parties.

Further, Newegg's suggestion that SUS should have somehow "corrected" its original claim constructions between the period of time between the venue transfer and the claim construction briefing in the transferee forum is baseless. There was no need, and no procedural vehicle, for SUS to somehow "correct" claim construction briefing from the original forum that became irrelevant once the case was transferred into a new forum which would conduct its own claim construction proceedings based upon new briefing. As the District Court appropriately found:

> SUS had no opportunity to file a reply in the first claim construction, and it amended its proposals in the claim construction in this court. SUS

thus attempted to correct the defects the defendants identified. And so, even if the court were to find that SUS's claim construction proposals before the Eastern District of Texas were objectively baseless, SUS's attempts to amend them do not reveal subjective bad-faith.

A25.

### 3. SUS's non-inclusion of a Table of Files within the Table of Search Engines as necessary linked structure for "creating and modifying the [website] database" was reasonable and not objectively baseless.

Newegg complains that SUS acted in an objectively baseless manner by advancing a construction of "means for creating and modifying a database of a website…" that did not include a structure comprising a Table of Files within the Table of Search Engines.  Brief of Appellant, p. 42.  The agreed function was "creating and modifying a database of a web site wherein said website database contains content capable of being indexed by an internet search engine." A1335. SUS's proposed construction for this term was "the combination of a web server, Common Gateway Interface script, ***website database*** and form and equivalents." 1335-1336.  SUS's proposed construction was reasonable and reflected SUS's good faith belief that the structure in the specification clearly linked to the agreed function. In its claim construction briefing, SUS pointed to specific linkages to the function, as follows:

- "Installation of the software tools places a number of CGI scripts, database tables, and HTML forms on the server. Each element performs a specific function relevant to the process and is outlined below." Col. 6, lines 48-49.

- "The user is provided with an HTML form and CGI script, hereinafter referred to as a CGI program, in order to configure the Enabled and Table of Files fields (See, FIG. 1, Box 100-101). Col. 7, lines 18-22; and
- "The Tables of Files is a field in the Table of Search Engines database. It is initially configured by the user through a CGI program (FIG. 1, Box 200) to list the files the user wishes to be registered with this search engine." Col. 7, lines 29-32.

*Id*. Thus, the database is created and modified using the web server, and the CGI script, database and form on the server.  A1337. As summarized in the specification: "The process is begun by distributing a set of search engine update software tools to the web site owner." Col. 4, lines 19-20. Figure 1a, 201, 202a-c are also instructive. *Id*.



*Id*.

Thus, SUS's construction of this term included the combination of a web server, CGI script, website database, form and equivalents, which work together to create and modify the website database.

SUS reasonably contended that a Table of Functions was not a corresponding structure because it reasonably believed that the Table of Functions is part of the

database built, and it does not create or modify the databases. There is substantial

support for this position in the specification, as follows:

- "The user is provided with an HTML form and CGI script, hereinafter referred to as a CGI program, in order to configure the Enabled and Table of Files fields[.]" Col. 7, lines 19–21;
- "The Table of Files . . . is initially configured by the user through a CGI program[.]" Col. 7, lines 29–31;
- "The form allows the user to choose from many methods of building the Table of Files." Col. 7, lines 57–58.

*Id*.; A1341.

Consequently, SUS reasonably contended that the Table of Files, which is

merely a field in a database (*i.e.*, the Table of Search Engines database) is

"configured' or "built" by the user performing the invention. A230, 7:29–31 & 57–

58. Further, claims 6 and 13 specify "creating a table of files" in the Table of Search

Engines database, while claim 8 does not. A234. Since Table of Files fields are

configured or built – *i.e.*, they are acted upon – they do not perform a function.[2]

---

[2] *See, e.g.,* A1392 ("three ways to populate the Table of Files records"; A230, Col. 7, lines 61-62 ("[R]esources are added to the Table of Files."); A221, Fig. 1a, Box 201 ("User selects method to update Table of Files database."); A230, Col. 6, lines 61-63 (stating that a Table of Files is a "Database table of files indexed on this site and for which changes must be tracked); *Id*. at 7:29-31 ("The Table of Files is a field in the Table of Search Engines database. It is initially configured by the user through a CGI program[.]"); Claim 6, element d "creating a table of files, contained in said search engine database, via said script." A234, Col. 15, lines 13-23 & Col. 16, lines. 29-39. Claim 6; accord claim 13, limitation d.  Further, the Table of Files contains "data" (e.g., A222 Fig. 1b, Boxes 206a, 207b, 207c ["notified of changed data in Table of Files."])

It should also be noted that while the District Court did not agree with SUS's construction, it did not agree with Newegg's construction of this term either. *Compare* A1851, ln. 11-A1852, ln. 3 *with* A1775, lns. 1-17; *See also* A8-A12. Under Newegg's myopic and self-serving view, it is inconsequential that Newegg's proposed construction did not get adopted by the District Court, but somehow "objectively baseless" that SUS's construction did not get adopted.

**4. The District Court did not commit clear error in finding that SUS's non-inclusion of a Table of Files within the Table of Search Engines as necessary linked structure for "creating and modifying the [website] database" did not constitute bad faith.**

For at least the same reasons (stated above) that Newegg has not shown that SUS's non-inclusion of tables for "creating and modifying the [website] database" was necessary linked structure was objectively baseless, Newegg has not shown that the District Court committed clear error in finding that SUS's non-inclusion of a Table of Files within the Table of Search Engines as necessary linked structure for "creating and modifying the [website] database" did not constitute subjective bad faith.

**5. As to claim construction, Newegg's reliance upon *Eon-Net* and *Raylon* is misplaced and conflates a rejected claim construction position (this case) with baseless infringement positions (*Eon-Net* and *Raylon*).**

**a. Newegg's reliance upon *Eon-Net* is entirely misplaced.**

As to claim construction, Newegg's reliance upon *Eon-Net* is misplaced and conflates a rejected claim construction positions with baseless infringement

positions.  In *Eon-Net,* the written description had "repeatedly" defined the invention as a system for processing information that originates from hard copy documents, and, under this construction, it was undisputed that the defendant Flagstar did not infringe any asserted claim of the patents-in-suit. *Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314, 1326 (Fed. Cir. 2011). Thus, because *Eon-Net's* infringement theory was baseless, the district court did not clearly err in finding that Eon–Net pursued objectively baseless infringement claims. *Id.*

In the present case, aside from the fact that indefinite claim terms cannot be infringed (an issue relative to which SUS reasonably relied, at least in part, upon the presumption of validity and its reasonable claim construction positions), Newegg has not shown that it did not infringe any of the claims as construed by the District Court.  Newegg could have sought to make such a showing in its Motion before the District Court, but it did not do so.

### b.  Newegg's reliance upon *Raylon* is entirely misplaced.

Newegg's reliance upon *Raylon* is also entirely misplaced. The facts of *Raylon* bear no reasonable resemblance to this case.  In *Raylon*, the plaintiff proposed a construction of a "display being pivotally mounted on said housing" to mean "an electronic device attached to a housing for the visual presentation of information, the display capable of being moved or pivoted relative to the viewer's perspective." 700 F.3d at 1365. However, the patent and the specification described

that the screen itself must pivot relative to the machine, not relative to the user. *Id.* This Court found that the plaintiff's position was not just unsupported by the patent but actually contradicted by it. *Id.* *Raylon* bears no applicability to this case.

Further, in *Raylon,* the district court had denied Rule 11 sanctions, and, based upon its denial of Rule 11 sanctions, also denied an exceptional case finding. *Raylon*, 700 F.3d at 1369. This Court reversed the lower court's denial of Rule 11 sanctions. *Id.* Consequently, since the district court's denial of an exceptional case finding had been based upon its denial of Rule 11 sanctions, this Court also remanded the case for a determination of whether there should be an exceptional case finding. *Id.* In light of these substantially disparate facts, Newegg's reliance upon *Raylon* is entirely misplaced.

In the present case, SUS never sought constructions contradicted by the '863 patent, Newegg never sought (nor was it entitled to) Rule11 sanctions, and the District Court did not deny Newegg's exceptional case motion based upon the lack of a Rule 11 violation. Newegg's vacuous argument that, "Site Update's incredible position was the very type that the Federal Circuit found objectively baseless in *Raylon*" lacks any factual basis or meaningful explanation. *See* Brief of Appellant, p. 50.

**6. Newegg's arguments about "website database" are baseless and constitute a blatant distortion of the facts.**

SUS's proposed construction for "website database" was a "record of resources on the website." A1335. SUS's construction, although rejected in part by the District Court, was reasonable. It was also consistent with the intrinsic evidence. As stated in the Summary of the Invention of the '683 patent:

> Upon initial execution, the software builds a database of the resources on the website. The resources catalogued can be specified by the user, or automatically through spidering function of the software. The database consists of one record per resource indexed on the site.

A229, 4:35-39. SUS's proposed construction reasonably defined database in a way that encompasses what would be understood by one of skill in the art, and makes sense within the context of the specification and claims. In some cases, disputed claim language involves a commonly understood term that is readily apparent to the Court. In such a case, the Court considers that a person of ordinary skill in the art would give the term its widely accepted meaning, unless a specialized definition is stated in the patent specification or was stated by the patentee during prosecution of the patent. *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, 2012 U.S. Dist. LEXIS 17918, 21-22 (N.D. Cal. 2012).-

Newegg's real complaint is not that SUS's proposed construction was baseless; rather Newegg complains that SUS's proposed construction failed to draw a distinction that the "'website database' is separate from the underlying resources

on the website itself." However, no such distinction was necessary for purpose of claim construction. SUS's proposed construction never stated that the "website database" was not separate from the underlying resources, *e.g.*, hyperlinks, on the website itself. SUS did not contend that a website database was not separate from the underlying resources on the website itself. Newegg cannot point to anything in SUS's infringement contentions that makes such a contention. Rather, SUS's infringement contentions make clear that its infringement theory comprised Newegg's XML Sitemaps, (A1877), something clearly distinct from the underlying resources on the website itself. Further, Newegg cannot point to anywhere in SUS's claim construction briefing where it argued that a website database was not separate from the underlying resources on the website itself. In fact, SUS agreed on the record during the claim construction hearing that the database would have to be something more than the site itself, as follows:

> The Court: So perhaps the database could be on the website, but wouldn't it have to be separate from? In other words, there has to be something more than just the site itself. Would you agree with that? Or do you have a problem with that notion?

> Ms. Lipski: I would agree with that, your honor.

A1785:19-24. Newegg's allegation that SUS contended to the contrary is frivolous.

> The District Court appropriately summed up what occurred, as follows:

> SUS's construction came from language in the Summary of Invention and is not so problematic that the court finds it was frivolous. As SUS explained at the hearing, it was concerned that Newegg's construction

suggested a "separate and distinct" database that was not an included limitation in the claim language and that appeared to preclude the website itself from hosting the database. SUS, however, agreed at the hearing that the "website database" had to be distinct from just the content of the website.  The court in fact adopted its description – "record of resources on the website" … It is true that SUS's proposal could be read to include the website… but that interpretation is not the only one… at the hearing, SUS agreed that this interpretation of "website database" … was not supported by the claim or the specification.

A15-16.

The only thing that Newegg can point to is that SUS's counsel, after having clearly agreed *on the record* that the database would have to be something more than the site itself, stated that "I think we'd rather stay with our proposed construction," in lieu of agreeing with Newegg's construction, which was believed to suggest a "separate and distinct" database that was not an included limitation in the claim language and that appeared to preclude the website itself from hosting the database. A16 & A1791.  Just because SUS's counsel arguing the *Markman* hearing would "rather stay with [their] proposed construction," does not mean that she "reneged" on SUS's clear agreement that the database would have to be something more than the site itself, including because SUS's construction did not state that a database would not have to be something more than the site itself.

Newegg's allegation that SUS "insisted …that the website database need not be distinct from the website or its resources" is baseless hyperbole.  *See* Brief of Appellant, p. 53. Newegg's arguments about "website database" constitute a

distortion of the facts. Newegg builds up a straw man by constructing a baseless argument that SUS contended something that it conceded was not the case on the record. The fact that SUS's counsel thought that SUS's proposed construction was more appropriate and was not prepared to agree with one unnecessarily departed from plain meaning to make an unnecessary distinction was not baseless, unreasonable, or even improper.

Further, the meaning (including the plain and ordinary meaning) of "website database" to one of ordinary skill in the art in view of the specification was a matter of legitimate dispute between persons having at least ordinary skill in the art. Both sides submitted declarations from experts in the field supporting their proposed constructions. The declaration of SUS's technical expert, Dr. Lavian – whose qualifications were not challenged – was thorough and well reasoned. A1572-74.

Finally, it should be noted that the District Court's construction of "website database" is more similar to SUS's proposed construction than to Newegg's. *Compare* A8 *with* A11. If anything, the District Court's construction of "website database" constitutes a substantial rejection of Newegg's proposed construction, which sought to limit a database narrowly to a "structure of fields or records." Under Newegg's self-serving view, it is inconsequential that Newegg's proposed construction did not get adopted by the District Court, but somehow "objectively baseless" that SUS's construction did not get adopted verbatim.

**7. Newegg has failed to show that the District Court clearly erred in finding that Newegg had not shown clear and convincing evidence of subjective bad faith.**

For at least the same reasons (stated above) that Newegg has not shown that SUS's position on "website database" was objectively baseless, Newegg has not shown that the District Court committed clear error in finding that SUS's position did not constitute subjective bad faith.

**8. Newegg has failed to show that the District Court clearly erred in finding that Newegg had not shown clear and convincing evidence of subjective bad faith due to SUS's claim construction positions.**

Newegg erroneously contends that SUS's allegedly "frivolous claim construction positions support a finding of subjective bad faith." Brief of Appellant, p. 55. However, as discussed above, SUS's claim construction positions were reasonable and made in good faith. Moreover, Newegg has failed to make any showing that the District Court clearly erred in finding that Newegg had not shown clear and convincing evidence of subjective bad faith due to SUS's claim construction positions.

**9. Newegg's reliance upon *MarTec* is misplaced.**

Newegg's reliance upon *MarTec* is misplaced. In *MarTec,* the district court found that the "written description and prosecution histories of the patents-in-suit, and other documentary evidence, demonstrate that MarcTec's patent infringement case was baseless." *See MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 918-

19 (Fed. Cir. 2012). The court further found that, because MarcTec disclaimed stents to overcome the prior art, it could not turn around and assert infringement against the Cypher stent. *Id.* Accordingly, the district court did not err in finding that MarcTec's infringement claims were objectively baseless.

This case does not involve any attempt to accuse something of infringement that was disclaimed during prosecution, nor does it involve any evidence of non-infringement. Nothing about *MarTec* bears any pertinence to this case.

### 10. This is not "Shake-down Litigation" Nor was it brought for any improper purpose of obtaining nuisance-value settlements.

Newegg's Motion is full of rhetoric, but lacks any factual support for Newegg's baseless contention that this case a "shake-down." First, Newegg complains that SUS sued multiple defendants. However, SUS is legally entitled to obtain a reasonable royalty from all infringers of its patent. *See* 35 U.S.C. § 284. When – as here – there are multiple infringers, SUS is entitled to seek just compensation from each of them. *See, e.g., ArrivalStar v. Meitek,* No. 2:12-cv-01225-JVS, Dkt No. 55, p. 8 (C.D. Cal. Nov. 20, 2012) ("evidence that ArrivalStar has filed suit against many other parties does not, by itself, prove that litigation is unjustified or baseless."). It would certainly be improper if SUS had brought suit against multiple defendants if it lacked a good faith basis to believe they infringed the '683 patent. However, that is not the case and there is no evidence of it being the case. Despite Newegg having the burden of proving an exceptional case by clear and

convincing evidence, Newegg has chosen to rely upon rhetoric instead of facts, and it has not proven that SUS lacked a good faith basis to contend infringement against any defendant, much less against Newegg. In fact, Newegg's Motion in the District Court was devoid of any evidence of non-infringement. Further, the limited record of exceptional case proceedings, especially on appeal, is inappropriate for adjudicating the merits of infringement, especially based upon Newegg's failure to develop any factual record in support of its allegations.

Newegg next complains that SUS joined all of the defendants in a single lawsuit. However, this suit was filed before the enactment of the AIA, and at that time joinder was proper. Moreover, joinder of defendants who infringe the same claim in a similar manner makes sense in terms of judicial efficiency and party efficiency. Also, here again, Newegg feigns indignation about an issue that it never complained about in the District Court. Newegg had the opportunity to move for severance if it deemed joinder to be improper, but it did not do so.

Newegg alleges that SUS made "immediate settlements" in order to "avoid exposing its baseless infringement claims and the invalidity of its patent." Again, Newegg's broad allegations lack factual support. SUS timely filed infringement contentions and responded to validity arguments during *Markman* briefing. As to the timing of settlements, this case was filed on May 11, 2010. A161. The nine settlement agreements appended to Newegg's Motion were signed as follows: one

in October 2010, three in November 2010, one in December 2011, two in April 2011, and two in June 2011. *See* A2252-A2348. This was not immediate, nor does the settlement history of this case evidence an effort to avoid the merits. In fact, the great majority of defendants were still in the case through *Markman*. Further, even as to settlements reached early in the case, Newegg has failed to explain how such settlements are *per se* improper. The District Court correctly held that, "attempts to settle claims early in the litigation for costs lower than the amounts of a defense are not sufficient, alone, to find subjective bad faith." A28.

### 11. Newegg's Reliance upon *Eon-Net* for objective bad faith is misplaced.

The *Eon-Net* case that Newegg relies so heavily upon represents an egregious set of facts. *See Eon-Net,* 652 F.3d at 1317-22. In *Eon-Net*, after entering an order of non-infringement, the District Court found the case to be exceptional, based upon numerous factual determinations, including:

- That Eon-Net initially sued Flagstar for infringing a patent that its supplier had already licensed. *Id.* at 1317.
- That, even after Eon-Net amended its complaint to add non-licensed patents, its position applying the claims to information from websites was baseless because the written description "clearly refute[d]" it by "repeatedly and consistently defin[ing] the invention as a system that processes information derived from hard copy documents." *Id.* at 1322.
- That Eon-Net and its counsel destroyed relevant documents and Eon–Net intentionally did not implement a document retention plan. *Id.* at 1324.
- That Eon–Net engaged in "offensive" litigation tactics. *Id.* at 1318 and 1325. In particular, Eon–Net failed to engage the claim construction process in good faith, *Id.* at 1325; and that Eon-Net's principal, Mr. Medina, displayed a "lack of regard for the judicial system" and a "cavalier attitude" towards the "patent litigation process as a whole." *Id.*

- That Eon– Net's case against Flagstar had "indicia of extortion" because it was part of Eon– Net's history of filing nearly over 100 nearly identical patent infringement complaints against companies who processed information originating from websites based on patents that "clearly and repeatedly" defined the invention as processing information that originates from hard copy documents -- with each filing accompanied by a demand for a quick settlement. *Id.* at 1326-27. Further, Eon– Net offered to settle for low amounts using an arbitrary fee schedule based on the defendant's ability to pay: $25,000 for defendants with sales less than $3,000,000; $50,000 for sales between $3,000,000 and $20,000,000; and $75,000 for sales between $20,000,000 and $100,000,000." *Id.* at 1327.

The only meaningful similarity between this case and *Eon-Net* is that the license fees, in most cases, are less than the likely cost of patent litigation. As noted above, Newegg's only support for this erroneous allegation is its citation to ten of SUS's licenses, which average $111,000 and are as high as $450,000. Certainly it is not *per se* improper to have settlements below the cost of litigation. Were the law to the contrary, then relatively small infringers could infringe patents with impunity, because they, like Newegg, could allege a "shakedown" whenever the settlement amount for their infringement is less than the expected cost of litigation.

Moreover, there is no evidence that SUS sought or obtained "quick settlements" to avoid litigating its claims. As noted above, SUS's first settlement was approximately five months after suit was filed, and the average time period between suit and settlement for the nine licenses appended to Newegg's Motion is almost nine months. Further, here the average of SUS's licenses is 23% higher than the *highest* tier of license that Eon-Net was offering in its fee schedule.

Newegg's suggestion that discounting a settlement demand for an early settlement is somehow improper is unrealistic and naïve. Defendants routinely and consistently demand discounts from actual damages in exchange for entering in to a settlement early in a litigation while risk and uncertainty exists for both sides.

Moreover, unlike the *Eon-Net* case, SUS's settlement metric was not arbitrary and based on a defendants' ability to pay higher amounts. Further, the amounts of SUS's settlements, as reflected by their varying amounts, were based upon reasonable judgment using available information about the extent of use and relative importance of the patented technology in general and available information about the extent of use and relative importance of the patented technology specifically to each defendant. A2570. *See Uniloc*, 632 F.3d at 1312–15. In view of the patented technology, in calculating settlement metrics, SUS took into account factors comprising the URL count, with flexibility given if the accused functionality was less important to the business, including in consideration of feedback from defendants, ALEXA ratings, how many visitors reached the site from search engine searches, and how many visitors are from the United States. *Id.*

## 12. SUS's post-*Markman* dismissals reflect reasonableness, not subjective bad faith.

Newegg alleges without support that a "typical troll plan" was somehow "thwarted" by Defendants when SUS dismissed its claims, somehow suggesting that SUS's actions following the *Markman* hearing evidence bad faith. To the contrary,

when the District Court indicated verbally at the *Markman* hearing that it had concerns that four terms were indefinite, rather than prolong the litigation, and in deference to the District Court's determination, SUS acted prudently by promptly offering to dismiss its claims against the remaining Defendants. A1682; A1901. Had SUS not done so, Newegg would no doubt now be arguing that SUS improperly prolonged the litigation by not dismissing its claims after receiving an adverse ruling.

SUS's decision to act prudently and dismiss Newegg rather than seek reconsideration or appeal of the Court's claim construction should not be held against it. *See Visto Corp.*, 2007 WL 160942 at *2 ("If fees are too readily awarded under § 285 when a patent holder extends a covenant not to sue resulting in dismissal of the case, then such covenants and the beneficial economies and finality attendant thereto might be unduly discouraged."). *See also American Technology v. American Future*, 2012 WL 859345, *6 (M.D. Fla. 2012) (noting that voluntary dismissal of suit before summary judgment or trial weighed against award of attorney's fees).

### C. Newegg has not shown that the District Court committed clear error in finding Newegg had not shown by clear and convincing evidence that SUS had brought meritless infringement claims. In fact, Newegg can point to no evidence in the record that SUS's infringement claims lacked merit.

In a meritless attempt to liken this case to *Eon-Net*, again and again Newegg baselessly alleges that somehow SUS's infringement theories lacked merit and were brought in subjective bad faith. While it is true that an invalid claim cannot be

infringed, Newegg has not shown that SUS subjectively knew that claim 8 was invalid due to the lack of corresponding algorithm structure in the specification. As noted above, SUS acted reasonably and in good faith in relying upon the presumption of validity; upon its reasonable, good faith claim construction positions that a special purpose computer was involved, and upon the reasoned analysis of its technical expert Dr. Lavian that a special purpose computer was involved. The court's resolution of a good faith legal and factual dispute between the parties, involving a complex area of the law, does not evidence bad faith.

As to the merits of infringement, Newegg has not shown that SUS's infringement claims lacked factual or technical merit, including relative to the claims as construed by the District Court. Newegg's hyperbole and unsworn lawyer argument are not evidence and have no support in the record. Newegg goes too far in asking this Court to adjudicate the merits of infringement for the first time on appeal and to find bad faith based upon Newegg's *ipsa dixits* which have no evidentiary support from the record.

### D. Newegg's discussion of "recent policy considerations" is irrelevant.

Apparently hoping to induce this Court into disregarding the facts, the law, and its duty to judge litigants and cases impartially, Newegg argues that "recent policy considerations" somehow override the lack of factual support for Newegg's exceptional case motion. Baseless litigation is unacceptable. However, this case

was not brought baselessly, and thus it is not part of the problem. SUS trusts that this Court will judge this case on the merits and disregard Newegg's invitation to ignore the merits based upon Newegg's tirade against alleged "patent trolls."

### E. Newegg's fee request is inappropriate and unfounded.

The District Court properly denied Newegg's fee request *in toto* because this is not an exceptional case.  Newegg's brief seems to suggest that this Court could somehow grant Newegg's fee request without any determination from the District Court of the appropriateness of the amounts requested. Newegg's position is inappropriate and unfounded.  SUS's briefing in the District Court addressed how Newegg's fee claim was woefully deficient and lacked sufficient details to for credibility or reliability. A2381-81 (*citing Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir.1992)); and *Villa San Clemente LLC v. County of Orange*, 2012 WL 3834629, *7 (Cal.App. 4 Dist. Sept. 4, 2012). The decision whether to grant fees at all is within the discretion of the District Court. *Group One v. Hallmark*, 407 F.3d 1297, 1308-09 (Fed. Cir. 2005). Further, the Federal Circuit has recognized the "substantial [] reputational impact of an award of attorney fees." *Eon-Net*, 652 F.3d at 1324. Finally, "[t]he amount of the attorney fees [awarded] depends on the extent to which the case is exceptional," *Highmark,* 687 F.3d at 1308, which, at a minimum, weighs heavily against the relief requested by Newegg.

Accordingly, Newegg's fee request to this Court is inappropriate and unfounded. Should this Court find this to be an exceptional case, then it would need to remand the matter to the District Court to determine what, if any, fees have been properly documented or should be awarded.

## VI. CONCLUSION

Newegg failed to show by clear and convincing (1) that no reasonable litigant could reasonably expect success on the merits (i.e., the objective prong); or (2) that any lack of objective foundation was either known or so obvious that it should have been known by Site Update (i.e., the subjective prong). *Highmark*, 687 F.3d at 1308. Further, Newegg has failed to show that the District Court committed clear error in finding a lack of bad faith and the subjective prong not met. Although Newegg bears the burden of proof by clear and convincing evidence, SUS has demonstrated that all of Newegg's complaints are unfounded, or just plain erroneous.

In reality, the claim construction issues in this case were issues in legitimate dispute which were supported by well reasoned briefing and arguments by SUS, as well as the well reasoned declaration of SUS's expert Dr. Lavian, who was not challenged for lacking qualifications or under Rule 702. Further, it should be noted that the defendants were the first to submit an expert declaration. If their proposed constructions were so crystal clear from the specification, they would not have needed an expert to support them. Finally, it should be noted that the District Court

did not wholesale adopt either side's claim construction positions, which also illustrates the difficult issues involved and that the issues were not clear cut. The defendants were not clearly right, nor was SUS clearly wrong. As correctly found by the District Court, "SUS may have been on the losing side of several arguments, but losing is not enough to warrant a finding of objective baselessness and also subjective bad faith." A33.

Accordingly, Newegg's appeal should be in all respects denied and the District Court's denial of Newegg's exceptional case motion should be affirmed.

Respectfully submitted,

Dated: November 8, 2013

*/s/ John J. Edmonds*
John J. Edmonds
Stephen F. Schlather
Shea Palavan
Collins, Edmonds, Pogorzelski,
Schlather & Tower, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone: (281) 501-3425
Facsimile: (832) 415-2535
jedmonds@cepiplaw.com
sschlather@cepiplaw.com
spalavan@cepiplaw.com

Attorneys for Plaintiff-Appellee SITE UPDATE SOLUTIONS LLC

## VII.    CERTIFICATE OF SERVICE

I, John J. Edmonds, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On November 8, 2013, a copy of the foregoing Brief for Plaintiff-Appellee was filed electronically with the Clerk of the Court using the CM/ECF System, which will serve via electronic mail notice of such filing to all counsel registered as CM/ECF users. Paper copies will also be sent to all opposing counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the electronically filed document, six paper copies will be filed with the Court via courier within the time provided by the Court's rules.

Dated: November 8, 2013                  /s/ *John J. Edmonds*
                                         John J. Edmonds

                                         COLLINS, EDMONDS, POGORZELSKI,
                                         SCHLATHER & TOWER, PLLC

## VIII. CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A), because it contains <u>13,713</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Times New Roman.

Dated: November 8, 2013              <u>/s/ *John J. Edmonds*    </u>
                                     John J. Edmonds

                                     COLLINS, EDMONDS, POGORZELSKI,
                                     SCHLATHER & TOWER, PLLC